# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHANDS JACKSONVILLE MEDICAL | ) | |
| CENTER, INC., *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case Nos. 14-cv-00263-EGS *et al*. (cons) |
| | ) | (14-cv-01477-EGS) |
| SYLVIA M. BURWELL, Secretary, | ) | |
| Department of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS ST. HELENA HOSPITAL *ET AL*.'S
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

Page

I.    ARGUMENT ......................................................................................................1

    A.    The Reduction Contravenes the Medicare Statute's Per-Discharge
        Reimbursement System and Exceeds the Secretary's Statutory Authority .............1

        1.    The Secretary Lacks Statutory Authority to Impose the Reduction
            Because It Is Neither an Exception Nor an Adjustment Within the
            Meaning of the Medicare Act ....................................................................1

        2.    The Statute's Structure and the Context of Subsection (d)(5)(I)(i),
            Combined with the Plain Language of the Provision,
            Unambiguously Fail to Authorize the Secretary to Impose System-
            Wide or Fundamental Changes to the IPPS ...................................................4

        3.    The Secretary Wholly Lacks Statutory Authority to Implement the
            Reduction for Capital-Related Costs ...........................................................6

    B.    The Secretary's Defense of Her Procedurally Invalid Rulemaking Lacks
        Merit........................................................................................................6

    C.    The Secretary Ignores the Reasons Why the Reduction Is Arbitrary and
        Capricious ..............................................................................................13

    D.    The Reduction Is Illogical......................................................................16

II.   CONCLUSION....................................................................................................18

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Adirondack Med. Ctr. v. Sebelius*,
    740 F.3d 692 (D.C. Cir. 2014) ...........................................................................2, 3

\* *Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014) ..............................................................................12

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
    271 F.3d 262 (D.C. Cir. 2001) ...........................................................................4, 5

*Amgen Inc. v. Smith*,
    357 F.3d 103 (D.C. Cir. 2004) ................................................................................1

*Atrium Med. Ctr. v. U.S. Dep't of Health & Human Servs.*,
    766 F.3d 560 (6th Cir. 2014) ................................................................................14

*Brennan v. Solis*,
    934 F. Supp. 2d 297 (D.D.C. 2013) ......................................................................18

*Brock v. Cathedral Bluffs Shale Oil Co.*,
    796 F.2d 533 (D.C. Cir 1986) ..........................................................................10, 11

*Cape Code Hosp. v. Sebelius*,
    630 F.3d 203 (D.C. Cir. 2011) ..............................................................................13

*City of Williams v. Dombeck*,
    151 F. Supp. 2d 9 (D.D.C. 2001) ..........................................................................11

*Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*,
    673 F.2d 525 (D.C. Cir. 1982) ...........................................................................7, 9

*Friends of the Boundary Waters Wilderness v. Bosworth*,
    437 F.3d 815 (8th Cir. 2006) ................................................................................14

*Landers v. Leavitt*,
    545 F.3d 98 (2d Cir. 2009) ....................................................................................14

*Marshall Cnty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) ............................................................................18

---

\* Authorities upon which we chiefly rely are marked with asterisks.

* *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
512 U.S. 218 (1994) .................................................................................... 1, 2, 4

*Miami-Dade Cnty. v. EPA*,
529 F.3d 1049 (11th Cir. 2008) ............................................................................ 13

*Molycorp, Inc. v. EPA*,
197 F.3d 543 (D.C. Cir. 1999) ............................................................................. 10

* *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007) ........................................................................ 8, 12

*Paroline v. United States*,
134 S. Ct. 1710 (2014) ........................................................................................... 5

*R.I. Hosp. v. Leavitt*,
548 F.3d 29 (1st Cir. 2008) .................................................................................. 11

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
132 S. Ct. 2065 (2012) ........................................................................................... 4

*Salt River Project Agric. Improvement & Power Dist. v. United States*,
762 F.2d 1053 (D.C. Cir. 1985) ........................................................................... 14

*United States v. Johnson*,
632 F.3d 912 (5th Cir. 2011) ............................................................................... 13

*Wilderness Soc'y v. Norton*,
434 F.3d 584 (D.C. Cir. 2006) .................................................................... 9, 10, 11

**STATUTES**

42 U.S.C. § 1395hh(a)(2) ....................................................................................... 12

42 U.S.C. § 1395ww(d)(3)(A)(vi) ........................................................................... 5

42 U.S.C. § 1395ww(d)(5) .................................................................................... 5, 6

42 U.S.C. § 1395ww(d)(5)(B) ................................................................................ 11

42 U.S.C. § 1395ww(d)(5)(I) ................................................................................ 4, 5

* 42 U.S.C. § 1395ww(d)(5)(I)(i) ..................................................................... *passim*

42 U.S.C. § 1395ww(d)(5)(I)(ii) ........................................................................... 4, 5

42 U.S.C. § 1395ww(g) ............................................................................................ 6

**RULES**

Fed. R. Civ. P. 12(b)(6)..............................................................................................................18

