## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SHANDS JACKSONVILLE MEDICAL CENTER, et al., | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| v. | ) | Case Nos.: | 14-00263 (EGS) |
| | ) | | 14-00536 (EGS) |
| SYLVIA M. BURWELL, Secretary, | ) | | |
| United States Department of | ) | | |
| Health and Human Services, | ) | | |
| | ) | | |
| Defendant. | ) | | |
| _____ | ) | | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Christopher L. Keough
  DC Bar No. 436567
Stephanie A. Webster
  DC Bar No. 479524
John R. Jacob
  DC Bar No. 444412
Hyland Hunt
  DC Bar No. 999276
Alex J. Talley
  DC Bar No. 1020488
AKIN GUMP STRAUSS HAUER
  & FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 887-4038
Fax: (202) 887-4288
ckeough@akingump.com


Counsel for Plaintiffs

Dated: October 31, 2014

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 1

I.    The "Offset" Is Unreasonable and in Excess of Statutory Authority ................................. 1

    A.    The Secretary Has Not Explained How Her Refusal to Pay for Proper Inpatient Cases Is Rational and Comports with the Statute ...................................................... 2

    B.    The Secretary's Inexplicably Contradictory Statutory Interpretation Must Fail .... 4

    C.    The Secretary's Universal Rate Reduction Is *Ultra Vires* ...................................... 7

II.   The Secretary Provided Insufficient Notice of Her Methodology .................................. 16

III.  The Record Does Not Support the Agency's Assumptions ............................................. 17

CONCLUSION .............................................................................................................. 18

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adirondack Med. Ctr. v. Sebelius*,
    740 F.3d 692 (D.C. Cir. 2014) .................................................................4, 5, 12, 15

*Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014) ........................................................................17

*\*Am. Radio Relay League v. FCC*,
    524 F.3d 227 (D.C. Cir. 2008) .........................................................................16

*Amgen, Inc. v. Smith*,
    357 F.3d 103 (D.C. Cir. 2004) .........................................................................11

*Bd. of Trustees of Knox Cnty. (Ind.) Hosp. v. Sullivan*,
    965 F.2d 558 (7th Cir. 1992) .............................................................................8

*Blackman v. D.C.*,
    456 F.3d 167 (D.C. Cir. 2006) ...........................................................................9

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988) ...........................................................................................4

*Cal. Indep. Sys. Operator Corp. v. FERC*,
    372 F.3d 395 (D.C. Cir. 2004) ...........................................................................8

*\*Cement Kiln Recycling Coal. v. EPA*,
    493 F.3d 207 (D.C. Cir. 2007) .........................................................................11

*Chem. Mfrs. Ass'n v. EPA*,
    28 F.3d 1259 (D.C. Cir. 1994) .........................................................................18

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) .........................................................................................14

*Edison Elec. Inst. v. Occupational Safety & Health Admin.*,
    411 F.3d 272 (D.C. Cir. 2005) .........................................................................11

*Episcopal Hosp. v. Sullivan*,
    Civ. A. No. 89-1716, 1991 WL 330924 (D.D.C. Nov. 12, 1991) .......................8, 9

*\*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ......................................................................................4, 7

*Authorities upon which we chiefly rely are marked with asterisks.

*Halverson v. Slater*,
   129 F.3d 180 (D.C. Cir. 1997) ........................................................................................14

*Health Ins. Ass'n of Am., Inc. v. Shalala*,
   23 F.3d 412 (D.C. Cir. 1994) ............................................................................................3

*Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n*,
   887 F. Supp. 2d 259 (D.D.C. 2012) .................................................................................10

*Marshall Cnty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) .........................................................................................8

*MCI Telecomms. Corp. v. AT&T*,
   512 U.S. 218 (1994) .........................................................................................................11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
   463 U.S. 29 (1983) .............................................................................................................2

*Northpoint Tech., Ltd. v. FCC*,
   412 F.3d 145 (D.C. Cir. 2005) ......................................................................................4, 7

*Paroline v. United States*,
   134 S. Ct. 1710 (2014) .......................................................................................................9

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ...............................................................................................................9

*Pharm. Research & Mfrs. of Am. v. Thompson*,
   251 F.3d 219 (D.C. Cir. 2001) ...................................................................................10, 13

*Rural Cellular Ass'n v. FCC*,
   588 F.3d 1095 (D.C. Cir. 2009) .......................................................................................18

*Sierra Club v. EPA*,
   551 F.3d 1019 (D.C. Cir. 2008) .......................................................................................13

*Village of Barrington, Ill. v. Surface Transp. Bd.*,
   636 F.3d 650 (D.C. Cir. 2011) ...........................................................................................3

