**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| BAKERSFIELD HEART HOSPITAL, et al., | ) ) ) | |
| Plaintiffs, | ) ) | 1:14-cv-263-EGS (cons.) |
| v. | ) ) | |
| SYLVIA MATHEWS BURWELL, in her official capacity as Secretary of the United States Department of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) | |

**BAKERSFIELD PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF
BAKERSFIELD PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.      ARGUMENT .................................................................................................................3

A.      The Rate Reduction is Procedurally Invalid Because CMS Did Not Observe
        Proper Notice and Comment Procedures. ...........................................................................3

B.      The Rate Reduction is Substantively Invalid Because It Was Determined in an
        Arbitrary and Capricious Manner. .....................................................................................7

C.      CMS Lacked the Authority to Impose the Rate Reduction. ..............................................11

II.     CONCLUSION ...........................................................................................................14

i

The Secretary's Memorandum of Points and Authorities in Support of its Cross-Motion for Summary Judgment, Motion to Dismiss, and Opposition to Plaintiffs' Motions for Summary Judgment (the "Secretary's Brief")[1] does nothing to alleviate the deficiencies identified by the Bakersfield Plaintiffs, each alone sufficient to show the rate reduction is invalid under the APA and the Medicare Act: (1) the agency did not observe proper notice and comment procedures; (2) the rate reduction was arbitrary and capricious as it relies on unreliable predictions and is not supported by substantial evidence; and (3) the agency did not have the statutory authority to promulgate the rate reduction.

Notice and comment procedures require that agencies provide the underlying data and methodology behind agency rulemaking.  Contrary to the position the Secretary is taking in this case, binding precedent in the D.C. Circuit is that it is not enough for an agency to provide only conclusions and mere generalities regarding its methodology underlying rulemaking. The Secretary provided *no* technical basis in the Proposed Rule for her proposed conclusion that there would be a net shift of 40,000 encounters moving from outpatient to inpatient, thus depriving the Bakersfield Plaintiffs of a meaningful opportunity to comment on the proposed cut in hospital payments.   Recognizing this, the Secretary tries to dredge up adequate notice from materials *outside* the Proposed Rule, but none of them dealt with the subject matter at issue in this case (*i.e.*, the proposed cut in payments), let alone contain or reference a technical basis for the proposed pay cut.  The Secretary's defense cynically asks the Court "how low can you go?" in attempting to set the bar for adequate notice at a new nadir, but the Court should resist engaging in this game of rulemaking limbo stick.  Not only did the Proposed Rule not give hospitals adequate notice as to upon what the Secretary was supposedly basing her proposed conclusion of

---

[1] Cited herein as "Sec'y's Brief."

4815-8539-5743.4

a net shift of 40,000 cases to inpatient, but she affirmatively hid the ball on the fact that 720,000 medical cases were omitted from the Centers for Medicare & Medicaid Services ("CMS") actuaries' "analysis." She offers no justification for this significant omission but instead retreats behind the rarely-used and even more rarely successful "harmless error" doctrine.  That excuse cannot save the Secretary's lack of notice here.

Similarly, the Secretary confronts the arbitrary and capricious challenge obliquely, choosing to argue deference early and often.  She recognizes that the Bakersfield Plaintiffs and others have argued that, among other reasons, it was error for her not to consider medical cases in finalizing the pay cut but does not offer any defense other than her incessant incantation of deference.  However, the arbitrary and capricious standard does not grant agencies unfettered power.  Applicable law does not give the Secretary a pass on irrational rulemaking but rather requires that it be the product of reasoned decision-making.  Whatever analysis the CMS actuaries performed purportedly justifying the rate reduction, it was not reasoned rulemaking because the 2 Midnights Policy is too muddled and internally inconsistent for the CMS actuaries to have made any reliable prediction as to the supposed net shift of cases from outpatient to inpatient.  In order for the CMS actuaries to make any rational prediction as to the extent to which cases would move from outpatient to inpatient and vice versa, they needed to have a baseline understanding upon which to predict logical responses from the hospitals.  However, the 2 Midnights Policy is so murky in so many areas that the actuaries could not have understood it in any cohesive manner, or if they did, they could not have assumed that the hospitals would have had the same understanding.  The Secretary's Brief addresses this deficiency only by incorrectly claiming that the Policy's ambiguities and inconsistencies are not at issue in this case. But where the CMS actuaries could not have predicted with any degree of reliability how

2

hospitals would react to the 2 Midnights Policy, their prediction could not have been reasoned decision-making, and as such CMS's resulting rate reduction was arbitrary and capricious (which is very much what is at issue in this case).

