## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHANDS JACKSONVILLE MEDICAL CENTER, INC. et al., <br><br> Plaintiffs, <br><br> v. <br><br> SYLVIA MATHEWS BURWELL, in her official capacity as Secretary of the United States Department of Health and Human Services, <br><br> Defendant. | Nos. 1:14-cv-263-EGS et al. (cons.) |

**PLAINTIFFS ATHENS REGIONAL *ET AL.*'S REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO THE SECRETARY'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

I.     The Secretary Provides No Justification for Her Failure to Consider Medical Cases. ........................................................................................................................ 3

II.    The Secretary Does Not Provide Any Basis To Conclude That 400,000 Cases Would Shift from Outpatient to Inpatient. ....................................................................... 10

III.   The Secretary Does Not Adequately Explain How A Net Shift of 40,000 Cases Would Result in An Additional $220 Million In Medicare Payments. ............................ 15

IV.   The Secretary Did Not Adequately Respond to Comments During the Rulemaking Process. ....................................................................................................................... 17

CONCLUSION ..................................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Am. Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008) .......................................................................... 7

*Appalachian Power Co. v. EPA,*
    251 F.3d 1026 (D.C. Cir. 2001) ........................................................................ 6

*Community Nutrition Inst. v. Block,*
    749 F.2d 50 (D.C. Cir. 1984) .......................................................................... 17

*Conn. Light & Power Co. v. Nuclear Reg. Comm'n,*
    673 F.2d 525 (D.C. Cir. 1982) .................................................................. 7, 8, 9

*County of Los Angeles v. Shalala,*
    192 F.3d 1005 (D.C. Cir. 1999) ...................................................................... 15

*Del. River Keeper Network v. FERC,*
    753 F.3d 1304 (D.C. Cir. 2014) ........................................................................ 4

*Fox v. Clinton,*
    684 F.3d 67 (D.C. Cir. 2012) .......................................................................... 15

*In re Polar Bear Endangered Species Act Listing and Section 4(d) Litig.,*
    709 F.3d 1 (D.C. Cir. 2013) ............................................................................ 14

*Jicarilla Apache Nation v. US Dep't of Interior,*
    613 F.3d 1112 (D.C. Cir. 2010) ...................................................................... 14

*Keating v. FERC,*
    569 F.3d 427 (D.C. Cir. 2009) ........................................................................ 14

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,*
    463 U.S. 29 (1983) ....................................................................................... 2, 6

*Nat'l Ass'n of Clean Water Agencies v. EPA,*
    734 F.3d 1115 (D.C. Cir. 2013) ...................................................................... 12

*New Jersey, Dep't of Environmental Protection v. EPA,*
    626 F.2d 1038 (D.C. Cir. 1980) ...................................................................... 13

*Owner-Operator Indep. Drivers v. FMCSA,*
    494 F.3d 188 (D.C. Cir. 2007) ........................................................................ 18

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ........................................................................................ 11

*Time Warner Entm't Co. v. FCC,*
    240 F.3d 1126 (D.C. Cir. 2001) ...................................................................... 17

**Regulations**

72 Fed. Reg. 24,680 (May 3, 2007) ...................................................................... 11

78 Fed. Reg. 27,486 (May 10, 2013) .............................................................. 11, 12

78 Fed. Reg. 50,496 (Aug. 19, 2013)......................................................................................... 3, 11

**INTRODUCTION**

At its core, this is not a complicated case.  It boils down to a simple problem: no one can figure out where the Secretary's numbers came from, not even the Secretary.  They do not match the publicly available data that the Secretary said she relied on.  Commenters raised this point during the rulemaking process, but the Secretary ignored them, and continues to do so in this case.  That alone is sufficient to deem the Secretary's decision arbitrary and capricious.

This case originates in the Secretary's decision to change the rules about who qualifies as an inpatient.  Instead of twenty-four hours to qualify, a physician now must reasonably expect a patient to stay in the hospital for two nights.  Because Medicare pays more for inpatient services than for outpatient services, the two-midnight rule results in a change in Medicare payments.  CMS's 2009-2011 claims data clearly indicate that payments would go down: about 1.5 million inpatient stays in 2011 lasted less than two nights; those stays should shift to *outpatient* status under the new rule.  Data also showed that about 121,000 outpatient stays in 2011 lasted more than forty-eight hours; those stays should shift to *inpatient* status under the new rule.  So somewhere between one and 1.5 million cases on net should shift to outpatient status, which would result in a decrease in overall payments.