50 Fed. Reg. 24,366 (June 10, 1985) ............................................................................................2

**GLOSSARY OF PERTINENT ABBREVIATIONS AND ACRONYMS**

APA       --       Administrative Procedure Act

IPPS      --       Inpatient Prospective Payment System

MS-DRG    --       Medicare Severity Diagnosis-Related Group

RR        --       Rulemaking Record

# I.     ARGUMENT

**A.     The Reduction Contravenes the Medicare Statute's Per-Discharge Reimbursement System and Exceeds the Secretary's Statutory Authority**

> 1.     The Secretary Lacks Statutory Authority to Impose the Reduction Because It Is Neither an Exception Nor an Adjustment Within the Meaning of the Medicare Act

The Secretary asserts that the plain language of 42 U.S.C. § 1395ww(d)(5)(I)(i) confers upon her virtually unfettered discretion to implement adjustments.  Sec'y Br. at 15-16.  This case, however, does not involve an "adjustment" within the plain meaning of the statute, and it does not necessarily follow that a broad adjustment authority permits the Secretary to rebase IPPS payments or adopt system-wide reductions designed to eliminate reimbursement for anticipated discharges.

A change to the IPPS is only permissible under subsection (d)(5)(I)(i) if it is in fact an adjustment.  Words like "adjustment" or "modification," however, refer to "moderate change" and have a "connotation of increment or limitation."  *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225, 228 (1994); *see also Amgen Inc. v. Smith*, 357 F.3d 103, 117 (D.C. Cir. 2004) ("[S]imilar limits inhere in the term 'adjustments' to those the Supreme Court found in the word 'modify.'").  Thus, the Secretary's adjustment authority does not include the power to make broad changes to the IPPS, which, at its core, relies on discrete annual updates to the standardized amount and a per-discharge payment methodology.[1]

Despite the sweeping breadth and novel nature of the Reduction, the Secretary attempts to characterize it as a mere adjustment of insignificant magnitude that does not disturb the IPPS's per-discharge payment methodology.  The Secretary's reliance on the size of the Reduction (0.2

---

[1] The Secretary suggests that the statute gives her authority to implement "exceptions *and reductions*."  Sec'y Br. at 2 (emphasis added).  The statute says "adjustments," not "reductions." 42 U.S.C. § 1395ww(d)(5)(I)(i).

percent) is misplaced and finds support in neither case law nor statute.  Sec'y Br. at 17.  Determining "whether a change is minor or major depends to some extent upon the importance of the item changed to the whole."  *MCI*, 512 U.S. at 229.  Here, the Reduction cuts at the per-discharge payment system established by Congress for inpatient care.  In addition, it impermissibly rebases the standardized amount.  As the Secretary has previously acknowledged, the Medicare Act does not authorize the Secretary to rebase the standardized amount; rather, it establishes the methodology and process for annually updating the standardized amount from year to year.  Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1986 Rates, 50 Fed. Reg. 24,366, 24,390 (June 10, 1985) ("We do not believe that section 1886(d) of the Act contemplates rebasing the standardized amounts.  Rather, it directs that the rates be updated annually.").  For these reasons, the Reduction falls outside the scope of a mere "adjustment."

The Secretary contends that the Reduction does not in fact disturb the per-discharge payment basis of the Medicare system and therefore is not a fundamental change.  In proposing and finalizing the Reduction, however, the Secretary made explicit her intent to deny payment for 40,000 anticipated discharges.  *See* RR 728.  Although the Reduction may be applied on a per-discharge basis, its objective runs contrary to the nature of the per-discharge payment system enacted by Congress.

The Secretary mistakenly contends that the amount of the Reduction (0.2 percent) transforms the Reduction into a mere adjustment.  Sec'y Br. at 17.  While the Secretary touts the larger magnitude of the adjustment at issue in *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014), which was approximately 2.9 percent, the Secretary ignores at least two key differences between *Adirondack* and this case.

First, the Secretary in *Adirondack* implemented a downward prospective adjustment to hospital-specific rate payments used for rural and sole community hospitals in order to address

coding changes that accompanied the revamping of the diagnosis coding system.  740 F.3d at 695–6.  Such hospitals represent a minority of all hospitals reimbursed under the IPPS.  In contrast, the Reduction applies to every IPPS hospital in the country, and every discharge.  The St. Helena Plaintiffs have found no precedent for the Secretary's adoption of an across-the-board payment reduction impacting every IPPS hospital and applying to every discharge, and the *Adirondack* court did not have occasion to determine whether a sweeping reduction like that at issue here exceeds the bounds of the Secretary's adjustment authority.