## STATUTES

42 U.S.C.
   § 1395ww(d)(3)(A)(vi) ................................................................................................5, 12
   *§ 1395ww(d)(5)(I) ....................................................................................................passim
   § 1395ww(d)(5)(I)(i) ...................................................................................................passim
   § 1395ww(d)(5)(I)(ii) ...................................................................................................14, 15

Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239
§ 6004, 103 Stat. 2106 ...............................................................................13

Social Security Amendments of 1983, Pub. L. No. 98-21
§ 601(e), 97 Stat. 65 ...................................................................................11

Social Security Act Amendments of 1994, Pub. L. No. 103-432
§ 109, 108 Stat. 4398 ..................................................................................14

REGULATIONS

59 Fed. Reg. 45,330 (Sept. 1, 1994) ...............................................................6

60 Fed. Reg. 45,778 (Sept. 1, 1995) ...............................................................7

65 Fed. Reg. 47,054 (Aug. 1, 2000)................................................................5

66 Fed. Reg. 39,828 (Aug. 1, 2001)................................................................6

78 Fed. Reg. 50,496 (Aug. 19, 2013)........................................................2, 3, 5

OTHER AUTHORITIES

103 CONG. REC. S15935 (daily ed. Nov. 17, 1993) .....................................14

H.R. Rep. No. 101-386 (1989) (Conf. Rep.)..................................................13

Prospective Payment Assessment Commission, Report and Recommendations to the
Congress, Mar. 1, 1993 .................................................................................6

**INTRODUCTION**

Lacking support in either law or facts, the Secretary argues deference. *See* Gov. Mem. 2, 3, 14, 18, 19, 25, 27, 40, 41.  But no amount of deference can save the Secretary's "offset" of the reimbursement that should be paid for 40,000 proper new inpatient cases.  The Secretary provided no coherent explanation as to *why* it was "appropriate" to offset additional inpatient reimbursement for cases that, in the Secretary's view, were previously billed incorrectly as outpatient cases rather than inpatient.  Nor has the Secretary explained her departure from her prior, narrower interpretation of the agency's authority to make "other exceptions and adjustments" to the prospective payment rates.  Indeed, that authority, as properly construed under *Chevron* step one in view of statutory context and intent, does not authorize the Secretary's across-the-board rate reduction.  Moreover, the Secretary failed to provide adequate notice of the key methodological assumptions and limitations underlying the predicted net increase in inpatient cases.  The government cannot identify any record support for the conclusion that the stricter new coverage rule would lead to that increase.  For all these reasons, the Secretary's rate reduction must be vacated.

**ARGUMENT**

**I.      THE "OFFSET" IS UNREASONABLE AND IN EXCESS OF STATUTORY AUTHORITY**

The government does not dispute that the Secretary's rate reduction is meant to offset inpatient payment for an expected net increase of 40,000 additional, medically necessary inpatient cases. *See* Gov. Mem. 16.  The government also does not dispute that the agency could not simply refuse to pay for any new inpatient cases in excess of last year's number of cases. *See id*.  The government nonetheless insists that the Secretary's attempt to achieve the same result, only indirectly, is "appropriate."  *Id*.  But the rate reduction is by no means appropriate just because the Secretary thinks so.  The Secretary has not explained how the rate reduction is

rationally connected to the problem the agency identified and why it comports with the prospective payment statute.  In addition, the Secretary's departure from her prior interpretation of the agency's limited authority to make "other exceptions and adjustments" is unexplained and unacknowledged.   And, in any event, the global rate reduction is inconsistent with the plain language of the statute as construed under *Chevron* step one using traditional tools of construction and considering statutory context and legislative intent.

  A. <u>The Secretary Has Not Explained How Her Refusal to Pay for Proper Inpatient Cases Is Rational and Comports with the Statute</u>

  The global rate reduction at issue cannot stand because it is both irrational on its face and inconsistent with the per discharge payment scheme at the core of the prospective payment statute.  The Secretary's reduction to the prospective payment rates reflects classic arbitrary and capricious decision making.  There is no connection, let alone a rational one, between the facts found by the Secretary and her choice to reduce the per discharge payment rates going forward.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).  The only rationale asserted by the Secretary in the rule was that the rate reduction addressed a "problem" that was "systemic" and had a "widespread impact."  78 Fed. Reg. 50,496, 50,953 (Aug. 19, 2013); *see also* Gov. Mem. 10.  According to the government, the "problem" was that hospitals had been treating about 40,000 too many patients as outpatients instead of inpatients.  Gov. Mem. 1, 2, 10.  That would mean that hospitals were paid too little before the rule change because Medicare payments for outpatient services amount to only about 30 percent of inpatient payments.  *Id*. at 32.  There is no rational connection between the finding that hospitals were underpaid in prior years and the determination to *reduce* inpatient rates going forward to offset the additional inpatient reimbursement that would be paid for the projected increase in inpatient cases as a result of the coverage rule change.