Lastly, the Secretary's Brief imagines that she has more power than that delegated to her by Congress.  The Secretary's assertion that she has the statutory authority to promulgate the rate reduction across all hospitals is inconsistent with Congress's reserved authority and renders wholly superfluous other statutory provisions in close proximity to the provision upon which she relies.

The Secretary's motions should be denied, and summary judgment should be entered for the Plaintiffs.

## I.  ARGUMENT

### A.  The Rate Reduction is Procedurally Invalid Because CMS Did Not Observe Proper Notice and Comment Procedures.

In their opening briefs, the Bakersfield Plaintiffs and other Plaintiffs pointed out that the Secretary was required to provide adequate notice of the technical basis for the .2 percent rate reduction in IPPS payments, and that the Proposed Rule was woefully lacking in this regard. Bakersfield Pls. Brief at 9-13.   The Secretary concedes that an agency "commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary."   Secy's Brief at 28, quoting from *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530-31 (D.C. Cir. 1982).  One would expect, therefore, that if the Secretary had something to say on behalf of the technical basis supporting her proposal for a .2 percent cut, as opposed to supporting a larger or smaller cut or no cut at all, it would appear following that concession.  It does not.  The Secretary claims that "the inpatient and outpatient data sources used and the underlying assumptions [were] adequately

3

identified and made accessible to the public to permit meaningful comment," Secy's Brief at 29,

but the Secretary provides no support for that claim.  She points to nothing in the Proposed Rule,

or even prior to the Proposed Rule, that alerts the public to the purported technical basis

underlying the payment cut.  Instead, the Secretary claims that "for years" CMS has studied

hospitals' use of observation and short inpatient stays and the concerns raised by hospitals about

determining which  hospital encounters are appropriate for inpatient hospitalization.   Secy's

Brief at 29-30.  Whereas that may be true, what does that have to do with providing interested

commenters with the basis for CMS's proposal to cut IPPS payments by .2 percent and its

conclusion that there would be a net shift of 40,000 cases from outpatient to inpatient?

Likewise, the Secretary's discussion of when, how, and why it came to propose the 2 Midnights

Policy (Secy's Brief at 29-31) has nothing to do with the purported technical basis underlying the

pay cut.

    The Secretary bizarrely points to an HHS Office of Inspector General ("OIG") report

issued *after* the Proposed Rule as somehow supplying the technical basis necessary for the public

to have a meaningful opportunity to comment.   Secy's Brief at 32; A.R. at 1960 *et seq*.  The

Secretary does not explain how that report provided a sufficient technical basis because she

cannot.  First, although the Secretary claims that the report was published during the notice and

comment period (Secy's Brief at 32), this is not true.  The comment period closed on June 25,

2013.  78 Fed. Reg. at 27486.  The study is dated July 29, 2013.  Second, the OIG made no

attempt to predict the number of cases moving from outpatient to inpatient or vice versa and did

not identify any data that was relied upon in the Proposed Rule or any underlying assumptions.

Most telling is that the OIG concluded that "[o]ur results indicate that under the policies

proposed in the [Notice of Proposed Rulemaking], the number of short inpatient stays would be

significantly *reduced*."  A.R. at 1974 ( emphasis added).  This conclusion runs directly contrary to the actuaries' potentially baseless prediction that the number of inpatient stays would increase under the 2 Midnights Policy.