The Secretary reached the opposite conclusion.  She insists that she relied on precisely the same historical claims data, but — somehow — her numbers do not match.  Rather than 1.5 million, the Secretary thinks only 360,000 cases will shift to outpatient status.  And, rather than 121,000, she thinks that 400,000 will shift to inpatient status.  Despite opportunities in the Proposed Rule, the Final Rule, the Administrative Record, and now her brief, the Secretary continues to fail to say how she got to those numbers.  If the APA means anything, it means that an agency cannot satisfy arbitrary and capricious review by plucking numbers out of thin air.

1

The Secretary's opposition confirms that the agency acted arbitrarily and capriciously. The Secretary concedes, for example, that she did not consider medical cases in calculating the shift from inpatient-to-outpatient.  She does not dispute that the two-midnight rule applies equally to medical cases and that a medical case lasting less than forty-eight hours would presumably shift to outpatient status just as a surgical case would.  And she does not dispute that medical cases represent about seventy-five percent of the cases that would shift to outpatient status.  In light of those admissions, the Secretary's failure to consider medical cases confirms that she "entirely failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983).

The Secretary also provides no basis for her estimate that 400,000 rather than 121,000 cases would shift from outpatient to inpatient status.  For the first time, she announces that she relied not only on historical claims data, but also on a "reasonable estimate of potential future experience" and "the exercise of actuarial judgment relating to potential responses to the proposed policy."  Secretary's Br. at 34, ECF No. 24 (Oct. 15, 2014).  But the Proposed and Final Rules clearly indicated that the Secretary was relying on historical data alone, and the commenters accordingly focused their attention on that data.  The Secretary's tardy and vague invocation of "potential future experience" and "potential responses" would not have allowed for meaningful comment even had commenters known about it during the rulemaking process.

Moreover, the fact that the Secretary cannot even explain how a net increase in 40,000 inpatient encounters would lead to a $220 million increase in payments reveals just how poorly she conducted this rulemaking.  She accuses plaintiffs of submitting an "extensive data analysis" that was "not before the Secretary," but that "extensive data analysis" was actually simple arithmetic.  The plaintiffs pointed out that dividing the Secretary's gross number for the increase

in inpatient payments ($290 million) by 40,000 equaled $7,250 — the agency's implicit cost-per-case number.   The point of this "analysis" is that this number does not match CMS's own substantially smaller cost-per-case numbers, raising the question of how the Secretary came up with her $220 million figure.

Finally, the rate reduction should be set aside because the Secretary failed to respond to significant comments submitted during the rulemaking process.   Commenters asked the Secretary to explain where her numbers came from, but she responded merely be reiterating the numbers themselves.   The Secretary's opposition in this case does the same.   The Secretary's inability to explain where her numbers came from suggests that she selected the $220 million number first, and then tried to find a way to justify it.   That is a quintessential example of an arbitrary and capricious agency decision.

## ARGUMENT

### I.    The Secretary Provides No Justification for Her Failure to Consider Medical Cases.

In our opening brief, we identified medical MS-DRGs as a fundamental point that the Secretary failed to consider.   Athens Regional Br. at 12-17, ECF No. 19-1 (Sept. 15, 2014).   The Secretary based the .2 percent rate reduction on her estimate that the two-midnight rule would shift only 360,000 cases from inpatient to outpatient status.   In reaching that number, the Secretary disclosed, but only in the Final Rule and long after the comment period closed, that her "actuaries examined inpatient claims containing a surgical MS-DRG.   Claims containing a medical MS-DRG were excluded."   78 Fed. Reg. 50,496, 50,953 (Aug. 19, 2013).   If the Secretary had included rather than excluded medical MS-DRGs, her estimate of the inpatient-to-outpatient shift would have been more than four times higher, dwarfing the 400,000 cases that the Secretary thought would shift from outpatient to inpatient status.   If the Secretary had

considered medical cases, in other words, she would have concluded that payment rates must be *increased* rather than slashed.