Second, *Adirondack* involved a payment adjustment designed to "combat *artificial* increases in payment amounts, i.e., to minimize the hospitals' receipt of funds for expenses they have not incurred."  740 F.3d at 701.  In contrast, the Secretary here is not targeting a "difficult and legitimate problem" that would otherwise confer a "financial windfall."  *Id.*  Instead, the Reduction seeks to offset reimbursement from an anticipated 40,000 medically appropriate inpatient discharges that the Secretary believes will result from the two-midnight policy.  RR 1360-61.  The Secretary does not contend that these inpatient discharges would be improper or that hospitals would receive a windfall absent the Reduction.  Instead, the Secretary seeks to eliminate reimbursement for wholly proper inpatient care through an across-the-board adjustment that cuts at the very nature of the discharge-based reimbursement system adopted by Congress.

As such, the Reduction is far more radical than the adjustment at issue in *Adirondack*. Because it cuts at the core of the IPPS and impacts every IPPS hospital in the country, the Reduction effects a change to the IPPS of a remarkable and unprecedented magnitude.  As such, it exceeds the scope of the Secretary's adjustment authority and is instead a fundamental change to the IPPS not authorized by Congress.

2. The Statute's Structure and the Context of Subsection (d)(5)(I)(i), Combined with the Plain Language of the Provision, Unambiguously Fail to Authorize the Secretary to Impose System-Wide or Fundamental Changes to the IPPS

The Secretary contends that the Court should confine itself to the plain language of subsection (d)(5)(I)(i) in isolation to discern the provision's meaning. Sec'y Br. at 17. However, in determining a statute's unambiguous meaning, courts are not "confine[d] . . . to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 267 (D.C. Cir. 2001) (internal quotation marks and citation omitted). In doing so, a court must "exhaust the traditional tools of statutory construction" to determine congressional intent. *Id.* (internal quotation marks and citation omitted). Ultimately, "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." *MCI*, 512 U.S. at 229.

Here, the context and placement of subsection (d)(5)(I)(i) limit the Secretary's adjustment authority. First, subsection (d)(5)(I) contains two clauses, the second of which would be rendered wholly superfluous under the Secretary's boundless interpretation of the first clause. Subsection (d)(5)(I)(ii) confers on the Secretary the specific authority to change "each of the average standardized amounts determined under paragraph (3)" when the Secretary makes an adjustment for transfer cases under subsection (d)(5)(I)(i). Where "a general authorization and a more limited, specific authorization exist side-by-side," the general/specific canon operates to avoid "the superfluity of a specific provision that is swallowed by the general one, violat[ing] the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (internal quotation marks and citation omitted). Reading subsection (d)(5)(I)(i) in context thus indicates that the

Secretary's authority to adjust "payment amounts" does not encompass the authority to change "each of the average standardized amounts." 42 U.S.C. § 1395ww(d)(5)(I).

Remarkably, however, the Secretary ignores the existence of subsection (d)(5)(I)(ii), contending that the Secretary's adjustment authority appears in a "self-contained statutory provision." Sec'y Br. at 20. This contention strains credulity. The Secretary, without asserting any interpretation of subsection (d)(5)(I) that would allow it to be read as a coherent whole, then contends that because the *Adirondack* court concluded that subsection (d)(3)(A)(vi) does not have preclusive effect on the Secretary's adjustment authority, no other provision of the Medicare Act may have such preclusive effect. Sec'y Br. at 23-24. The conclusion that the enactment of a specific authorization in a distant paragraph of § 1395ww did not operate to strip the Secretary of her authority to enact targeted adjustments for particular types of hospitals does not control this case. Here, the Secretary finalized a far more sweeping and wholly untargeted payment reduction under an overbroad interpretation of her adjustment authority that renders the very next clause of the statute superfluous. Basic canons of statutory construction prohibit a provision from being read entirely out of context, *see Am. Bankers Ass'n*, 271 F.3d at 267, yet the Secretary insists that such a decontextualized interpretive approach is appropriate here.

Second, subsection (d)(5)(I) is part of subsection (d)(5), which enumerates specific types of authorized exceptions and adjustments to hospital reimbursement amounts. Each paragraph in subsection (d)(5) addresses discrete issues that arise in unique cases (e.g., extraordinarily expensive outlier cases) or result in payment inequities for particular types of hospitals (e.g., Medicare-dependent hospitals). It is a "familiar canon of statutory construction that catchall clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated." *Paroline v. United States*, 134 S. Ct. 1710, 1721 (2014) (citation omitted). The Secretary makes no attempt to explain how her interpretation of subsection (d)(5)(I)(i) bears any similarity to the

targeted adjustment and exception provisions enumerated in subsection (d)(5).  Rather, the Reduction at issue here is entirely unlike the other modifications to hospital reimbursement contemplated under subsection (d)(5).