To be more specific, the Secretary's rule failed to address three key points.  *See* Shands Mem. 23-24.  First, it does not explain why a net addition of new inpatient cases warrants a reduction in aggregate inpatient payments going forward when the prospective payment statute is designed to increase or decrease aggregate payments automatically in response to volume increases or decreases.  Second, whatever problem existed with too many outpatient stays in the past, the Secretary's change to the coverage rule addressed that problem because under the new guidelines, hospitals are expected to appropriately categorize those longer outpatient stays as inpatient stays when warranted.  *See* 78 Fed. Reg. at 50,951.  Finally, given that the primary asserted problem was too many patients being treated as outpatients when they should have been treated as inpatients all along, the only potential systemic problem was that hospitals were systematically underpaid by about 70% for the treatments they furnished to those patients in prior years.  Gov. Mem. 32.  The determination to reduce future inpatient hospital payment rates across the board is not a rational solution to that problem.

The Secretary's irrational determination warrants no deference.  Courts may defer to agency action only if the agency offers a "permissible interpretation" and "a reasoned explanation for why it chose that interpretation."  *Village of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011).  And no *Chevron* deference is due if the agency's "judgments … seem wholly unsupported or if they conflict with the policy judgments that undergird the statutory scheme."  *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994).

Perhaps recognizing the rule's inadequacies, the government's litigation counsel now hints at a new explanation, suggesting in the introduction to their brief that that the Secretary made the offset because the additional inpatient reimbursement for the projected additional

inpatient cases would not be attributable to changes in the types of benefits, the beneficiary population, or the number or intensity of services.  Gov. Mem. 2.  But that rationale was not asserted by the Secretary in the rulemaking record, so it is beside the point.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (courts owe no deference to counsel's "litigating positions").  Further, the additional inpatient reimbursement that would be paid for these additional inpatient cases is not an artificial increase in payment for the same volume of inpatient cases with the same severity of illness.  *Compare Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 701 (D.C. Cir. 2014) (upholding an adjustment to the hospital specific rate to "combat *artificial* increases in payment amounts").  Rather, the additional inpatient reimbursement represents appropriate payment under the per discharge payment regime for *additional* cases that should have been treated as inpatient cases all along.

By effectively mandating that hospitals continue to be paid outpatient rates while properly treating thousands of new inpatient cases, the Secretary's rate reduction perpetuates the very "systemic problem" that the agency purports to fix by overriding the per discharge payment scheme under the statute.  That unsupported statutory interpretation warrants no deference and must be vacated.

B.      The Secretary's Inexplicably Contradictory Statutory Interpretation Must Fail

The Secretary's wholesale rate reduction also cannot stand because it reflects an unexplained departure from her prior view of her limited authority to make "other exceptions and adjustments" to the per discharge payment rates.  That makes the rule "not a reasonable one," *Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 156 (D.C. Cir. 2005), because an agency cannot satisfy the requirement of reasoned decision making unless it "display[s] awareness that it *is* changing position" and does not "depart from a prior policy *sub silentio*."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

4

Before this rulemaking, on at least two occasions, the Secretary determined that the exceptions and adjustments clause in section 1395ww(d)(5)(I)(i) does not authorize the agency to effect an across-the-board rate reduction and that express legislative authority is needed to offset expected payment increases from other changes to payment policies. *See* Shands Mem. 21-22.

The agency confirmed this interpretation of section 1395ww(d)(5)(I) when it declined to implement changes to the diagnosis-related groups ("DRGs") unless Congress granted specific legislative authority to make an adjustment to the standard payment rates to offset any payment increase associated with the changes to the DRGs. *See* 65 Fed. Reg. 47,054, 47,103 (Aug. 1, 2000) (stating that the agency "would need specific legislative authority to offset, through adjustments to the standardized amounts, any significant anticipated increase in payments attributable to changes … to the DRG classification system"). The Secretary's litigation counsel now implies that the agency previously interpreted the statute to allow it to make insignificant "offset" adjustments absent specific legislative authority. Gov. Mem. 26. But that is no help, as the Secretary described the expected aggregate increase in payments here as "significantly impact[ing] the [inpatient prospective payment system]," 78 Fed. Reg. at 50,954, and certainly the loss of $220 million in reimbursement for an expected 40,000 new inpatient cases is significant to the affected plaintiff hospitals in this consolidated litigation.