Moreover, the Secretary cannot effectively analogize CMS's deficient lack of notice with the situation considered in *Connecticut Light*, 673 F. 2d 525 (D.C. Cir. 1982).  In *Connecticut Light*, the court found that the Commission "complied but barely" with APA notice and comment procedures where the Commission conducted an "extensive process of plant by plant evaluations" that were on file as "public documents," relied on studies that were themselves "subject to widespread public comment," and "explored safety proposals in a public forum."  *Id.* at 528-32.  In this case, CMS did not rely on hospital evaluations that were "public documents," did not rely on studies that were "subject to widespread public comment," and did not consider the rate reduction "in a public forum."  CMS did a lot less than the Commission in *Connecticut Light*, and thus the rate reduction cannot survive.  *Id.* at 528 ("If the Commission had provided any less in the way of reasoned explanation for the fire protection program, we would be compelled to remand the program to the NRC").  In *Connecticut Light*, the court held its nose while observing that the Commission came "perilously close to foreclosing any useful participation whatsoever during the rule-making process itself."  *Id.*  This Court should decline the Secretary's invitation to set the bar even lower.

The only data that the Secretary points to as allegedly providing a reasonable basis for the rate reduction is the "FY 2009 through FY 2011 Medicare claims data."  Secy's Brief at 32.  But the Bakersfield Plaintiffs and the other Plaintiffs have already explained why the Proposed Rule's reference to such claims data fell far short of giving the public a meaningful opportunity to comment on the Proposed Rule's conclusion that the 2 Midnights Policy would lead to a net

5

shift of 40,000 inpatient cases.  Bakersfield Pls. Brief at 9-13.  The fact that the Proposed Rule referenced "claims data" that was publicly available tells commenters nothing about how that claims data was used.  Simply referencing the claims data is akin to a court referencing Webster's for purposes of a reasoned explanation and telling the litigants that "the words are in there somewhere."  For example, the Proposed Rule hid the ball in not disclosing that CMS's actuaries did not include 720,000 medical MS-DRGs in their analysis.  *See* Athens Pls. Brief at 16, n. 5.  The Secretary attempts to gloss over this failure by claiming no harm – no foul.  Secy's Brief at 36.  As the D.C. Circuit has noted, "the [rulemaking provision of the] Medicare statute [*i.e.* 42 U.S.C. § 1395hh] has no harmless error exception."  *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1109 (D.C. Cir. 2014).  As in *Allina,* the Secretary  "suggests that [this Court] ignore this explicit text."  *Id.*  In any event, even if the harmless error exception were available, the only way the Secretary could make a colorable harmless error argument on the facts is if, after the publication of the Proposed Rule, CMS's actuaries re-did their analysis but this time with the medical MS-DRGs included.  However, this did not happen.  Instead, CMS acknowledged for the first time in the Final Rule that medical MS-DRG cases were excluded from the analysis, without explanation as to why and without an analysis of the impact of the exclusion.[2]

Equally as important (for purposes of the opportunity for meaningful comment) as knowing what claims data was used and how it was used, is knowing how the CMS actuaries understood the policy.  As discussed in the Bakersfield Plaintiffs' opening brief, and below, the 2 Midnights Policy is a  morass of ambiguities, uncertainties and outright contradictions.   The Proposed Rule did not offer any clues as to: (1) whether the actuaries assumed that all stays

---

[2] As explained by the Athens Plaintiffs in their opening brief, there would have been no reason for interested parties to have suspected that medical DRGs were being excluded because the proposed policy clearly extended to medical cases and not just surgical cases.  Athens Pls. Brief at 15.

4815-8539-5743.4

crossing two midnights would be billed as inpatient and paid as inpatient by the contractors, or whether only some such stays would be billed and paid as inpatient and if so, what percentage; and (2) whether the actuaries assumed any stays not crossing two midnights would be billed as inpatient and paid as inpatient, and if so, (a) what percentage, and (b) whether that assumption applied to any stays for which the physician did not have an expectation that the stay would cross two midnights or to any stays that did not involve an "inpatient only" procedure.  In short, the Proposed Rule did not inform the public as to the assumptions the CMS's actuaries were making, let alone the bases for those assumptions.