The Secretary's failure to consider medical cases is as unexplained as it is unjustified.  In the Actuary Memo dated two weeks *after* the proposed rule was finalized, CMS described the omission as if doing so was enough to justify it.  In the words of the Actuary Memo, "[i]n estimating the number of inpatient stays that would shift to the outpatient setting, claims containing a surgical MS-DRG were analyzed.  Claims containing medical MS-DRGs and those that resulted in death or a transfer were excluded because it was assumed that these cases would be unaffected by the policy change."  Administrative Record ("AR") at 2047.  But CMS's unadorned say-so does not provide a basis to sustain the agency's action.  *See, e.g.*, *Del. River Keeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (explaining that "simple, conclusory statements . . . are not enough to fulfill an agency's duty") (citation and alteration omitted).  CMS' conclusion is also inexplicable, as the two-midnight rule by its plain terms applies to all cases, not just surgical cases.  The Secretary does not contest that critical point.  A single day patient encounter billed as a medical MS-DRG would shift to outpatient status just as a surgical case would.  *See* Athens Regional Br. at 13.

The Secretary's opposition brief leaves that critical failure unexplained.  In a single paragraph near the end of her brief, the Secretary asserts that "there was a reasoned basis for the Secretary's actuaries' consideration of surgical MS-DRGs in estimating the movement from inpatient to outpatient and long observation cases in estimating the movement from outpatient to inpatient."  Secretary's Br. at 42.  In support of that contention, the Secretary assembles several isolated cites to the Administrative Record, but as shown below, all of these cites are non-

sequiturs because none of them addresses the Secretary's decision to exclude medical cases from her calculation of the inpatient to outpatient shift.

For example, the Secretary cites a passage in the Proposed Rule that reads as follows: "We have heard from various stakeholders that hospitals appear to be responding to the financial risk of admitting Medicare beneficiaries for inpatient stays that may later be denied upon contractor review, by electing to treat beneficiaries as outpatients receiving observation services, often for longer periods of time, rather than admit them." AR 96. That passage explains why the Secretary adopted the two-midnight rule, but says nothing about the financial impact of the two midnight rule, the inpatient to outpatient shift, or why medical cases were omitted from the Secretary's calculations.

The Secretary also relies on the Proposed Rule for this proposition: "We have stated in our existing Medicare manual that when a beneficiary receives a minor surgical procedure or other treatment in the hospital that is expected to keep him or her in the hospital for only a few hours (less than 24), the services should be provided as outpatient services." AR 727. The relevance of this passage to the projected inpatient-to-outpatient shift is difficult to discern. It describes CMS's past billing guidelines, making clear CMS's view that both "minor surgical procedures" and "other treatment" that is expected to last less than 24 hours should be provided on an outpatient basis. If anything, this passage supports the plaintiffs' view by illustrating that "other treatment[s]" (including medical cases) lasting less than 24 hours that were previously billed as inpatient services should be provided on an outpatient basis.

The Secretary also cites the Administrative Record for the proposition that the two-midnight rule was designed to address the problem of short inpatient stays and long observation stays. Secretary's Br. at 42. *See* AR 1962 ("CMS and others also have raised concerns about

short inpatient stays," and CMS has "found that a significant portion of payments for these stays were improper because the services should have been provided in the outpatient setting."); *id.* ("CMS expected these policy changes to reduce the number of observation stays lasting 2 nights or longer and to reduce the number of short inpatient stays.").  These cites further explain the rationale for the two-midnight rule, but they shed no light on why the Secretary excluded medical cases from her calculation of the inpatient to outpatient shift.  In fact, they say nothing about the difference between surgical and medical cases.

Finally, the Secretary cites passages in the Final Rule showing CMS's expectation that the two-midnight rule would result in fewer long-term observation stays.  *See* AR 1354 ("The potential increase in very short (less than 2 midnights) observation stays should be balanced by a significant decrease in long (2 midnights or more) observation stays."); *id.* ("[W]e expect that this revision should virtually eliminate the use of extended observation.").  Again, this does nothing to explain why the Secretary thought it appropriate to exclude medical cases from her calculation of the inpatient to outpatient shift.  The Secretary cannot scrounge together any support from the Administrative Record because it contains none.