   3.   The Secretary Wholly Lacks Statutory Authority to Implement the Reduction for Capital-Related Costs

As the St. Helena Plaintiffs' opening brief explained (at 18-19), the statutory authority cited by the Final Rule for implementing the Reduction for capital-related costs—42 U.S.C. § 1395ww(g)—does not empower the Secretary to undertake across-the-board payment reductions.  The Secretary's brief provides no defense of the Final Rule's invocation of subsection (g).  Instead, the Secretary cursorily asserts that her analysis of the exceptions and adjustments authority under subsection (d)(5)(I)(i) "applies equally to Plaintiffs' challenge to the Secretary's reduction for capital-related costs."  Sec'y Br. at 14 n.5.  That is clearly incorrect.  Apart from the fact that the Final Rule did not rely upon subsection (d)(5)(I)(i), that subsection only applies to exceptions and adjustments for *operating* costs.  Subsection (d) establishes the payment amount for operating costs, and subsection (d)(5)(I)(i) is limited to exceptions and adjustments "to such payment amounts *under this subsection*."  (Emphasis added.)

**B.   The Secretary's Defense of Her Procedurally Invalid Rulemaking Lacks Merit**

As the St. Helena Plaintiffs explained in their opening brief (at 20-23), the Reduction is procedurally invalid and must be set aside because the Secretary failed to provide meaningful notice and opportunity to comment by omitting from the Proposed Rule any explanation as to how her actuaries reached their conclusion that the two-midnight policy would cause a net increase in inpatient encounters that would necessarily raise Medicare expenditures by approximately $220 million.  RR 577, 728.  That actuarial conclusion was no trivial detail; it served as the Secretary's *sole* justification for the Reduction.  *Id.*  Rather than provide the necessary infor-

mation in the Proposed Rule or accede to commenters' reasonable requests for the missing in-

formation prior to the close of the comment period so as to allow a meaningful opportunity to

comment, the Secretary refused to disclose *any* information regarding her actuaries' methodolo-

gy and analysis until the Final Rule.  RR 1361.  The Reduction also should be set aside because

the Secretary failed to codify the Reduction in a regulation, as explicitly required by subsection

(d)(5)(I)(i).

      The Secretary responds that she committed no procedural error and that, even if she did,

any such error was harmless.  Sec'y Br. at 27-37.  The Court should reject the Secretary's argu-

ments.

      1.     The Secretary failed to provide meaningful notice and opportunity to comment.

Contrary to the Secretary's assertion (at 29-30), the agency conduct at issue in *Conn. Light &*

*Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525 (D.C. Cir. 1982), differs in two critical

respects from that at issue here.  In *Connecticut Light & Power*, a utility complained that an

agency's notice of proposed rulemaking failed to identify technical studies on which the agency

relied in proposing new safety standards for nuclear power plants.  *See id.* at 530–32.  Important-

ly, the technical studies at issue in *Connecticut Light & Power* were publicly available and had

already been subjected to "widespread public comment."  *Id.* at 532.  While the D.C. Circuit

criticized the agency for failing to mention the technical studies in the proposed rule, given that

the technical studies were publicly available and had been subjected to "adversarial comment,"

the appellate court found that the agency's conduct "barely" met the APA's minimum procedural

requirements for notice-and-comment rulemaking.  *Id.* at 528, 532.

      Here, in contrast, the Secretary held in secret the details of her actuaries' analysis, thus

precluding public comment on "the exercise of actuarial judgment" that the Secretary apparently

uncritically accepted.  Inexplicably, the Secretary disclosed some of the general contours of her

actuaries' methodology in the Final Rule and in a memorandum issued by her actuaries weeks after the Final Rule was signed (RR 1361, 2046-48), but the Secretary properly does not argue that these after-the-fact statements can be considered when assessing whether the procedural requirements of the APA have been met.  This regulatory sandbagging violates the law of this Circuit.  *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 201 (D.C. Cir. 2007) (finding agency violated APA by first disclosing critical methodology in final rule).[2]

Nor is the Secretary correct in claiming (at 29) that the "underlying assumptions" of her actuaries' methodology were "adequately identified and made accessible to the public to permit meaningful comment during the rulemaking process."  As explained in the St. Helena Plaintiffs' opening brief (at 20-21), the first time the Secretary disclosed any of her actuaries' assumptions was in the Final Rule itself.  *See, e.g.*, RR 1361 (revealing actuaries had excluded non-surgical MS-DRG cases when estimating how many encounters would switch from inpatient to outpatient).  That her actuaries may have applied their undisclosed methodology and assumptions to publicly available "inpatient and outpatient data sources," Sec'y Br. at 29, is immaterial.  Merely having access to the general universe of data against which an agency could apply a methodology does not permit the public to meaningfully comment on the undisclosed methodology actually used by the agency, particularly where, as here, the Secretary acknowledges that the actuaries' analysis was based on "a reasonable estimate of potential future experience that encompassed an examination of historical data *and* the exercise of actuarial judgment."  Sec'y Br. at 34.

---

[2] The St. Helena Plaintiffs' opening brief explained (at 29 n.12) that the Court should strike the actuarial memorandum from the rulemaking record because it postdates the rulemaking.  The Secretary's brief ignores, and effectively concedes, this issue.