The government's brief also rewrites history. The Secretary's prior concern was that the statute empowered the Secretary to reduce the standardized amount only where Congress provided special authority for such an across-the-board rate cut as an "offset"—significant or not. *See Adirondack*, 740 F.3d at 698 (noting that "[p]rior to the enactment of § 1395ww(d)(3)(A)(vi) [(permitting adjustments to the standardized amount to address aggregate payment increases from changes to DRGs)], the Department expressed doubts about its ability to

correct … payments resulting from changes to how hospital cases were classified.").  Until the rulemaking at issue, the Secretary has reduced the standardized amount as an "offset" only after Congress granted her explicit authority to do so.  *See* 66 Fed. Reg. 39,828, 39,862 (Aug. 1, 2001) ("Section 301 of Public Law 106-554 authorized the Secretary to adjust the average standardized amounts if he determines that DRG coding or classification changes are likely to result in a change in aggregate payments.  Therefore, *based on this authority*, we are beginning to evaluate the potential for implementing severity-adjusted DRGs.") (emphasis added).

Similarly, in 1994, the agency declined to make a payment policy change for patients transferred from one hospital to another because the proposed change would have increased aggregate payments absent an across-the-board rate reduction to maintain budget neutrality.  59 Fed. Reg. 45,330, 45,366 (Sept. 1, 1994).  The agency stated that it would be inappropriate to make such a change "absent an offsetting savings provision," and expressed its view that the agency lacked authority under the statute (including section 1395ww(d)(5)(I)), to make that offset adjustment.  *Id.*  Specifically, the agency "note[d] that, in its March 1, 1993 report to Congress, [the Prospective Payment Assessment Commission] recommended that Congress provide authority to [the agency] to implement a graduated payment methodology [for transfer cases] in a budget neutral manner" but "as yet, no such legislative change has been enacted."  *Id.* The Secretary expressed her view that Congress needed to act on the Commission's recommendation to "provide [that] authority."[1]  *Id.*

---

[1] The Commission shared that view.  Its recommendation to Congress made clear that the only adjustment within section 1395ww(d)(5) for which the agency was authorized to make corresponding offsets to the standardized amount was the outlier adjustment under section 1395ww(d)(3)(B).  Thus, the Commission recommended that Congress "should provide authority to the Secretary to implement, in a budget neutral manner, necessary changes for … payment for transfer cases," explaining that "[c]urrent law allows budget neutral changes to outlier policy but not to transfer policy."  Prospective Payment Assessment Commission, Report and Recommendations to the Congress, Mar. 1, 1993, at 52.

Congress, based on that same understanding of the limited authority granted to the Secretary to make other exceptions and adjustments, amended section 1395ww(d)(5)(I) by adding a new clause (ii) that allowed the agency to "make adjustments to each of the average standardized amounts" when "making adjustments under clause (i) for transfer cases."  42 U.S.C. § 1395ww(d)(5)(I).  And it was only after Congress enacted that amendment that the Secretary interpreted the statute to allow the agency to adjust the standardized amount to achieve budget neutrality to offset expected payment increases from the change to transfer policy.  *See* 60 Fed. Reg. 45,778, 45,805 (Sept. 1, 1995) (explaining that the amendment "authorized the Secretary to make adjustments to the prospective payment system standardized amounts so that adjustments to the payment policy for transfer cases do not affect aggregate payments").  In this instance, the Secretary failed even to acknowledge her past interpretation of her exceptions and adjustments authority in section 1395ww(d)(5)(I)(i)—relied upon in this rulemaking—much less explain how or why she now takes a diametrically opposite view of that same authority.  That is patently unreasonable under *Chevron* and arbitrary and capricious.  *Fox*, 556 U.S. at 515; *Northpoint Tech., Ltd.*, 412 F.3d at 156.

   C.     The Secretary's Universal Rate Reduction Is *Ultra Vires*

In any event, the Secretary's original interpretation of her limited authority to make other exceptions and adjustments was correct.  The statutory context of that provision and legislative intent confirm the plain meaning of the statute as precluding an across-the-board rate reduction to effectively negate payment for new cases.