**B.      The Rate Reduction is Substantively Invalid Because It Was Determined in an Arbitrary and Capricious Manner.**

The Secretary acknowledges the Bakersfield Plaintiffs' (and other Plaintiffs) assertion that it was arbitrary and capricious for CMS's actuaries to have excluded all medical MS-DRGs (which approximate 720,000) when arriving at the conclusion of a net shift of 40,000 cases to inpatient each year.  Secy's Brief at 40.  The Secretary then launches into a protracted argument as to why she believes it was proper for the actuaries to consider the extent to which surgical MS-DRGs would shift from outpatient to inpatient (*id.* at 42-43), but makes no attempt to justify the exclusion of medical MS-DRGs from consideration of the number of cases that would shift from inpatient to outpatient.   In fact, the Secretary does not mention medical MS-DRGs again.  Secy's Brief at 40-43.  The Secretary apparently has no explanation for why medical cases, which typically outnumber surgical cases nearly four to one, Athens Pls. Brief at 16, were simply omitted from any analysis of the extent to which inpatient cases would move to outpatient.  "The rule in this circuit is clear that when a plaintiff fails to respond to an issue raised in a dispositive motion, the Court may treat that argument as conceded."  *Singh v. District of Columbia*, No. 10-

1615, 2014 U.S. Dist. LEXIS 92090, at *21 (D.D.C. July 8, 2014) (citing *Iweala v. Operational Techs. Servs., Inc.*, 634 F. Supp. 2d 73, 80-81 (D.D.C. 2009)).[3]

That the Secretary has no explanation for why medical cases were excluded is not surprising given that the CMS actuaries admitted that they simply "assumed" these cases should be excluded. In a memorandum issued subsequent to the Final Rule, the CMS Actuaries stated, "claims containing medical MS-DRGs . . . were excluded because it was assumed that these cases would be unaffected by the policy change." A.R. at 2047. Putting aside that the actuaries could not have understood "the policy change" effected by the Two Midnights Policy and could not have predicted the hospitals' billing behavior and the contractors' claims processing behavior because hospitals and contractors could not have completely understood the Policy either (*see* Bakersfield Pls. Brief at 13-29), the post hoc memorandum by the actuaries makes no attempt to explain *why* "it was assumed" that medical DRGs would be unaffected by the "policy change." Given the significant number of medical cases that were excluded and the potential effect that including them could have had, CMS's decision (if it were indeed a decision and not an oversight) to exclude them without explanation renders the rate reduction arbitrary and capricious for this reason alone.

In their opening brief, the Bakersfield Plaintiffs explained that the 2 Midnights Policy as set forth in the Final Rule is so confused and internally inconsistent that CMS's actuaries could not possibly have formed a basis for making a reliable prediction as to the supposed net shift of cases from outpatient to inpatient. Bakersfield Pls. Brief at 13-22. The Secretary acknowledges that the Bakersfield Plaintiffs have made this argument but does not take issue with the assertion

---

[3] Note further that "arguments not raised until the reply brief are waived." *KLB Indus., Inc. v. NLRB*, 700 F.3d 551, 559 (D.C. Cir. 2012) (quoting *Lake Carriers' Association v. EPA*, 652 F.3d 1, 10 n.9 (D.C. Cir. 2011).

8

that the Final Rule is confused and internally inconsistent[4] or with the proposition that it is

arbitrary and capricious for an agency's actuaries to base their prediction of how regulated

parties will act in response to a policy where the policy is so incoherent that the actuaries could

not possibly have predicted how the hospitals and the Medicare payment contractors would react

to it.  Secy's Brief at 39, n.16.[5]  At best, the regulatory text at 42 C.F.R.  §412.3(e)(1) is unclear

as to what is meant by the statements that a stay crossing at least two midnights is "generally"

appropriately inpatient and that a stay not crossing at least two midnights is "generally" not

appropriate.[6]  The preamble does nothing to elucidate the meaning of the text, but to the

contrary, contains a plethora of contradictory statements.  *See* Bakersfield Pls. Brief at 16-22;