As we explained in our opening brief, the Secretary's egregious failure to consider how medical cases would impact her calculation of the inpatient-to-outpatient shift independently requires the rate reduction to be set aside.  It is black letter law that an agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem."  *State Farm*, 463 U.S. at 43.  *See also Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1035 (D.C. Cir. 2001) (agency action is arbitrary and capricious when the agency adopts a "methodology without offering any reasoned explanation for its choice").  Because medical cases account for more than

seventy-five percent of the cases that presumably would shift from inpatient-to-outpatient status, the Secretary's failure to consider them was significant indeed.

Moreover, even if the Secretary had given some reasoned explanation in her opposition brief or in the Final Rule, that rationale would have come too late to allow the public an opportunity to comment. As the D.C. Circuit has observed, "[i]t would appear to be a fairly obvious proposition that studies upon which an agency relies in promulgating a rule must be made available during the rulemaking in order to afford interested persons meaningful notice and an opportunity for comment." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008). "An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Conn. Light & Power Co. v. Nuclear Reg. Comm'n*, 673 F.2d 525, 530-31 (D.C. Cir. 1982). Indeed, commenters' analyses proceeded on the assumption that the Secretary was considering medical cases because there was no reason to think otherwise. As we explained in our opening brief (*see* Athens Regional Br. at 16), if the commenters had known that the Secretary was excluding medical cases, they would have submitted different and expanded comments focused on the irrationality of excluding medical cases.[1]

The Secretary's brief tries to divert attention from the .2 percent payment cut by discussing the two-midnight rule and trying to defend that rule. She insists that "[f]or years, CMS has studied hospitals' use of observation and short inpatient stays and the concerns raised by hospitals about determining those hospitals['] services appropriate for inpatient hospitalization." *Id.* at 29-30. She recites the role of Medicare Administrative Contractors in

---

[1] Since the Proposed Rule applied to all cases, medical and surgical, there was no way for commenters to guess that CMS had omitted medical cases from its calculation of the effects of the two midnight rule.

determining that inpatient care is not reasonable and necessary, hospitals' ability to "appeal the denial or rebill certain of the provided services under Part B of Medicare," and hospitals' practice of delaying the admission decision until after an extended observation stay. *Id.* at 30. *See also id.* at 29-31.

But this is all smoke-and-mirrors. This case is not a challenge to the two-midnight rule. It is a challenge to the .2 percent payment reduction. The problems the two-midnight rule was designed to address — hospitals' use of short inpatient stays and long observation stays — are beside the point here. The problem for the Secretary is that she did not disclose anything about why the two midnight rule would lead to an aggregate increase in Medicare expenditures for inpatient services. She made no effort to reconcile her prediction that 40,000 net cases would shift from outpatient to inpatient with her own data that showed 1.5 million inpatient cases that would shift to outpatient. The Secretary may have discussed long observation stays and short inpatient stays in past rulemakings, but on the points that matter to *this* case — the .2 percent reduction in payment rates — the Secretary has nothing to say. Not now or in past rulemakings.

Recognizing that she did not provide a reasoned explanation for the payment cut, the Secretary invokes *Connecticut Light* for the proposition that doing a bad job does not necessarily require a court to invalidate an agency's decision. Secretary's Br. at 29. But the Secretary's effort to make lemonade out of the *Connecticut Light* lemon is unavailing. *Connecticut Light* represents the bare minimum that it takes to comply with the APA. There, the agency "complied but barely with the procedures mandated by the Administrative Procedure Act for notice and comment-rulemaking." 673 F.3d at 528. It relied "on some technical studies that were not mentioned in the notice of proposed rule-making." *Id.* at 532. The court nevertheless upheld the challenged rule, but only because the "rule-making process took place against a background of

8

five years during which the [agency] explored . . . proposals in a public forum and exposed the important technical studies to adversarial comment." *Id.* Indeed, the studies that the agency had not mentioned in the notice of proposed rulemaking "had already been subject to widespread public comment." *Id.* In addition, the agency drew on "a common store of experience . . . that had been developed and accumulated in interaction with" the public. *Id.*

Here, the agency did far less than the Nuclear Regulatory Commission did in *Connecticut Light.* To say that the studies justifying the Secretary's predictions about the net shift to inpatient status have not been "exposed . . . to adversarial comment" would be an understatement; they have never seen the light of day. The Secretary continues to disagree, insisting that "the Secretary's .2 percent reduction was promulgated in a context where the technical background, including the inpatient and outpatient data sources used and the underlying assumptions, was adequately identified and made accessible to the public to permit meaningful comment during the rulemaking process." Secretary's Br. at 29. But this statement is patently false because the Secretary did not publicly reveal her decision not to consider medical cases.