The Secretary argues that the plaintiff-hospitals "would prefer" that her estimates of a new policy's impact be an "accounting exercise" where an examination of historical data "yields a single inescapable conclusion." Sec'y Br. at 33. This is a red herring because the St. Helena Plaintiffs express no "preference" other than the Secretary follow the law of this Circuit, which requires that she "identify and make available technical studies and data that [she] has employed in reaching the decisions to propose particular rules." *Connecticut Light & Power*, 673 F.2d at 530. Her failure to do so in this case constitutes "serious procedural error." *Id.* While predicting the "behavioral consequences of hospitals confronted with new or clarified rules" may not be a simple accounting exercise yielding a single answer, Sec'y Br. at 33, publicly disclosing the "actuarial judgment" that the Secretary relied on to make such a prediction is simply required by the APA.

2.      The Secretary also failed to adopt the Reduction in the form of a "regulation," as required by the plain language of subsection (d)(5)(I)(i). Instead, she merely included the Reduction within hundreds of pages of preamble text in the Proposed Rule, RR 576-77, 728-29, and Final Rule, RR 915-16, 1361-62. The Secretary asserts that the Reduction is a "regulation" because it allegedly meets three factors set forth in *Wilderness Soc'y v. Norton*, 434 F.3d 584, 595 (D.C. Cir. 2006). Sec'y Br. at 44. Her argument fails for two reasons.

First, the *Wilderness* factors were not used to determine whether preamble language was a "regulation" for purposes of a statute requiring same, but were analyzed to determine whether an agency's internal policies were a judicially enforceable "binding norm or merely a statement of policy" exempt from the APA's rulemaking requirements. 434 F.3d at 595. Therefore, even

if the Reduction met the three factors, it would only prove that the Reduction is a judicially enforceable "binding norm," not a "regulation" as required by subsection (d)(5)(I)(i).[3]

Second, the Secretary misconstrues one of the factors.  She apparently reads the second factor—"whether the action was published in the Federal Register *or* the Code of Federal Regulations," *Wilderness*, 434 F.3d at 595 (emphasis added)—to mean that publication in the Federal Register alone is sufficient to convert an agency statement into a "regulation."  *See* Sec'y Br. at 44.  Not so.  The D.C. Circuit in *Wilderness* found that, although the policies at issue had twice been published in the Federal Register, "more significantly, [the policies were never published] in the Code of Federal Regulations."  434 F.3d at 596.  Moreover, the court in *Wilderness* went on to quote the following critical passage from *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir 1986):

> *Failure* to publish in the Federal Register is indication that the statement in question was *not* meant to be a regulation since the [APA] requires regulations to be so published.  The converse, however, is not true: *Publication* in the Federal Register does *not* suggest that the matter published was meant to be a regulation, since the APA requires general statements of policy to be published as well.  The real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents "having general applicability and *legal effect*," and which the governing regulations provide shall contain only "each Federal *regulation* of general applicability and current or future effect."

*Wilderness*, 434 F.3d at 596 (quoting *Brock*, 796 F.2d at 538-39) (internal quotation marks and citations omitted) (emphases supplied by *Wilderness* court).

By quoting *Brock*, the court in *Wilderness* clarified that use of the disjunctive "or" in the second factor did not mean that publication in the Federal Register alone was sufficient to make

---

[3] Similarly, in *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999), the statute being analyzed applied to "final regulations, requirements, and denials of petitions to promulgate, amend or repeal a regulation."  As such, the above factors were applied to more than just strictly "regulations."  Demonstrating that the factors were met would not conclusively render agency action a "regulation."

an agency policy a "regulation." *See id. See also City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 22 (D.D.C. 2001) (explaining that "the law in this circuit [established by *Brock*] expressly rejects publication in the Federal Register as the hallmark of a regulation"). A policy merely discussed within hundreds of pages of preamble text, which is not thereafter codified in the Code of Federal Regulations, is not a "regulation."

The Secretary herself has previously argued that in order to be a "regulation," a statement must be codified in the Code of Federal Regulations. *See R.I. Hosp. v. Leavitt*, 548 F.3d 29, 40 (1st Cir. 2008). The statute at issue in *Rhode Island Hosp.* instructed the Secretary to compute additional Medicare payments for certain costs "in the same manner as the adjustment for such costs under regulations (in effect as of January 1, 1983) . . . ." 42 U.S.C. § 1395ww(d)(5)(B). Because the Secretary had never codified the manner in which she made the adjustment, and instead had made the adjustment in Federal Register notices, the Secretary argued that there were no relevant "regulations" in effect on January 1, 1983. *R.I. Hosp.*, 548 F.3d at 40. The First Circuit rejected the Secretary's argument because of unambiguous legislative history demonstrating that Congress intended to maintain the methodology in effect on January 1, 1983, regardless of whether that methodology had been codified. *Id.* at 40. No such legislative history exists in this case. Moreover, the Secretary's codification argument in *Rhode Island Hosp.* would have stripped the statute of any practical effect. Here, in contrast, codification gives effect to Congress's command that such exercise occur by "regulation."