The government's primary argument is that the statute necessarily permits any adjustments under section 1395ww(d)(5)(I)(i) that the Secretary decides to adopt by referring to adjustments "deem[ed] appropriate."  *See* Gov. Mem. 15-17.  But this position is rejected by the very authorities the brief relies upon, which reject the contention that the statute commits

adjustments to the Secretary's discretion. *See Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1224, 1225 (D.C. Cir. 1993) ("[T]he government, in our view, puts too much emphasis on the word 'deem.' …. [W]e surely can hypothesize forms of regulatory amendments that could be thought unreasonable in light of the statute."); *Bd. of Trustees of Knox Cnty. (Ind.) Hosp. v. Sullivan*, 965 F.2d 558, 563 (7th Cir. 1992) ("[T]he Medicare act does not give unusual deference to the Secretary.  It is instead a detailed and meticulous statute that imposes a number of mandatory duties upon the HHS."); *see also Episcopal Hosp. v. Sullivan*, Civ. A. No. 89-1716, 1991 WL 330924, at *5 (D.D.C. Nov. 12, 1991) (reviewing the Secretary's refusal to adopt an adjustment under section 1395ww(d)(5)(I) for reasonableness).  Thus, while the exceptions clause provides discretion to make "other … adjustments" that are "appropriate," the law of this Circuit makes clear that it is not enough for the Secretary merely to deem an adjustment so.  Rather, the Medicare Act provides standards for a court to judge whether an adjustment is actually appropriate.  *Marshall Cnty. Health Care Auth.*, 988 F.2d at 1224.

Moreover, the statutory text, context, and legislative history all establish that the Secretary's system wide rate reduction to cap aggregate inpatient payments is not an "appropriate" "other … adjustment."  42 U.S.C. § 1395ww(d)(5)(I)(i).  The government ignores the object of the *Chevron* inquiry, Gov. Mem. 15, which is to determine Congress's intent on the precise question at issue.  That question is not whether Congress afforded the Secretary some discretion with respect to adjustments, but whether Congress afforded the Secretary the discretion to make an across-the-board rate "adjustment" that effectively negates payment for an expected increase in inpatient volume.  *See Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004) ("The issue is not so much whether the word 'practice' is, in some

abstract sense, ambiguous, but rather whether, read in context and using the traditional tools of statutory construction, the term 'practice' encompasses the procedures used" by the agency).

That the exceptions clause operates as a "'catch-all,'" Gov. Mem. 15, is just the beginning, not the end, of the inquiry under *Chevron*.  The question is what does that residual provision catch—and the answer is "other … adjustments" of a kind with those listed in the other subparagraphs of section 1395ww(d)(5).  *See Paroline v. United States*, 134 S. Ct. 1710, 1721 (2014) (noting it is "a familiar canon of statutory construction that [catchall] clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated") (internal quotation marks omitted; alteration in original).  Section 1395ww(d)(5)(I) reaches things like "particular difficulties encountered by hospitals" in certain circumstances, not system wide offsets of volume-based payment increases.  *See Episcopal Hosp.*, 1991 WL 330924, at *4 (citing the same 1983 House committee report that the plaintiff hospitals rely upon in their opening brief (at pp. 16-17)).

In answering that threshold question presented, the government would postpone consideration of statutory structure and context to *Chevron* step two, Gov. Mem. 19-20, but that is indisputably wrong. The Supreme Court, the D.C. Circuit, and this Court have all instructed that the plain meaning of statutory text cannot be decided under *Chevron* step one without consideration of context and without application of traditional tools of construction.  *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 18 (1981) ("[W]e must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."); *Blackman v. D.C.*, 456 F.3d 167, 176 (D.C. Cir. 2006) (To determine "the plain meaning of the text," the court "look[s] to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.") (internal

quotation marks omitted); *Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n*, 887 F. Supp. 2d 259, 279 (D.D.C. 2012) ("The Court is mindful that, in searching for the plain meaning of [a statutory provision], the Court must not take words in isolation, must view them in context, and must attempt to give effect to all words in the statute."); *see also Pharm. Research & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001) (holding the reviewing court must apply all the traditional tools of construction, including consideration of legislative history, in determining the plain meaning of a statute under *Chevron* step one).

Here, three textual and contextual elements of the statute establish that the plain meaning of the adjustments clause in section 1395ww(d)(5)(I)(i) does not authorize a global rate reduction to offset additional inpatient payments for additional inpatient cases: (1) the use of the term "adjustment"; (2) the limitation to "other" exceptions and adjustments; and (3) the placement of the authority to make those other adjustments within section 1395ww(d)(5), which addresses adjustments for special hospital circumstances, rather than section 1395ww(d)(3), which addresses adjustments to the standard payment rate for all inpatients treated by all hospitals.