Bakersfield Complaint at ¶¶ 22-36.  For example, the Secretary does not explain how the CMS

actuaries could have predicted – upon a reasonable basis – the extent to which physicians would

order an inpatient admission as opposed to treating the patient as an outpatient, and the extent to

which hospitals would bill under Part A (even if the physician ordered an inpatient admission),

given the contradictory and confusing statements concerning the following core issues:  (1)

whether it is enough, for a hospital encounter to be appropriately inpatient, for the treating

physician to expect the patient's stay to cross two midnights (even if it does not) or whether the

---

[4] Although the Bakersfield Plaintiffs' Brief provides considerable detail as to the inconsistencies and incoherencies of the Final Rule, their Complaint provides even more detail.  *See* Bakersfield Complaint at ¶¶ 30-44.

[5] Instead of responding to the Bakersfield Plaintiffs' points, the Secretary incorrectly accuses the Bakersfield Plaintiffs of challenging the 2 Midnights Policy itself.  Secy's Brief at 39, n.16.  The Bakersfield Plaintiffs agree that whether the 2 Midnights Policy itself is legally defective and should be invalidated is not before this Court, and they have not argued that it is an issue in this case.  What the Bakersfield Plaintiffs have argued is that the Policy is hopelessly ambiguous and internally consistent, and thus the CMS actuaries could not have formed a valid prediction based on it concerning how many cases would move from outpatient to inpatient, thus rendering the rate reduction arbitrary and capricious. Whether the rate reduction is arbitrary and capricious, of course, is at issue here.

[6] Note that whereas the preamble occasionally speaks of a "presumption," the regulatory text does not use this term, and even the preamble does not appear to use "presumption" in a legal sense.

stay in fact must span two midnights?;[7]  (2) whether stays that are not expected to last two

midnights and which do not involve procedures on the "inpatient only" list or other enumerated

exceptions can be appropriately inpatient.[8]  The Final Rule cannot even make up its mind as to

whether the 2 Midnights Policy is entirely time-based or whether physicians can properly order

admission based on the intensity of the services needed.[9]

In their opening brief, the Bakersfield Plaintiffs pointed out that even if CMS's actuaries

had understood the Final Rule as providing a bright line test and meaning that all stays lasting at

least two midnights are appropriately inpatient, their prediction of a net shift of 40,000 cases

from outpatient to inpatient would still be arbitrary and capricious.  Hospitals will not bill all

stays lasting at least two midnights as inpatient, and with respect to those stays lasting at least

two midnights that are billed as inpatient, Medicare contractors will not pay all such stays.

Bakersfield Pls. Brief at 22-25.  The Secretary does not dispute these assertions, either because

she does not disagree, or because the actuaries did not have such an understanding of the Final

---

[7] Bakersfield Pls. Brief at 16-17.  *Compare* 78 Fed.  Reg. at 50950, first column (". . . if it was reasonable for the physician to expect the beneficiary to require a stay lasting 2 midnights, and that expectation is documented in the medical record, inpatient admission is generally appropriate") *with* 78 Fed.  Reg. at 50950, third column ("If the physician admits the beneficiary as an inpatient but the beneficiary is in the hospital for less than 2 midnights after the order is written, CMS and its medical review contractors will not presume that the inpatient hospital status was reasonable and necessary for payment purposes, but may instead evaluate the claim pursuant to the 2-midnight benchmark").  *See also* Bakersfield Complaint at ¶¶ 41-44 for additional examples of inconsistency.

[8] Bakersfield Pls. Brief at 19-20; *see also* Bakersfield Complaint at ¶¶ 34-40.

[9]  *Compare* 78 Fed. Reg. at 50946 ("We do not believe beneficiaries treated in an intensive care unit should be an exception . . . , as our 2-midnight benchmark policy is not contingent on the level of care required or the placement of the beneficiary within the hospital"), *with  id*. at 50945, 50948 (the decision whether to admit a patient involves the "complex medical judgment" of the ordering physician) *and id.* at 50977 ("we will presume that generally services spanning less than 2 midnights should have been provided on an outpatient basis, unless there is clear physician documentation in the medical record supporting the physician's order and expectation that the beneficiary required an inpatient level of care").