Moreover, the Secretary cannot and does not point to a single line in the Proposed Rule that revealed any assumptions she used to adjust historical data or the claimed empirical basis for such assumptions. Indeed, if there were such assumptions made, apart from the inexplicable omission of medical cases, the Secretary has yet to inform hospitals or this Court what they were. The commenters have already shown that the Secretary's "data sources" — the Medicare claims data — could not be reconciled with the Secretary's numbers in the Final Rule. The Secretary may not simply identify data sources that do not match her conclusions and then refuse to explain the discrepancies. There was no way to offer meaningful comments; the commenters

were operating in the dark.  In *Connecticut Light*, the court made clear that "[i]f the [agency] had provided any less in the way of reasoned explanation . . . we would be compelled to remand the program to the" [agency]."  673 F.3d at 528.  That is the case here.

## II.      The Secretary Does Not Provide Any Basis To Conclude That 400,000 Cases Would Shift from Outpatient to Inpatient.

The Secretary's failure to consider medical cases is reason enough to set the rate reduction aside.  Independently, the Secretary did not make any effort to explain her conclusion that the two-midnight rule would cause 400,000 cases to shift from outpatient to inpatient.  As we explained in our opening brief, the Secretary's number is inconsistent with the Secretary's own data, which shows an average (from 2009-2011) of only 105,822 observation cases of more than 48 hours.  Athens Regional Br. at 17-18.  Those are presumably the cases that would shift from outpatient to inpatient under the new policy.  How the Secretary managed to more than triple that number is never revealed.

Trying to sweep that problem under the rug, the Secretary now announces that she did not rely on "historical data alone," but instead also predicted the "behavioral consequences of hospitals confronted with new or clarified rules."  Secretary's Br. at 33.  This is the first time the Secretary has suggested that she adjusted her claims numbers to account for "behavioral consequences."  The Actuary Memo (where one would expect to see such forecasts) references no predictions about how the two-midnight rule would change hospital behavior in such a way to question what is otherwise revealed by Medicare claims data.  And there is no mention of any such forecasts or adjustments in either the Proposed or Final Rules.

In fact, the Secretary's statements in the Proposed and Final Rule on their face support the opposite conclusion — that no adjustments were made to the historical claims data to account for "behavioral consequences."  In both the Proposed and the Final Rule, the agency stated only

that its "actuaries examined FY 2009 through FY 2011 *Medicare claims data* for extended hospital outpatient encounters and shorter stay hospital inpatient encounters and estimated that approximately 400,000 encounters would shift from outpatient to inpatient and approximately 360,000 encounters would shift from inpatient to outpatient, causing a net shift of 40,000 encounters."   78 Fed. Reg. 27,486, 27,649 (May 10, 2013) (emphasis added); 78 Fed. Reg. 50,496, 50,953 (Aug. 19, 2013).   There is no hint in these statements that the Secretary further adjusted the Medicare claims data to account for other "behavior changes" whether actually forecasted by the Secretary or not.[2]

The commenters took the Secretary at her word and submitted comments addressing the historical data that the Secretary said she was relying on.   If the commenters had known that the Secretary was engaging in an amorphous predictive analysis about "potential responses" instead, they would have analyzed those assumptions and submitted comments on them.   Because the Secretary's dubious claim of reliance on assumptions of "behavioral" change is, at best, a post-hoc rationalization, it may not be used to sustain the rate reduction.   *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").   If the rule were otherwise, parties would not be able to participate meaningfully in the notice-and-comment process.

---

[2] In the past, the Secretary has noted that "generally, we do not attempt to predict behavioral responses to our proposed policy changes." 72 Fed. Reg. 24,680, 25,115 (May 3, 2007).   But in special circumstances when the Secretary makes assumptions about how hospitals will react to proposed rules, those assumptions are set forth in proposed rules.   Furthermore, the Secretary laid out specific behavioral bases on which the impact modeling rests (basing the anticipated national increase payment for MS-DRGs on a particular state's experience in prior implementation). *Id.* at 24,709.