Congress had good reason to impose the "regulation" requirement in subsection (d)(5)(I)(i). The Secretary annually publishes thousands of pages of dense text in the Federal Register. The Proposed Rule alone was over 300 pages, RR 564-902, only five paragraphs of which discussed the Reduction, RR 576-77, 728-29. The Final Rule was over 500 pages, RR 903-1448, less than five of which discussed the Reduction, RR 1154-55, 1360-62. By requiring

the Secretary to exercise her "exceptions and adjustments" authority by "regulation," Congress insured that both it and the public would not have to search for needles in haystacks in order to identify significant policy changes effectively negating Congress's detailed statutory formula for calculating Medicare payments. Instead, Congress and the public could easily identify such changes in the few pages of actual regulatory text that typically accompany the Secretary's rule-making in this context. *See, e.g.*, RR 834-38 (text of all proposed regulatory amendments in Proposed Rule); RR 1373-79 (text of all regulatory amendments in Final Rule).

3. The Court should reject the Secretary's harmless-error argument, Sec'y Br. at 36, because the rulemaking requirements imposed by the Medicare Act contain no harmless-error exception. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014) (noting same but rejecting Secretary's harmless-error argument on other grounds). In relevant part, 42 U.S.C. § 1395hh(a)(2) instructs that "[n]o rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the . . . payment for services . . . under [Medicare] shall take effect unless it is promulgated by the Secretary by regulation . . . ." This shall-not-take-effect command is plain and unambiguous.

Further, even assuming *arguendo* that the APA's harmless-error exception applies, the St. Helena Plaintiffs need only identify with reasonable specificity those portions of the methodolo-gy and analysis to which they object and how they might have responded if they had been given sufficient information to comment meaningfully on them. *Owner-Operator*, 494 F.3d at 202. The St. Helena Plaintiffs' opening brief describes in detail (at 21-22, 25-30) what portions of the methodology and analysis made public in the Final Rule are objectionable and how they might have responded had the Secretary subjected them to public scrutiny. For example, the St. Helena Plaintiffs explained (at 27) how the actuaries' exclusion of non-surgical cases resulted in a flawed analysis because the two-midnight policy applies to surgical and non-surgical cases alike.

*See also* Bakersfield Pls. Br. at 29, ECF No. 15 (highlighting same); Am. Hosp. Ass'n Pls. Br. at 21, ECF No. 16 (same); Shands Pls. Br. at 29, ECF No. 17-1 (same); Athens Pls. Br. at 12-17, ECF No. 19-1 (same).   Accordingly, the Secretary's assertion that her procedural violations caused no prejudice lacks merit.[4]

## C.   The Secretary Ignores the Reasons Why the Reduction Is Arbitrary and Capricious

The Secretary has fallen far short of overcoming the St. Helena Plaintiffs' showing that her imposition of the Reduction was so incomplete and flawed so as to be arbitrary and capricious.  *See* St. Helena Pls. Br. at 25-30.  The bulk of the Secretary's argument on this point consists of a string cite to a litany of cases standing for the general proposition that agency decisions are entitled to deference and should be upheld if there is a "rational basis" for them.  *See* Sec'y Br. at 40-42.  The St. Helena Plaintiffs do not dispute the general administrative law principles the Secretary has recited; however, they are not determinative here.

The deference owed to the Secretary's decision-making in the Medicare context is not unlimited.  Rather, whatever level of deference applies, courts must still engage in a "searching and careful review of the record to ensure that the Secretary has applied her expertise in a reasoned manner and not acted arbitrarily or capriciously . . . ."  *Cape Code Hosp. v. Sebelius*, 630

---

[4] The non-binding authorities on which the Secretary relies (at 36-37) are factually inapposite.  *See United States v. Johnson*, 632 F.3d 912, 931–32 (5th Cir. 2011) (finding agency's erroneous invocation of "good cause" exception to rulemaking requirements did not prejudice criminal defendant because agency's interim rule expressly considered all arguments criminal defendant would have made had rulemaking requirements been followed); *Miami-Dade Cnty. v. EPA*, 529 F.3d 1049, 1061–62 (11th Cir. 2008) (finding environmental group was not prejudiced by final rule's elimination of proposed standard because environmental group could not show how it would have mounted a credible challenge to the proposed standard's elimination because the group had argued that the proposed standard violated the underlying statute and was arbitrary and capricious).