*First*, the term "adjustment" itself denotes a limitation that the Secretary's cross-cutting rate reduction violates. The Secretary claims the rate reduction qualifies as an appropriate "adjustment" because of its small size in percentage terms and because the reduced rate applies per discharge and therefore "Medicare's per-discharge payment basis is not disturbed." Gov. Mem. 16-17. But—as the Secretary does not dispute, *see* Gov. Mem. 16—the purported adjustment effectively denies payment for an increase in inpatient volume of 40,000 new cases to the tune of more than $200 million, which is no small or insignificant alteration to the payment scheme. The Secretary does not dispute that the statute prohibits her from capping aggregate expenditures at last year's total, and that such a payment policy would represent "total

elimination or severe restructuring of the statutory scheme." *Amgen, Inc. v. Smith*, 357 F.3d 103, 117 (D.C. Cir. 2004). The exact same policy fares no better for being implemented through an across-the-board rate reduction; either way it is no "adjustment." *Id.* (A "substantial departure from the default amounts" "violate[s] the Secretary's statutory obligation to make such payments and cease[s] to be an 'adjustment[].'"); *cf. MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 228 (1994) ("'Modify,' in our view, connotes moderate change. It might be good English to say that the French Revolution 'modified' the status of the French nobility—but only because there is a figure of speech called understatement and a literary device known as sarcasm.").

*Second*, the phrase "such other exceptions and adjustments" indicates that this "catch-all" authority is limited to adjustments that are similar in kind to the other adjustments enumerated within section 1395ww(d)(5), all of which relate to particular categories of hospitals or unique cases. *See Edison Elec. Inst. v. Occupational Safety & Health Admin.*, 411 F.3d 272, 281 (D.C. Cir. 2005) (applying *ejusdem generis* to conclude that "'other means' … include procedures similar to the examples offered …, but do not include procedures that are fundamentally different."). The result is no different because of how Congress structured the list; contrary to the Secretary's assertion, Gov. Mem. 20, the canon of *ejusdem generis* applies to items in a statutory list even if the items are set forth in separate subparagraphs of a single paragraph of the statute, as they are here. *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 221 (D.C. Cir. 2007) (applying the canon to a list set out in separate subparagraphs). Moreover, as originally enacted, the other adjustments clause was one item within a four-item list that likewise entirely addressed the special needs of particular types of hospitals. *See* Social Security Amendments of 1983, Pub. L. No. 98-21, §601(e), 97 Stat. 65, 157-58 (amending Section 1886 of the Social Security Act to add a new provision on adjustments at (d)(5)(C)). That Congress later changed

11

its numbering scheme in light of the expansion of statutory detail regarding the other hospital-specific adjustments hardly alters the fundamental meaning of the provision.

*Third*, placement of the other adjustments authority within section 1395ww(d)(5) itself reinforces that the adjustments permitted under section 1395ww(d)(5)(I)(i), at issue here, do not include adjustments to the base rates for all hospitals unrelated to special hospital characteristics or types of cases.  As the Secretary's description of the statutory scheme indicates, Congress placed the authority to make adjustments to the base rate for all hospitals that are unrelated to specific hospital characteristics or case types in section 1395ww(d)(3).  *See* Gov. Mem. 5 (describing adjustments to the base rate within section 1395ww(d)(3)).  Thus, when Congress provided the Secretary specific legislative authority to adjust the system wide base rates to account for aggregate payment increases from changes to the diagnosis-related group coding system, Congress specified the authority for that adjustment in section 1395ww(d)(3).  *See* 42 U.S.C. § 1395ww(d)(3)(A)(vi).  All of the adjustments in section 1395ww(d)(5), on the other hand, relate to special types of hospitals (or cases, such as outliers and transfers), not adjustments to base rates related to circumstances that affect all cases for all hospitals.  *See id.* § 1395ww(d)(5).  Section 1395ww(d)(5)(I) is no different; it, too, permits only adjustments addressing special circumstances for certain cases or particular types of hospitals.  This reading is consistent with the interpretation of section 1395ww(d)(5)(I) to permit an adjustment to the hospital-specific rate in *Adirondack*, 740 F.3d at 700-01, because that rate reduction applied only to two special types of hospitals that are paid unique hospital-specific rates under other exceptions provided in section 1395ww(d)(5).  *Adirondack* did not address the validity of a system wide adjustment to the standard payment rate paid to all hospitals for all cases under section 1395ww(d)(3), like the adjustment at issue.

*Finally*, the legislative history demonstrates that Congress intended the other adjustments clause to allow the Secretary authority to make further adjustments like the other adjustments listed by statute, *i.e.*, to address the special circumstances of particular types of hospitals or cases. *See* Shands Mem. 16-17. The Secretary does not dispute that this legislative history indicates congressional intent to confer authority to make adjustments for special circumstances similar in kind to the other adjustments specified by statute, and not to confer authority to adopt an "adjustment" that overrode the statutory base payment rates for all hospitals in order to effectively cap payment levels for inpatient cases. *See* Gov. Mem. 21-22. Nor does the Secretary dispute that the law of the Circuit requires that legislative history must be consulted to determine Congress's plain meaning at *Chevron* step one even if the text is "superficially clear." *Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008); *see also Pharm. Research & Mfrs. of Am.*, 251 F.3d at 224 (listing legislative history as one of the "traditional tools of statutory interpretation" employed at *Chevron* step one).