Rule (or the Secretary does not know how the actuaries understood the Final Rule).[10] The Secretary complains that the Bakersfield Plaintiffs would prefer that the actuaries' prediction be "an accounting exercise," Secy's Brief at 33, and that they erroneously treat the actuaries' prediction as absolute statements, *id.* at 38, n. 15, but she misses the point. The Bakersfield Plaintiffs are not demanding or expecting mathematical precision in the estimate of the relative number of inpatient and outpatient cases going forward. The point is that even if the 2 Midnights Policy provides a bright line test (which it does not), at least some – and perhaps a significant number – of stays lasting at least two midnights will not be billed as inpatient or will not be paid as inpatient even if they are billed as inpatient, yet there is no indication that the actuaries considered, let alone attempted to quantify, what the Secretary herself deems an "unremarkable proposition," *id.*, that not all encounters lasting at least two midnights will be billed as inpatient. Tellingly, the CMS actuaries have conceded that "relatively small changes would have a disproportionate effect on the estimated net costs," and therefore "these estimates are subject to a much greater degree of uncertainty than usual, and actual results could differ significantly." A.R. at 2048; *see* Bakersfield Pls. Brief at 21.

### C.     CMS Lacked the Authority to Impose the Rate Reduction.

In their opening brief, the Bakersfield Plaintiffs detailed how the Secretary's interpretation of 42 U.S.C. § 1395ww(d)(5)(I)(i) as giving her the authority to impose across-the-board payment cuts is contrary to Congress's reserved power to prescribe the PPS rates. The Secretary acknowledges this description and her brief contains the heading "The Secretary's Interpretation Is not in Conflict with Authority Provided Elsewhere in the Medicare Statute."

---

[10]   The Proposed Rule did not set forth the basis for actuaries' prediction of a net shift of 40,000 cases to inpatient in any meaningful way, including no explanation of the actuaries' baseline assumption of what the proposed 2 Midnights Policy was supposed to mean.

Secy's Brief at 22.  Yet the Secretary never responds to the point or otherwise attempts to demonstrate why her interpretation of 42 U.S.C. § 1395ww(d)(5)(I)(i) is not in conflict with other provisions in 42 U.S.C. § 1395ww.   Secy's Brief at 22-24.  The Bakersfield Plaintiffs reiterate the point they made in their opening brief – namely, that it does not make sense for Congress to have prescribed by statute a yearly update factor for all hospitals if it also gave the Secretary the authority to set the IPPS rates at whatever level the Secretary deems appropriate. The Secretary does not attempt to explain why Congress would have delegated to the Secretary the authority to make limitless payment cuts (or increases) in a multi-billion dollar payment system with major implications for the national budget, much less why, if it was going to do that, Congress bothered with the exercise of nominally reserving that power for itself.

To the extent to which the Secretary would attempt to harmonize the provisions by saying that Congress meant the yearly update to be a "first cut" subject to the Secretary's ability to override it through publishing a different amount in the IPPS final rule, it strains credulity to believe that Congress intended to leave ultimate responsibility for total PPS payments to the Secretary.  According to the Secretary's interpretation, it would not just be the statutory provision specifying the yearly update that is subservient to the Secretary's authority, but instead virtually all of the payment provisions related to the standardized amount, the wage index, the indirect medical education  and disproportionate share hospital adjustments, outlier payments, and graduate medical education are merely suggestive,  subject to "adjustment" by her.

Faced with the difficulty of having to explain the inconsistency of Congress reserving ultimate power for itself as to the yearly PPS rates but also (according to the Secretary's interpretation) having given that power away, the Secretary dismisses all statutory provisions that undercut her interpretation as mere superfluities, and asserts that the canon of construction

12

of superfluities is not a mandate and merely provides that "if possible a court should construe a statue to give effect to every word that renders a word or clause surplusage." Secy's Brief at 22, (quoting *Adirondack Med. Ctr. v. Sebelius*, 891 F. Supp. 2d 36, 46-47 (D.D.C. 2012)).  The Bakersfield Plaintiffs agree that this Court should, if possible, construe 42 U.S.C. § 1395ww(d)(5)(I)(i) in a manner so as to avoid the redundancy the Secretary urges.  In fact, it is possible to avoid the superfluous interpretation the Secretary promotes by simply adhering to the plain language of the statute and interpreting it as giving her the authority to make exceptions and adjustments and not across-the-board changes to the IPPS such as payment cuts for all IPPS hospitals.