In all events, the Secretary's after-the-fact justification consists of a string of meaningless generalities upon which it would have been impossible to comment even had they been revealed during the rulemaking.  What "behavioral consequences?"  The Secretary does not say even now, and neither does the Administrative Record.   Again, these "consequences" are certainly not described in the Actuary Memo.  The Secretary also informs the Court that "there are multiple variables and consequently multiple potential consequences," and insists that her "analysis was a reasonable estimate of potential future experience that encompassed an examination of historical data *and* the exercise of actuarial judgment relating to potential responses to the proposed policy."  Secretary's Br. at 33-34.  This is bureaucrat-speak.  What are the "multiple variables?"  What are the "multiple potential consequences?"  How did the Secretary exercise her "actuarial judgment relating to potential responses to the proposed policy?"  One would expect to see an answer in the Actuary Memo, but there is nothing there.  The Secretary lectures that "[a]ctuarial science is an applied science based on concepts and observations distilled from the experience of practitioners and from other sciences," *id.* at 33 n.11, but a theoretical course about actuarial science does nothing to explain where the Secretary's numbers came from.

The closest the Secretary comes to identifying *any* basis for her conclusion is a 2012 report from the Office of the Inspector General.  Secretary's Br. at 32.  The Secretary asserts that the Report was published "during the public notice-and-comment period for the proposed rule," (*id.*) but that is plainly false.  The report bears a publication date of July 29, 2013, AR 1960, but the comment period closed more than a month earlier, on June 25, 2013, 78 Fed. Reg. 27,486 (May 10, 2013).   The public thus had no opportunity to comment on the report which the Secretary openly says she relied upon.  *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1148 (D.C. Cir. 2013) ("A purpose of notice-and-comment provisions under the APA

. . . is 'to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is likely to give real consideration to alternative ideas.'") (citing *New Jersey, Dep't of Environmental Protection v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980)).

Even if the OIG Report had not only been issued during the comment period but also identified by the Secretary as relevant to the .2 percent adjustment, that report does not justify the Secretary's reliance on vague "multiple variables" and "potential responses to the proposed policy."  The Secretary cites two passages from the Report, neither of which does anything to clarify where the Secretary's numbers came from.  The first passage observes that, under the two-midnight policy, "the number of short inpatients stays would be significantly reduced; however, the number of observation and long outpatient stays may not be reduced if outpatient nights are not counted towards the 2-night presumption."  Secretary's Br. at 32 (citing AR 1974). In other words, this passage suggests that a significant number of short inpatient stays would become outpatient and that a number of existing long observation stays would remain in outpatient status.  That, of course, shows the opposite of the net outpatient-to-inpatient shift that the Secretary predicted and sheds no light on why 121,000 outpatient cases would swell to 400,000.

The second passage cited by the Secretary provides no more comfort to the Secretary.  It notes that "some hospitals would likely follow the provisions and continue to bill these as outpatient stays; other hospitals — given strong financial incentives and few barriers — would likely not follow the provisions and would admit beneficiaries as inpatients as soon as possible to meet the 2-night presumption."  Secretary's Br. at 32 (citing AR 1974).  This highly general "on the one hand, on the other hand" reasoning could support *any* estimate of the net shift — in *any*

direction and in *any* amount.   There certainly are no specific "variables" or specific "consequences" arising from "multiple variables" identified in these passages.   At bottom, this Court should test the Secretary's decision by whether "the agency 'considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made.'"   *In re Polar Bear Endangered Species Act Listing and Section 4(d) Litig.*, 709 F.3d 1, 8 (D.C. Cir. 2013) (quoting *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009).   There is no rational connection here and the OIG Report does not provide the link.   The Secretary's path was a mystery.

The Secretary accuses the plaintiffs of "prefer[ring] that this estimate were an accounting exercise, where an examination of historical data alone yields a single inescapable conclusion."   Secretary's Br. at 33.   That is not a fair characterization of the plaintiffs' position.   Perfect precision may not be required, but even estimates can be irrational if based on irrational assumptions.   That is why the APA requires that "the agency's explanation for its decision must be sufficient to enable us to conclude that it was the product of reasoned decisionmaking."   *Jicarilla Apache Nation v. US Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010) (internal citation and alteration omitted).   Here, the Secretary's explanation made it impossible for the plaintiffs to meaningfully comment because she made no effort to connect her numbers to the data sources that she said she was relying on.   Plaintiffs do not insist on "a single inescapable conclusion," only what the APA requires: a reasoned explanation.