F.3d 203, 216 (D.C. Cir. 2011) (internal quotation marks and citation omitted).[5]   The Secretary

also is correct that in cases warranting significant deference to agency decisions, a decision may

be upheld on any rational basis proffered by the agency, subject to an important caveat.   Specifi-

cally, even where deference is afforded, if it is established that the agency relied on flawed data

and, but for those errors, there is a significant possibility the agency would have reached a differ-

ent result, the decision should be reversed.   *See, e.g.*, *Salt River Project Agric. Improvement &*

*Power Dist. v. United States*, 762 F.2d 1053, 1061 n.8 (D.C. Cir. 1985) ("When an agency relies

on a number of findings, one or more of which are erroneous, we must reverse and remand . . .

when there is a significant chance that but for the errors the agency might have reached a differ-

ent result."); *Friends of the Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 824 (8th

Cir. 2006) (affording *Chevron* deference to agency decision, but nevertheless reversing it be-

cause "the data relied upon and calculations performed [by the agency were] so unreliable or

inadequately explained as to make reliance on them arbitrary and capricious").

   The Secretary's decision here fails even under the deferential administrative review

standards she relies upon because, as the St. Helena Plaintiffs have explained previously, this is

---

   [5] The Secretary claims that it is "immaterial" whether *Chevron* or *Skidmore* deference
applies because a few cases have stated that, in matters involving complex programs like Medi-
care and Medicaid, the two standards of review start to "converge." Sec'y Br. at 14 n.6 (citing
*Landers v. Leavitt*, 545 F.3d 98, 107 (2d Cir. 2009)).   Although the St. Helena Plaintiffs
acknowledge that some courts outside this Circuit have made that point, courts have continued to
recognize that there are differences between *Chevron* and *Skidmore* review.   *See, e.g.*, *Atrium*
*Med. Ctr. v. U.S. Dep't of Health & Human Servs.*, 766 F.3d 560, 566 (6th Cir. 2014) (acknowl-
edging cases that have recognized "convergence" between *Skidmore* and *Chevron* deference in
some instances, but noting that "[t]here are . . . real differences between the two standards");
*Landers*, 545 F.3d at 107 (noting that the *Chevron* and *Skidmore* standards can "converge," but
nevertheless analyzing the agency decision at issue under *Skidmore* review).   In this regard, the
St. Helena Plaintiffs maintain that the differences between *Chevron* and *Skidmore* review remain
material and that this case should be governed by *Skidmore*.   Nevertheless, as the St. Helena
Plaintiffs' opening brief explained (at 25), the ultimate result in this case should be the same
regardless of whether *Chevron* or *Skidmore* applies because the Secretary's decision was unrea-
sonable and unsupportable.

precisely the type of situation where, but for the Secretary's methodological errors with respect to the Reduction, the results of her analysis likely would have been much different.  In our opening brief (at 27-30), the St. Helena Plaintiffs presented numerous errors the Secretary made in determining the need for, and the amount of, the Reduction and explained how, if corrected, any one of those errors would have resulted in the Secretary reaching vastly different results.  The Secretary's brief does not address, let alone refute, any of these points.  Rather, the Secretary simply picks and chooses various quotes from the rulemaking record and presents them as if they provide a coherent explanation of the methodology and analysis behind the Reduction.  They do not, and we address them immediately below.  But perhaps more importantly, such bits and pieces of information would not even have been adequate as notice even if provided in the Proposed Rule and they were not provided at all.

For example, the St. Helena Plaintiffs explained (at 27) that the Secretary erred by excluding medical cases and relying exclusively on surgical cases when analyzing the two-midnight policy's potential impact on payments.  In this regard, the quotes from the rulemaking record that the Secretary now offers provide some information regarding why she *included* surgical cases in her analysis, but say nothing about why she *excluded* medical cases.  *See* Sec'y Br. at 42-43.  Nor is the Secretary correct in suggesting (at 40) that this was a mistake made at a "granular level."  As the St. Helena Plaintiffs' opening brief explained (at 8, 27), medical cases make up a significant portion of cases impacted by the two-midnight policy.  Therefore, eliminating such cases from the calculation of the policy's impact does not anchor the forecast in the "reality" with which it must correlate.  Thus, deference or not, nothing in the Secretary's brief rebuts that it was arbitrary and capricious for the Secretary to exclude medical cases from her analysis of the two-midnight policy's impact.

Similarly, the Secretary's brief provides no rationale for the lack of symmetry in her calculations.  *See* St. Helena Pls. Br. at 27-28.  The Secretary's brief quotes (at 42-43) portions of the rulemaking record referencing observation cases, but none of those quotations come close to explaining why she did not treat observation cases uniformly in analyzing the probable impact of the two-midnight policy.  This is another aspect of the calculation that, if handled differently, could have altered the outcome dramatically.

The Secretary also fails to address the simple mathematical vulnerabilities of her projections given the level of uncertainty she has admitted with respect to the assumptions underlying those projections.  *See* St. Helena Pls.' Br. at 28-30.  The Secretary's projections, on their face, allow for a range of probable outcomes with respect to any shifts between inpatient and outpatient cases resulting from the two-midnight policy, when the uncertainty she concedes is considered.  As such, the Secretary's forecast of the outcome of the two-midnight policy is inherently flawed and unreliable.

The Secretary's methodological flaws remain as glaring and unexplained now as they did when they were first disclosed in the Final Rule.  But for any of these errors, the results of the Secretary's analysis would have been drastically different.  Therefore, the Secretary's Reduction is arbitrary and capricious, and should be set aside.