Instead, the Secretary offers a non-sequitur, contending that whatever the 1983 Congress contemplated, "a subsequent Congress expanded that authority" by removing the parenthetical in the 1983 statute that referred to the special needs of cancer centers. Gov. Mem. 21. But the legislative history regarding the 1989 deletion of that parenthetical makes plain that the parenthetical was deleted only as a "conforming amendment" when Congress codified a specific statutory exemption from the prospective payment system for cancer centers in section 1395ww(d)(1)(B). *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6004, 103 Stat. 2106, 2159. It reflects no intent to expand the Secretary's authority to permit system wide "adjustments" to effectively deny payment for new inpatient cases. *See* H.R. Rep.

No. 101-386 at 729-30 (1989) (Conf. Rep.) (discussing change to exempt cancer centers from the prospective payment system).

Furthermore, the "most recent statement of authority" the Secretary urges us to consult, Gov. Mem. 21, confirms the original intent that the general authority in section 1395ww(d)(5)(I) permits only adjustments for special types of hospitals or cases, and not adjustments to "offset" expected increases in aggregate payments. The most recent amendment to the other adjustments clause was, as described above, to "authorize[] [the Secretary] to make future revisions to transfer payment policy in a budget neutral manner." 103 CONG. REC. S15935 (daily ed. Nov. 17, 1993) (section-by-section analysis); *see* Social Security Act Amendments of 1994, Pub. L. No. 103-432, § 109, 108 Stat. 4398, 4408. That amendment confirmed that Congress did not intend the other adjustments clause to permit "offset" adjustments, or else providing such authority only for the Secretary "[i]n making adjustments under clause (i) for transfer cases," 42 U.S.C. § 1395ww(d)(5)(I)(ii), would have been futile. *See Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) (holding that to read a specific authority as "merely confirm[ing]" the agency's general authority "violates the familiar doctrine that the Congress cannot be presumed to do a futile thing"). The Secretary insists that section 1395ww(d)(5)(I)(i) and (ii) merely represent "redundancies" and therefore this Court must give effect to both, relying upon *Connecticut National Bank v. Germain*, 503 U.S. 249, 253 (1992). *See* Gov. Mem. 22, 24. But the Supreme Court explained in *Germain* that redundancies of this sort are present only when there is "overlap … but each section confers jurisdiction over cases that the other section does not reach." *Id.* When, on the other hand—as here—"giving effect to both [provisions] would … render one or the other wholly superfluous," *Germain* instructs that a court "should disfavor

interpretations of statutes that render language superfluous," *id.*, as the Secretary does not dispute her interpretation would do, *see* Gov. Mem. 22.

The D.C. Circuit's decision in *Adirondack* is not to the contrary.  In that case, the D.C. Circuit faced the question whether a provision granting express authority to adjust the base payment rates downward under section 1395ww(d)(3) to address diagnosis-related group changes impliedly limited the Secretary's authority under section 1395ww(d)(5)(I)(i) to adjust the special rates established under (d)(5) for particular kinds of hospitals for the same purpose. *Adirondack Med. Ctr.*, 740 F.3d at 697.  The Court declined to read the express grant of authority in section 1395ww(d)(3), which allowed adjustments only to base rates, as impliedly limiting the authority within section 1395ww(d)(5)(I) to adjust the hospital-specific rate paid only to two special kinds of hospitals.  But the Court also recognized that the case might have been different if the Secretary had been relying upon the same statutory provision that contained the more limited grant of authority, *i.e.*, if the Secretary's adjustment authority for special hospital rates had been contained within section 1395ww(d)(3).  *Id.* at 696.  That is precisely the case here, as the very provision on which the Secretary relies for the authority to adjust base rates for "offset" purposes itself expressly permits such "offset" adjustments only for changes to payment policy regarding transfers.  42 U.S.C. § 1395ww(d)(5)(I)(ii).  In addition, as we have already discussed, the *Adirondack* court reviewed an adjustment that addressed the special circumstances of particular types of hospitals that are paid unique hospital-specific rates under section 1395ww(d)(5), not the system wide "offset" adjustment to the standard payment rate applicable to all cases for all hospitals, at issue here.

The Secretary points to no legislative history—in 1983, 1989, 1994, or otherwise—supporting her view of the other adjustments clause as a free pass to unwind Congress's carefully

articulated base payment rate calculations at will.  As statutory text, context, history, purpose, and the Secretary's prior interpretations all confirm, Congress has not authorized the Secretary to undertake system wide "offset" adjustments in response to projected inpatient volume increases.