Notwithstanding her acknowledgement that courts should avoid construing statutory provisions in a manner that makes one or more provisions superfluous, the Secretary argues that superfluity is not so bad.  In *Connecticut National Bank v. Germain*, 503 U.S. 249 (1992), a case upon which the Secretary relies (Secy's Brief at 24), the Supreme Court reiterated that, generally "courts should disfavor interpretations of statutes that render language superfluous."  The Supreme Court found that in the case before it, the "rule" against superfluities did not apply "[b]ecause giving effect to both  [28 U.S.C.] §§ 1291 and 158(d) would not render one or the other wholly superfluous."  503 U.S. at 253.  The Supreme Court explained that "[s]ections 1291 and 158(d) do overlap . . . but each section confers jurisdiction over cases that the other section does not reach.   In contrast here, the Secretary's interpretation of  42 U.S.C. § 1395ww(d)(5)(I)(i) would render other subparagraphs "wholly superfluous."   Under the Secretary's interpretation, there is not simply overlap between section 1395ww(d)(5)(I)(i) and other subparagraphs but rather those other subparagraphs are rendered totally unnecessary.  That is, if section 1395ww(d)(5)(I)(i) allows the Secretary to impose across-the-board payment cuts or

13

increases whenever she deems it appropriate, there is simply no need for sections 1395ww(d)(5)(C) (exceptions and adjustments as the Secretary deems appropriate to take into account the special needs of regional and national referral centers), (d)(5)(H) (adjustments to the payment amounts the Secretary deems appropriate to take into account the unique circumstances of hospitals located in Alaska and Hawaii).

Finally, the Secretary does not respond to the Bakersfield Plaintiffs' explanation that 42 U.S.C. § 1395ww(g) does not provide authority for the reduction to the IPPS capital rates.  *See also* St. Helena Pls. Brief at 18-19.   The Secretary did not purport to rely on section 1395ww(d)(5)(I)(i) as authority for reducing capital payments, *see* 78 Fed. Reg. at 27498, and the language of section 1395ww(d)(5)(I)(i) is not the same as that of section 1395ww(g)(1)(B)(iii).   The plain meaning of the latter section is that the Secretary has the authority to except certain hospitals of the Secretary's choosing from capital PPS or one or more of the requirements under capital PPS, and does not mean that the Secretary can uniformly adjust capital PPS rates for all hospitals in one fell swoop, usurping that power from Congress.

## II.   CONCLUSION

For the reasons described above, the Bakersfield Plaintiffs respectfully request this Court enter summary judgment for them, deny the Secretary's motions, and declare the rate reduction unlawful and set it aside.

Date: October 31, 2014                          Respectfully submitted,

                                                /s/ Lori A. Rubin
                                                Lori A. Rubin, D.C. Bar No. 1004240
                                                Benjamin R. Dryden, D.C. Bar No. 983757
                                                Foley & Lardner LLP
                                                3000 K Street, N.W., Suite 600
                                                Washington, D.C.  20007-5143
                                                Telephone:  (202) 672-5300
                                                Fax:  (202) 672-5399
                                                Email:  larubin@foley.com
                                                Email:  bdryden@foley.com

                                                *Attorneys for Plaintiffs Bakersfield Heart Hospital,
                                                Louisiana Medical Center and Heart Hospital,
                                                Willis-Knighton Medical Center, Willis-Knighton
                                                Bossier Health Center, Parma Community General
                                                Hospital, UH Regional Hospitals, University
                                                Hospitals Case Medical Center, EMH Elyria
                                                Medical Center, University Hospitals Geauga
                                                Medical Center, and University Hospitals Ahuja
                                                Medical Center*