The Secretary points to various comments submitted during the rulemaking process as evidence that meaningful comment was possible.   Secretary's Br. at 34.   But those comments prove the opposite.   The point of the commenters' submissions was that they could *not* comment meaningfully because the Secretary was relying on undisclosed assumptions.   *See, e.g.*, AR

4653-54 (explaining that the commenter could not "duplicate CMS's conclusions" and that the agency has not "provided an adequate explanation of its estimate"); AR 5010 ("CMS has not been transparent in identifying the criteria used by the actuaries to identify the patient status shifts that would occur.").  The commenters asked the Secretary to provide an explanation to allow for meaningful comment, but she did not do so.  "[E]ven though arbitrary and capricious review is fundamentally deferential . . . no deference is owed to an agency action that is based on an agency's purported expertise where the agency's explanation for its action lacks any coherence."  *Fox v. Clinton*, 684 F.3d 67, 74-75 (D.C. Cir. 2012) (internal quotation marks, citations, and alterations omitted).

**III.    The Secretary Does Not Adequately Explain How A Net Shift of 40,000 Cases Would Result in An Additional $220 Million In Medicare Payments.**

In our opening brief, we explained that the Secretary's $220 million estimate cannot be justified even on its own terms.  Athens Regional Br. at 19-21.  The Secretary estimated that 40,000 additional inpatient cases would increase IPPS expenditures by $290 million.  She then subtracted what Medicare otherwise would have paid for those encounters on an outpatient basis to reach the $220 million estimate.  Implicit in the Secretary's calculations was an IPPS cost-per-case of $7,250 ($290 million divided by 40,000).  But that number cannot be reconciled with CMS's own cost-per-case numbers, which show an estimated cost per case of less than $6,900. The Secretary's decision thus "runs counter to the evidence before the agency" and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (citation omitted).

We also explained that the Secretary failed to allow a meaningful opportunity for public comment on this estimate.  The Secretary's $290 million gross estimate discussed above was not

revealed until the post-hoc Actuary Memo — which postdated the Final Rule by two weeks. During the rulemaking, commenters thus were left to analyze only the Secretary's final net $220 million estimate. They confirmed much of the Secretary's underlying data, but could not figure out how a net increase in 40,000 inpatient encounters could translate to a $220 million increase in payments; the commenters' figure was closer to $180 million. Commenters expressly informed the Secretary of that discrepancy, AR 4653-55, but she chose to ignore it. The Secretary's failure to reveal the gross number until after the rulemaking deprived the public of the opportunity to comment on the amount of the adjustment even if accepting the Secretary's prediction of the net shift of 40,000 cases from outpatient to inpatient status. Both the substantive and procedural points independently require the rate reduction to be set aside.

The Secretary responds in a lengthy footnote. She says that "Athens Regional Plaintiffs in their motion for summary judgment include an extensive data analysis" that "was not before the Secretary when she promulgated the .2 percent reduction." Secretary's Br. at 35 n.14. But what the Secretary calls an "extensive data analysis" takes up eight lines of text, uses only data published by the agency in the Federal Register, and is actually simple division of two numbers that appear in the Administrative Record. The Athens Regional plaintiffs divided the Secretary's $290 million gross number by the Secretary's estimate of 40,000 new inpatient cases, pointing out that the result ($7,250) was substantially higher than CMS's own cost-per-case numbers. Thus the Secretary either generated the $290 million gross number arbitrarily to justify her $220 million estimate, or she relied on another undisclosed assumption.