**D.**     **The Reduction Is Illogical**

The Secretary's brief makes certain statements to support her argument that the two-midnight policy would lead to increased inpatient admissions and increased cost to the Medicare program as a result.  But the Secretary's statements actually support the opposite result, as predicted by her own Office of Inspector General.  RR 1974.  Specifically, the Secretary highlights the fact that the two-midnight policy restricts the definition of an inpatient admission, yet tries to argue that the policy will somehow increase the number of inpatient admissions.

16

First, the Secretary describes how the two-midnight policy was developed in response to confusion on the part of providers in correctly identifying which services are appropriate for inpatient admission.  The Secretary points to a public comment stating that "[d]ifferentiating inpatient admission from outpatient observation has presented a major challenge for hospitals and has been the source of a great deal of lost revenue when Medicare auditors retrospectively determined that some patients admitted as inpatients could have been safely treated with outpatient observation."  Sec'y Br. at 7 (quoting RR 3509).  The Secretary goes on to cite statistics that she used responding to public comments, i.e., that inpatient hospital admissions for 1-day stays or less had a Part A improper payment rate of 36 percent, while the improper payment rates for 2-day or 3-day stays dropped to 13.2 percent and 13.1 percent, respectively.  *Id.*  With these statements, the Secretary underscores that the genesis of the two-midnight policy was a view that hospitals were inappropriately treating patients as inpatients when they should have been treated as outpatients.  It is very difficult to see how a policy designed to decrease the number of inappropriate inpatient admissions could result in an increase in inpatient admissions, as the Secretary suggests it would.

Next, the Secretary goes on to describe the elements of the two-midnight policy.  In particular, the Secretary points out that under the two-midnight policy, a physician should order admission only if he/she expects that a beneficiary's length of stay will exceed two midnights (or if the procedure is recognized as inpatient-only under Medicare regulations), and that services would be inappropriate for payment under Medicare Part A if the physician expected to keep the patient for a limited time period that did not cross two midnights.  *Id.* at 8-9.  These requirements create a more restrictive definition of an inpatient admission than that which was in effect prior to when the policy took effect.  Without more than is presented in the rulemaking record, the Secretary cannot reasonably argue that a policy that establishes a more restrictive regulatory

17

definition of an inpatient admission would lead to increase in volume of, and in turn, increased payments for, such admissions.

## II.  <u>CONCLUSION</u>

For the foregoing reasons and those contained in the St. Helena Plaintiffs' opening brief, the Court should grant the St. Helena Plaintiffs' Motion for Summary Judgment, ECF No. 18, and deny the Secretary's Motion to Dismiss and Motion for Summary Judgment, ECF No. 23.[6]

Dated:  October 30, 2014

John R. Hellow (Cal. Bar No. 105814)
Jordan B. Keville (Cal. Bar No. 217868)
Katrina A. Pagonis (Cal. Bar. No. 262890)
Nina Adatia Marsden (Cal. Bar. No. 247773)
Tracy A. J. Hale (Cal. Bar No. 260569)
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, CA  90067-2517
Tel:  (310) 551-8155
Fax:  (310) 551-8181
E-mail: jhellow@health-law.com

Respectfully submitted,

_____/s/ Robert L. Roth_____
Robert L. Roth (D.C. Bar No. 441803)
James F. Segroves (D.C. Bar No. 480630)
Kelly A. Carroll (D.C. Bar No. 1018485)
HOOPER, LUNDY & BOOKMAN, P.C.
401 9th Street, NW, Suite 550
Washington, DC  20004
Tel.: (202) 580-7701
Fax: (202) 580-7719
E-mail: rroth@health-law.com

*Counsel for Plaintiffs St. Helena Hospital et al.*

1172992.15

---

[6] The Secretary's motion asserts (at 1) that the Court should dismiss the St. Helena Plaintiffs' complaint under Fed. R. Civ. P. 12(b)(6) and grant her summary judgment with respect to the other plaintiff-hospitals in these consolidated actions.  However, the brief filed in support of the Secretary's motion provides no justification for invoking Rule 12(b)(6), instead focusing on why she believes all of the plaintiff-hospitals should be denied summary judgment and why she should be granted summary judgment.  *See* Sec'y Br. at 1-3, 13-45.  Therefore, the Court should convert the Secretary's motion to dismiss into one for summary judgment.  *See Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.5 (D.C. Cir. 1993) (advising it is the "better practice for a district court always to convert to summary judgment" motions to dismiss filed in APA cases decided on the administrative record); *Brennan v. Solis*, 934 F. Supp. 2d 297, 304 (D.D.C. 2013) (following *Marshall*'s admonition and converting motion to dismiss into one for summary judgment).  The St. Helena Plaintiffs reserve the right to respond should the Secretary use her reply brief to present for the first time argument in favor of invoking Rule 12(b)(6).