## II.   THE SECRETARY PROVIDED INSUFFICIENT NOTICE OF HER METHODOLOGY

The government does not dispute that its notice and comment obligation forbids the Secretary from "rely[ing] on … studies in a rulemaking but hid[ing] from the public parts of the studies that may contain … relevant explanations of the methodology employed" or "parts that signal caution about that data." *Am. Radio Relay League v. FCC*, 524 F.3d 227, 239 (D.C. Cir. 2008); *see* Shands Mem. 25-27.  But the government does not point to any place in the record where the Secretary actually revealed explanations of the actuaries' assumptions, including the exclusion of all medical cases in projecting the number of inpatient cases that may become outpatient cases, or the actuaries' own caution about the accuracy of its estimates.  *See* RR 2048 ("[T]hese estimates are subject to a much greater degree of uncertainty than usual.").

As the Hospitals explained in their opening brief, contrary to the government's assertions, Gov. Mem. 29, 34, the proposed rule merely recited the actuaries' bottom-line estimates, not the underlying methodology.   Shands Mem. 25.   The government's reiteration of those same estimates, *see* Gov. Mem. 32, does not help its case.  Nor does its citation of the Office of the Inspector General report, which was not cited by the Secretary as part of the rulemaking on the payment reduction, and would seem to suggest different assumptions were actually used.  *See* RR 1974 (predicting "the number of short inpatient stays would be significantly reduced" but "the number of … outpatient stays may not be reduced").   Neither of these documents, nor anything else pre-dating the final rule, identified even the few elements of the methodology that were belatedly revealed in the final rule.

The Secretary's last-ditch effort to seek refuge in the prejudicial-error rule also fails.  All that is required to show prejudice is "that an opportunity to comment regarding an agency's important information created 'enough uncertainty' as to its possible effect on the agency's disposition."  *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  The valid criticisms of the Secretary's belatedly-revealed assumptions as arbitrary and capricious, *see* Shands Mem. 27-30, satisfy this requirement.

## III.   THE RECORD DOES NOT SUPPORT THE AGENCY'S ASSUMPTIONS

The Hospitals identified several ways in which the premises of the Secretary's payment reduction are unexplained and unsupported, and therefore arbitrary and capricious, including that the agency assumed—without explanation and contrary to available evidence—that no short-stay medical cases (as opposed to surgical ones) would shift from inpatient to outpatient, and that the agency's estimate of cases shifting out of inpatient status (360,000) was wildly disproportionate to the number of short-stay inpatient cases in the data (1.6 million).  *See* Shands Mem. 27-30.

The government does not attempt to explain how it is reasonable that her estimates fail to account for about 1.2 million short stay inpatient cases.  And the assertion that the Secretary provided a reasoned basis for the exclusion of medical diagnoses from the estimate of how many cases would shift from inpatient status to outpatient, Gov. Mem. 42-43, is not borne out by the evidence she cites.  Of the five statements cited, not one distinguishes between short medical stays and short surgical stays.  Instead, they generally reiterate the agency's view—inconsistent with the assumptions adopted in making its estimates for rate reduction purposes—that all short stay inpatient cases are equivalent.  *See, e.g.*, RR 727 (referring to either a "minor surgical procedure" or "other treatment" as not being a proper basis for inpatient admission when it is expected to keep the patient in the hospital for only a few hours); RR 1962 (referring to short inpatient stays as a group without differentiating between surgical and medical diagnoses).  The

government insists that this Court's review must be extra deferential given that the rate reduction involved predictive judgments, but the authority invoked does not absolve the Secretary of the obligation to "identify the considerations it found persuasive" in making its predictive judgments. *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). This the Secretary has not done. Deferential review does not mean no review; if judicial review is "to earn [its] keep," then "judicial deference to the agency's modeling cannot be utterly boundless." *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994).

## CONCLUSION

For the foregoing reasons and those stated in their opening brief, the plaintiff Hospitals respectfully request that the Court deny the Defendant's motions, grant the Hospitals' motion for summary judgment, and vacate the payment reduction.

Respectfully Submitted,

/s/ Christopher L. Keough

Christopher L. Keough
    DC Bar No. 436567
Stephanie A. Webster
    DC Bar No. 479524
John R. Jacob
    DC Bar No. 444412
Hyland Hunt
    DC Bar No. 999276
Alex J. Talley
    DC Bar No. 1020488
AKIN GUMP STRAUSS HAUER
    & FELD LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 887-4038
Fax: (202) 887-4288
ckeough@akingump.com

Dated: October 31, 2014                    Counsel for Plaintiffs