The Secretary's complaint about omissions in the plaintiffs' reasoning illustrates the plaintiffs' point: the rate reduction violates the APA because the Notice of Proposed Rulemaking failed to give sufficient information for the public to replicate the Secretary's methodology,

reasoning, and assumptions.  If the Secretary made assumptions about changes in case mix or other factors, the Secretary should have explained those assumptions.  But the Secretary still fails to disclose what, if any, assumptions she made that resulted in projecting a cost per short stay case substantially in excess of data she also published in the Federal Register.[3]

## IV.   **The Secretary Did Not Adequately Respond to Comments During the Rulemaking Process.**

Aside from the Secretary's substantive failure to reconcile her conclusions with the evidence before the agency, the agency's failure to respond to commenters during the rulemaking process is an independent procedural reason to set the rate reduction aside.  As we explained in our opening brief, the Secretary played "hunt the peanut" with the basic assumptions underpinning her conclusions.  *Conn. Light*, 673 F.2d at 530.  She refused to explain how she reduced 1.5 million to 360,000, and how she increased 121,000 to 400,000.  Nor did she say how a net increase in 40,000 inpatient encounters could translate to a $220 million increase in payments.  *See Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1140 (D.C. Cir. 2001) ("[A]n agency cannot rest a rule on data 'that, [in] critical degree, is known only to the agency.'") (quoting *Community Nutrition Inst. v. Block*, 749 F.2d 50, 57 (D.C. Cir. 1984)).

---

[3] The Secretary's remaining quibbles with the plaintiffs' reasoning were also not disclosed during the rulemaking process and therefore provide no basis to uphold the rule.  She contends that the actual cost-per-case number is $6,623, the average cost per case for two day stays, rather than $6,552, the average cost per case for one day stays.  Because the proposed rule applies only to stays of less than two days, the Secretary is wrong.  But no matter: $6,623 still is much less than the Secretary's implicit cost-per-case number of $7,250.  The Secretary also asserts that plaintiffs failed to consider changes in "case-mix."  Secretary's Br. at 35 n.14.  But this rationale also was not disclosed during the rulemaking process.  In any event, the two midnight rule is based on the assumption that hospital stays of less than two days are not complex, and thus the observation about possible changes in case mix is beside the point.  Finally, the Secretary asserts that plaintiffs ignored "changes in the future number of cases handled by hospitals and the consequential increase in the overall discharge numbers."  *Id.*  But the Secretary gave the plaintiffs no footing to analyze this or the other factors.  They do not appear anywhere in the Administrative Record, and they are so general that they could be used to justify any estimate.

The Secretary makes no real response to this point.  She quotes (Secretary's Br. at 38) the agency's entire response to these comments, which consists solely of reiterating what the agency had previously said.  She explained that "[t]he number of claims spanning 2 or more midnights based on the dates of service that were expected to become inpatient was approximately 400,000" and that "[t]he number of claims spanning less than 2 midnights based on the length of stay that were expected to become outpatient, after excluding encounters that resulted in death or transfers, was approximately 360,000."  AR 1361.  In essence, the commenters asked the Secretary how she came up with the 400,000 and 360,000 numbers, and the Secretary responded that her numbers were 400,000 and 360,000.  An agency does not respond to comments by ignoring them.

Finally, the Secretary asserts that there was no "prejudicial error," pointing out that a plaintiff must "show that on remand [it] can mount a credible challenge . . . and [was] thus prejudiced by the absence of an opportunity to do so before the agency."  *Owner-Operator Indep. Drivers v. FMCSA*, 494 F.3d 188, 202 (D.C. Cir. 2007) (citation omitted).  But the error here was highly prejudicial.  If the Secretary had credited the estimates that the King & Spalding commenters put forth, she would have increased inpatient payment rates rather than decreased them.  Moreover, the commenters would have been able to explain why the exclusion of medical cases — seventy-five percent of the overall number — was irrational, given that the two-midnight rule applies equally to both surgical and medical cases.

## CONCLUSION

The Secretary's cross-motion for summary judgment should be denied, and the plaintiffs' motion for summary judgment should be granted.

Dated: October 31, 2014                    Respectfully submitted,


                                            */s/ Mark D. Polston*
                                           Mark D. Polston
                                             D.C. Bar No. 431233
                                           Daniel J. Hettich
                                             D.C. Bar No. 975262
                                           Ethan P. Davis
                                             *Admitted Pro Hac Vice*
                                           KING & SPALDING LLP
                                           1700 Pennsylvania Avenue, NW
                                           Washington, D.C. 20006
                                           Telephone:  (202) 737-0500
                                           Facsimile:  (202) 626-3737
                                           mpolston@kslaw.com

                                           *Counsel for Plaintiffs Athens Regional et al.*