**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHANDS JACKSONVILLE MEDICAL CENTER, INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 14-263 |
| ALEX AZAR, Secretary, U.S. Department of Health and Human Services, | |
| *Defendant.* | |
| DIGNITY HEALTH, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 14-536 |
| ALEX AZAR, Secretary, U.S. Department of Health and Human Services, | |
| *Defendant.* | |
| ATHENS REGIONAL MEDICAL CENTER INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 14-503 |
| ALEX AZAR, Secretary, U.S. Department of Health and Human Services, | |
| *Defendant.* | |

AMERICAN HOSPITAL ASSOCIATION, *et al.*,

Plaintiffs,

v.

ALEX AZAR, Secretary, U.S. Department of Health and Human Services,

*Defendant.*

Civil Action No. 14-607

---

BAKERSFIELD HEART HOSPITAL, *et al.*,

*Plaintiffs*,

v.

ALEX AZAR, Secretary, U.S. Department of Health and Human Services,

*Defendant.*

Civil Action No. 14-976

---

ST. HELENA HOSPITAL, *et al.*,

*Plaintiffs*,

v.

ALEX AZAR, Secretary, U.S. Department of Health and Human Services,

*Defendant.*

Civil Action No. 14-1477

AHMC MONTEREY PARK HOSPITAL LP, *et al.*,

        *Plaintiffs*,

      v.

ALEX AZAR, Secretary, U.S. Department of Health and Human Services,

        *Defendant.*

Civil Action No. 17-39

---

ANTELOPE VALLEY HOSPITAL,

        *Plaintiff*,

      v.

ALEX AZAR, Secretary, U.S. Department of Health and Human Services,

        *Defendant.*

Civil Action No. 17-175

---

ADVENTIST BOLINGBROOK HOSPITAL, *et al.*,

        *Plaintiffs*,

      v.

ALEX AZAR, Secretary, U.S. Department of Health and Human Services,

        *Defendant.*

Civil Action No. 15-192

| | |
|---|---|
| LONG BEACH MEMORIAL MEDICAL CENTER, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 15-1601 |
| ALEX AZAR, Secretary, U.S. Department of Health and Human Services, | |
| *Defendant.* | |
| FLOWER MOUND HOSPITAL PARTNERS, LLC, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 15-1793 |
| ALEX AZAR, Secretary, U.S. Department of Health and Human Services, | |
| *Defendant.* | |
| AMERICAN LEGION HOSPITAL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 15-1800 |
| ALEX AZAR, Secretary, U.S. Department of Health and Human Services, | |
| *Defendant.* | |

| | |
|---|---|
| ASANTE ASHLAND COMMUNITY HOSPITAL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 16-32 |
| ALEX AZAR, Secretary, U.S. Department of Health and Human Services, | |
| *Defendant.* | |
| ASANTE ASHLAND COMMUNITY HOSPITAL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 16-1543 |
| ALEX AZAR, Secretary, U.S. Department of Health and Human Services, | |
| *Defendant.* | |
| ST. HELENA HOSPITAL, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 16-30 |
| ALEX AZAR, Secretary, U.S. Department of Health and Human Services, | |
| *Defendant.* | |

AUBURN MEDICAL CENTER, *et al.*,

        *Plaintiffs*,

    v.

ALEX AZAR, Secretary, U.S. Department of
Health and Human Services,

        *Defendant.*

Civil Action No. 16-2301

## MEMORANDUM OPINION

These consolidated cases are before the Court following an earlier decision holding that
the Department of Health and Human Services failed to provide a meaningful opportunity for
public comment on a rule that imposed a 0.2 percent, across-the-board reduction in inpatient
prospective payment system rates used to compensate hospitals for FY 2014 under the Medicare
program. *See Shands Jacksonville Medical Center v. Burwell*, 139 F. Supp. 3d 240 (D.D.C.
2015) ("*Shands I*"). The issue now before the Court is the lawfulness of the Secretary's actions
on remand following the Court's earlier decision.

As the Court explained in its prior opinion, in August 2013, the Secretary of Health and
Human Services[1] adopted a new policy—known as the "2-midnight policy"—to distinguish
between inpatient and outpatient hospital visits. In the Secretary's view, that change in policy
came with significant budgetary consequences; the Department's actuaries estimated that
adoption of the 2-midnight policy would cause a net utilization shift of approximately 40,000
"encounters . . . from outpatient to inpatient" status and, because inpatient stays typically cost the

---

[1] A number of different agency actions, undertaken from 2013 to 2016, are relevant to the issue
currently before the Court. At all relevant times, the Secretary of the Department of Health and
Human Services was either Kathleen Sebelius or Sylvia Mathews Burwell.

Medicare program more than outpatient visits, it would increase Medicare expenditures by approximately $220 million in 2014. Medicare Program, 78 Fed. Reg. 50,496, 50,953 (Aug. 19, 2013) ("FY 2014 rule"). In light of the "magnitude and breadth" of this "utilization shift," the Secretary concluded that it was appropriate to exercise her exceptions and adjustments authority to offset the cost to the program, and she thus adopted the 0.2 percent rate reduction. *Id.* at 50,953–54.

In response, an array of hospitals brought suit under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* They argued that the Secretary lacked statutory authority to adopt the rate reduction; that the FY 2014 rule failed to comply with the procedural requirements of the APA; and that the 0.2 percent rate reduction was arbitrary and capricious. Although the Court rejected the hospitals' challenge to the Secretary's statutory authority and declined to reach their arbitrary and capricious challenge, it held that the Secretary did not reveal key actuarial assumptions until after the close of the comment period and thereby deprived the hospitals of a meaningful opportunity to comment on the rate reduction. *Shands I*, 139 F. Supp. 3d at 260–66. The Court, accordingly, remanded the matter (without vacatur) to allow the Secretary to identify the assumptions the Department's actuaries applied and to provide an opportunity for meaningful public comment. *Id.* at 266–71.

On remand, the Secretary published a notice describing the assumptions that the Department's actuaries used in calculating the "utilization shift" and invited public comment. *See* Medicare Program, 80 Fed. Reg. 75,107 (Dec. 1, 2015) ("December 2015 notice"). Then, after receiving and considering those comments, the Secretary did an about-face, abandoning the Department's effort to sustain the 0.2 percent reduction for FY 2014 (and other years) and, instead, proposing that the Department no longer impose the rate reduction going forward and

adopt a one-time 0.6 percent rate increase for FY 2017 "to address the effect of the 0.2 percent reduction to the rates in effect for FY 2014," FY 2015, and FY 2016.  *See* Medicare Program, 81 Fed. Reg. 24,946, 25,138 (proposed April 27, 2016) ("FY 2017 proposed rule").  Four months later, the Department finalized that rule.  *See* Medicare Program, 81 Fed. Reg. 56,762 (Aug. 22, 2016) ("FY 2017 rule").

The matter has now returned to this Court, where two groups of plaintiffs raise separate challenges to the Secretary's actions on remand.  The first group—the "*Bakersfield* Plaintiffs"— argue that the Court in *Shands I* remanded the matter to the Secretary to provide her with an opportunity "to cure the [FY 2014] rule's deficiencies" and, because the Secretary did not do so, the Court should vacate that rule.[2]  Dkt. 82 at 8.  The Secretary's adoption of the 0.6 percent increase for FY 2017, in their view, did not redress this problem for two reasons.  First, the administrative record fails to establish that the 0.6 percent rate increase made the *Bakersfield* Plaintiffs whole; a decline in inpatient visits to a particular hospital over the FY 2014 to FY 2016 period, for example, would mean that the rate increase in later years would not fully compensate that hospital for the rate decrease in earlier years.  Second, and more importantly, the FY 2017 rule is only "forward-looking" and did not "repeal, amend, or supersede the FY 2014 [r]ule." Dkt. 82 at 25.  The FY 2014 rule, they therefore argue, remains in effect and, because it was

---

[2]  "*Bakersfield* Plaintiffs" refers to the plaintiffs in *Bakersfield Heart Hosp. v. Price*, Civil Action No. 14-0976; *St. Helena Hosp. v. Price*, Civil Action No. 14-1477; *Shannon Med. Ctr. v. Price*, Civil Action No. 15-1800; *St. Helena Hosp. v. Price*, Civil Action No. 16-30; *Asante Rouge Valley Med. Ctr. v. Price*, Civil Action No. 16-32; *Palmerton Hospital-Carbon v. Price*, Civil Action No. 16-1543; *Auburn Med. Ctr. v. Price*, Civil Action No. 16-2301; *St. Helena Hosp. v. Price*, Civil Action No. 17-39; *Antelope Valley Hosp. v. Price*, Civil Action No. 17-175.  *See* Dkt. 82 at 1 n.1.

neither adopted in conformity with APA procedural requirements nor remedied on remand, it must be set aside.

The second group of hospitals—the "*Athens* Plaintiffs"—take a different tack.[3] While the *Bakersfield* Plaintiffs treat the FY 2017 rule as immaterial—and, indeed, suggest that the Court lacks jurisdiction to consider that separate rulemaking—the *Athens* Plaintiffs engage with the FY 2017 rule and acknowledge that the Secretary took a step in the right direction by adopting the 0.6 percent rate increase. But that step, in their view, was far too small. They contend that the data that was before the Department did not merely show that the Secretary erred in hypothesizing that the 2-midnight rule would result in a net increase in inpatient encounters; it actually showed that the 2-midnight policy would decrease inpatient encounters and would, accordingly, decrease Medicare payments to hospitals. Dkt. 84-2 at 23. For this reason, they argued in the administrative process that the Secretary should have adopted an across-the-board rate increase to compensate hospitals for the reduced payments. Because the Secretary failed to consider the data and comments supporting a rate increase, they contend that the Court should once again remand the matter but, this time, should vacate the FY 2014 rule and direct that the Secretary (1) consider Plaintiffs' comments and data and (2) "budget neutralize any replacement rule." Dkt. 84-2 at 9.

Both the *Bakersfield* and *Athens* Plaintiffs have moved for summary judgment, and the Secretary has cross-moved for summary judgment. For the reasons explained below, the Court will **DENY** the Plaintiffs' motions for summary judgment and will **GRANT** the Secretary's cross-motion.

---

[3] "*Athens* Plaintiffs" refers to the plaintiffs in *Athens Reg'l Med. Ctr. v. Burwell*, Civil Action No. 14-503.

# I. BACKGROUND

## A.    Statutory Framework

The Medicare program provides federally-funded health insurance for elderly and disabled individuals.  42 U.S.C. §§ 1395 *et seq.*  The program is divided into two main parts: Part A provides insurance for inpatient services, *see* 42 U.S.C. §§ 1395c *et seq.*, while Part B provides additional insurance for services not covered by Part A, including hospital outpatient services and visits to a doctor, *see id.* §§ 1395j–1395w.  The amount of compensation a hospital receives from the Medicare program depends on whether the beneficiary was admitted to the hospital as an inpatient or an outpatient; generally speaking, payments for inpatient treatment under Part A are higher than payments for outpatient treatment under Part B.  *Shands I*, 139 F. Supp. 3d at 243; Medicare Program, 78 Fed. Reg. 27,486, 27,649–50 (proposed May 10, 2013) ("FY 2014 proposed rule").

"Prior to October 1983, Medicare reimbursements were based on the 'reasonable costs' of inpatient services furnished to Medicare patients."  *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994) (quoting 42 U.S.C. § 1395f(b) (1988)).  In 1983, however, Congress "completely revised the scheme for reimbursing Medicare hospitals."  *Id.*  In place of the cost-reimbursement system, Congress established the Prospective Payment System, which "relies on prospectively fixed rates for each category of treatment rendered."  *Id.*  The Inpatient Prospective Payment System—or "IPPS"—compensates hospitals based on the number of patients they discharge and each patient's primary diagnosis at that time.  *See* 42 U.S.C. § 1395ww(d)(3)(D)(iii).  In calculating IPPS rates, the Center for Medicare and Medicaid Services ("CMS") starts with the "standardized amount," "which roughly reflects the average cost incurred by hospitals nationwide for each patient they treat and then discharge."  *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011).  It then applies various statutory

adjustments, including adjustments to account for differentials "between the local average of hospital wages and the national average of hospital wages" and "to account for the fact that the costs of treating patients varies based on the patients' diagnoses." *Id.* (internal quotation omitted).

Most hospitals are compensated for Medicare inpatient services according to this rate, which is referred to in the regulations as the "federal rate." *Shands I*, 139 F. Supp. 3d at 244; *see also* 42 U.S.C. § 412.64. "A minority of hospitals, including those providing treatment to underserved communities," however, "are compensated in part on hospital-specific rates." *Shands I*, 139 F. Supp. 3d at 245 (internal quotation omitted). Those rates are "calculated with a base amount derived not from national data, but from historic operating costs at an individual hospital." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 695 (D.C. Cir. 2014). Finally, CMS "also sets a Puerto Rico-specific rate[,] which is calculated using a Puerto Rico-specific base amount." *Shands I*, 139 F. Supp. 3d at 245 (internal quotation omitted).

**B.      The 2-Midnight Policy**

Although the payments that the Medicare program makes vary depending on whether a Medicare beneficiary is treated on an "inpatient" or an "outpatient" basis, the Medicare Act does not define either term and does not "specify when inpatient admission is appropriate." *Id.* Before 2013, Medicare guidance "advised physicians to 'use a 24-hour period as a benchmark' and to 'order [inpatient] admission for patients who are expected to need hospital care for 24 hours or more.'" *Id.* (quoting Medicare Benefit Policy Manual, CMS Pub. 100-02, Ch. 1, § 10 (2003)). The expected length of stay, however, was only one factor in the "complex medical judgment" whether to admit a Medicare beneficiary for inpatient care. FY 2014 proposed rule, 78 Fed. Reg. at 27,645. Over time, the Secretary became concerned that this open-ended approach engendered provider uncertainty and "considerable variation" in billing decisions. *Id.*

at 27,648.  The Secretary observed an increase in the number of Medicare beneficiaries who were kept as outpatients for long periods of observation, for example, and "heard from various stakeholders that hospitals appear to be responding to the financial risk of admitting Medicare beneficiaries for inpatient stays that may later be denied . . . , by electing to treat beneficiaries as outpatients receiving observation services."  Hospital Outpatient Prospective and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs, 77 Fed. Reg. 45,061, 45,156 (proposed July 30, 2012).  More generally, the Secretary concluded that "the appropriate determination of a beneficiary's patient status" had become "a systemic and widespread issue" and that Medicare contractors had "recovered more than $1.6 billion in improper payments because of inappropriate beneficiary patient status."  FY 2014 proposed rule, 78 Fed. Reg. at 27,649.

To clarify the standard for inpatient treatment, the Secretary proposed the 2-midnight policy in May of 2013.  *Id.* at 27,645.  Under that policy, "in addition to services designated . . . as inpatient only, surgical procedures, diagnostic tests, and other treatment would be generally appropriate for inpatient hospital payment under Medicare Part A when the physician expects the patient to require a stay that crosses at least 2 midnights and admits the patient to the hospital on that expectation."  *Id*. at 27,648.  "Conversely, when a patient enters a hospital" for care not specified as inpatient only and the stay is expected to last "a limited period of time that does not cross 2 midnights, the services would be generally inappropriate for payment under Medicare Part A."  *Id.*  To further increase predictability, the Secretary also proposed a "2-midnight presumption," directing that Medicare contractors "presume that inpatient hospital admissions are reasonable and necessary for beneficiaries" whose hospital stays "cross[] 2 'midnights.'"  *Id.* at 27,645.  Absent evidence that the hospital was abusing the new benchmark, the presumption

would control.  *Id.* at 27,645–46.  "For shorter stays, reviewers would consider whether the attending physician who authorized the inpatient admission reasonably expected the patient's stay to" cross "at least two midnights."  *Shands I*, 139 F. Supp. 3d at 247.  After considering public comments, the Secretary adopted both the 2-midnight policy and the presumption in a final rule, which was published in August 2013.  FY 2014 rule, 78 Fed. Reg. at 50,965, *codified as amended at* 42 C.F.R. § 412.3(d)(1).

As explained in its FY 2014 notice of proposed rulemaking, the Department's actuaries estimated that the 2-midnight policy would result in a net utilization shift of 40,000 "encounters" from outpatient to inpatient status.  FY 2014 proposed rule, 78 Fed. Reg. at 27,649.  "Because hospitals are typically paid more for inpatient stays, the Secretary estimated that this 'net shift of 40,000 encounters' would cost the Medicare program an additional $220 million over the course of . . . fiscal year" 2014.  *Shands I*, 139 F. Supp. 3d at 247–48.  To offset that cost, the Secretary proposed to use her "exceptions and adjustments authority," 42 U.S.C. § 1395ww(d)(5)(I)(i), to adopt a 0.2 percent reduction to the "the operating IPPS standardized amount, the hospital-specific amount, and the Puerto Rico-specific amount."  FY 2014 proposed rule, 78 Fed. Reg. at 27,651.

Commenters objected on multiple grounds, including the Secretary's failure to explain or to support the methodology the Department's actuaries employed to conclude that replacing the 24-hour benchmark with the 2-midnight policy would lead to a net decrease in IPPS encounters.  *Shands I*, 139 F. Supp. 3d at 248.  According to many commenters, the Secretary's assessment not only lacked transparency but also lacked common sense.  *Id.*  In their view, the Secretary "profoundly underestimated the volume of [outpatient] encounters" that would result from the

change in policy, and they predicted that the change would, instead, lead to a net decrease in inpatient encounters. *Id.* (quoting JA 299).

Notwithstanding these comments, the Secretary adopted the 0.2 percent rate reduction in the final FY 2014 IPPS rule. FY 2014 rule, 78 Fed. Reg. at 50,953–54. The Secretary "disagree[d] with commenters who indicated that [the Department's] actuaries estimated increase in IPPS expenditures of $220 million was unsupported and insufficiently explained to allow for meaningful comment." *Id.* at 50,953. The Secretary explained, as she did in the proposed rule, that the Department's actuaries estimated that approximately 360,000 "encounters" would shift from inpatient to outpatient, and that approximately 400,000 "encounters" would shift from outpatient to inpatient, yielding a 40,000 "encounter" increase in net inpatient "encounters." *Id.* But, this time, the Secretary disclosed two aspects of the actuaries' methodology that were not disclosed in the proposed rule: first, when estimating the number of "encounters" expected to shift from outpatient to inpatient status under the new policy, the actuaries excluded "[c]laims not containing observation or a major procedure," and, second, when estimating the number of "encounters" expected to shift from inpatient to outpatient status, the actuaries excluded claims involving "medical"—as opposed to "surgical"—diagnostic-related groups ("DRGs"). *Id.* On the same day the Secretary published the final rule, the CMS Office of the Actuary released a memorandum that further elaborated on this methodology, explaining that the actuaries assumed that the excluded "encounters" "'would be unaffected by the policy change.'" *Shands I*, 139 F. Supp. 3d at 249 (quoting JA 208–10).

The Secretary also "disagree[d] with commenters who indicated that [the Department had] not provide[d] sufficient rationale for the use of [its] exceptions and adjustments authority" to adopt the 0.2 percent reduction. FY 2014 rule, 78 Fed. Reg. at 50,953. She noted that "the

issue of patient status ha[d] a substantial impact on improper payments under Medicare Part A for short-stay inpatient hospital claims" and that this concern was "not isolated to a few hospitals." *Id.* In light of "the systemic and widespread nature of this issue," the Secretary adhered to the position that "an overall adjustment to the IPPS rates" was "justifie[d]." *Id.* While stressing that "[p]olicy clarifications such as this do not usually result in utilization shifts of sufficient magnitude and breadth to significantly impact the IPPS," the Secretary concluded that the utilization shift resulting from the 2-midnights policy was "unique" and that "it would be inappropriate to ignore such a utilization shift in the development of the IPPS payment rates." *Id.* at 50,953–54. The Secretary, accordingly, included the 0.2 percent IPPS rate reduction in the final FY 2014 rule. *Id.* at 50,968.

Various groups of hospitals timely challenged the FY 2014 adjustment before the Provider Reimbursement Review Board, which concluded that it lacked authority to decide the legal question presented and thus granted the hospitals' "request for expedited judicial review for the issue and the subject year [FY 2014]." JA 1–7, 27–33, 52–58, 61–68, 70–76, 79–85, 90–98, 100–08, 110–18, 120–26; Dkt. 23-1 at 22 n.4. Over a thousand hospitals—including the *Bakersfield* and *Athens* Plaintiffs—then brought six separate actions in this Court challenging the FY 2014 rule.[4] *See Shands I*, 139 F. Supp. 3d at 250 (listing cases). The Court consolidated the six actions, and Plaintiffs and the Department filed cross-motions for summary judgment. Dkts. 15, 16, 17, 18, 19 & 23.

---

[4] Since then, the number of actions pending before the Court has vastly expanded as other hospitals have challenged the FY 2014 rule, *see, e.g.*, *Soldiers & Sailors Memorial Hospital v. Burwell*, Civil Action No. 15-1244; *Alvarado Hospital Medical Center v. Burwell*, Civil Action No. 15-1743, and a multitude of hospitals have brought suits challenging the similar 0.2 percent adjustments the Department made for FY 2015 and FY 2016, *see, e.g.*, *Arrowhead Regional Medical Center v. Burwell*, Civil Action No. 16-1544; *Adventist Bolingbrook Hospital v. Price*, Civil Action No. 17-455.

**C.**     *Shands I*

Plaintiffs raised three arguments in support of their motions for summary judgment: (1) the Secretary was not authorized under the Medicare Act to make the 0.2 percent rate adjustment; (2) the Secretary violated the procedural requirements of the APA by failing to disclose critical information about the methodology the Department's actuaries applied, failing to offer meaningful responses to substantial comments, and failing to offer a reasoned basis for the final rule; and (3) the 0.2 percent rate reduction was arbitrary and capricious. *Shands I*, 139 F. Supp. 3d at 250.

With respect to the first of these arguments, the Court held that the Department reasonably construed 42 U.S.C. § 1395ww(d)(5)(I)(i) to authorize the Secretary to adopt an across-the-board 0.2 percent reduction to the standardized amount, the hospital-specific rates, and the Puerto Rico-specific rate. *Id.* at 250–60. As the Court explained, the language of § 1395ww(d)(5)(I)(i) is "'[a]t the very least' ambiguous for purposes of *Chevron* step one," *Shands I*, 139 F. Supp. 3d at 256 (quoting *Adirondack*, 740 F.3d at 700), and the Secretary's use of her general exceptions and adjustment authority to adopt the 0.2 percent reduction was neither unreasonable nor at odds "with the overall statutory scheme," *id.* at 259.

Plaintiffs' second set of arguments, in contrast, proved more successful. As explained above, the Department's actuaries concluded that approximately 40,000 hospital discharges would shift to inpatient status in 2014 due to the change from the 24-hour benchmark to the 2-midnight policy and presumption. In the view of various commenters, that was a remarkable and counterintuitive conclusion. It was not until the Secretary announced the final FY 2014 rule that the commenters came to understand that the actuaries examined only "outpatient claims for observation or a major procedure" when they estimated the likely shift from outpatient to inpatient encounters, and that they examined only "claims containing a surgical MS-DRG" in

16

estimating the likely shift from inpatient to outpatient encounters.  *Id*. at 262–63.  The Court held

that the Secretary's failure to disclose these critical assumptions before issuing the final rule

deprived "Plaintiffs and other members of the public of a meaningful opportunity to comment on

the proposed 0.2 percent reduction" and thus violated the APA.  *Id.* at 263–65.

Given that conclusion, the Court decided that it was both unnecessary and premature to

reach Plaintiffs' third argument—that the 0.2 percent reduction was arbitrary and capricious.  *Id.*

at 266.  In short, because the Secretary did not timely disclose the assumptions that the

Department's actuaries applied, commenters did not have the opportunity to explain to the

Secretary why the Department's analysis was flawed, and the Secretary did not have the

opportunity to consider and to respond to those comments.  As a result, the administrative record

was insufficiently developed to permit the type of arbitrary and capricious review that Plaintiffs

raised.  *Id.*

Finally, the Court considered the question of remedy.  Applying the test established in

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993),

the Court held "that the flaw in the notice and comment process was substantial and that it [was]

possible that the procedural error affected the Secretary's final decision to adopt the 0.2 percent

reduction."  *Shands I*, 139 F. Supp. 3d at 268.  But the Court also found that a remand with

vacatur would have serious "disruptive consequences" and "would, in effect, dictate a

substantive outcome based on a procedural error."  *Id.* at 269–70.  Accordingly, although a close

question, the Court remanded the FY 2014 rule to the Department without vacatur but set "a

timetable for administrative proceedings on remand."  *Id.* at 271.  *See also* Dkt. 53; Minute Order

(March 17, 2016).  The Court cautioned, however, that "vacatur may be appropriate in a future

proceeding" if the Secretary failed "on remand to give meaningful consideration to significant comments." *Shands I*, 139 F. Supp. 3d at 270–71.

**D.      Further Administrative Proceedings on Remand**

In accordance with the Court's remand order, the Secretary published a notice describing "the basis for the 0.2 percent reduction and [the actuaries'] underlying assumptions and invite[d] comments on the same in order to facilitate [its] further consideration of the FY 2014 reduction." December 2015 Notice, 80 Fed. Reg. at 75,107.  The notice explained that "[t]he task of modeling the impact of the 2-midnight policy on hospital payments beg[an] with a recognition that some cases that were previously outpatient cases will become inpatient cases and vice versa" and that the actuaries, therefore, needed "to develop a model that determined the net effect of the number of cases that would move in each direction." *Id.* at 75,108.  The model the actuaries used analyzed calendar year ("CY") 2011 data; assumed that, in general, payments made for outpatient stays would be substantially smaller than payments made for inpatient stays and that outpatient beneficiaries would pay 20 percent of the Part B (outpatient) cost; and, as discussed above, analyzed spending for observation care and major procedures when measuring the shift to inpatient encounters and analyzed spending for surgical MS-DRGs when measuring the shift to outpatient encounters.  *Id*. at 75,108–09.

As relevant to this litigation, the Secretary explained why the Department excluded certain encounters from its analysis.  With respect to the decision to consider only spending for observation care and medical procedures in analyzing the shift from outpatient to inpatient encounters, the Secretary stated: "This was done in order to remove claims with diagnostic services and minor procedures that would be less likely to trigger an encounter in which there was a continuous stay." *Id.* at 75,109.  Although the Secretary continued to embrace this assumption, she noted that the definition of "observation care" that the Department had

18

previously used "may have been overly conservative" and that, had the Department used a more expansive definition, it would have identified 50,000 additional "cases shifting to inpatient status." *Id.* The Secretary also questioned whether the Department should have applied a more expansive measure of length of care, which—when combined with the more expansive definition of "observation care"—would have resulted in an estimate of "570,000 cases shifting from the outpatient to the inpatient setting . . . instead of the 400,000 cases used in the [actuaries' original] estimate." *Id.* at 75,109–10.

With respect to the decision to consider only surgical—and not medical—cases in measuring the utilization shift from inpatient to outpatient encounters, the Secretary explained that the Department sought to account for "behavioral changes by hospitals and admitting practitioners." *Id.* at 75,110. "Claims containing medical MS-DRGs were excluded because" the Department's actuaries "believed that due to [these] behavioral changes . . . most inpatient medical encounters spanning less than 2 midnights before the current 2-midnight policy was implemented might be reasonably expected to extend past 2 midnights after its implementation and would thus still be considered inpatient." *Id.* Apparently, in the view of the actuaries and CMS's medical staff, "the clinical assessments and protocols used by physicians to develop an expected length of stay for medical cases were, in general, more variable and less defined than those used to develop an expected length of stay for surgical cases." *Id.* The Secretary further explained that this distinction between medical and surgical cases was supported by "proprietary utilization review tools such as the Milliman Care Guidelines . . . and InterQual," both of which "reflect [this] same type[] of distinction[]." *Id.* To be sure, "all guidelines" recognize that "individuals vary in their post-operative courses, [but] there are predictable post-operative courses that are based on such factors as whether or not the abdominal cavity or the pleural

cavity are entered, the expected time for recovery from anesthesia, the expected time to resume

urinary [or bowel] function, . . . the expected time to regain mobility, and the typical period for

common post-operative interventions." *Id*. In contrast, "for medical admissions a single

diagnosis typically covers a much broader spectrum of possibilities," and thus "the medical

diagnosis does not imply a reasonably consistent set of activities." *Id.*

Finally, the Secretary observed that the Department's actuaries were in the process of

analyzing "claims experience for FY 2014 and FY 2015 in light of available data," and sought

"comment on whether [it] should await the completion of the actuaries' analysis of FY 2014 and

FY 2015 data before resolution of th[e] [remand] proceeding." *Id*. In addition to potentially

shedding light on the actuaries' assumptions, that data—according to the Secretary—might also

reflect "factors that" the actuaries "could not [have] anticipated," "such as the prohibition on

Recovery Audit post-payment reviews that became effective October 1, 2013." *Id.* at 75,111.

By April 2016, however, the Department's confidence in the 0.2 percent rate reduction

had waned. At that time, the Department published a proposed rule that, among other things,

addressed the *Shands I* remand and the comments the Department received in response to the

December 2015 notice. FY 2017 proposed rule, 81 Fed. Reg. 24,946. The Secretary first

explained that "[t]he 2-midnight policy itself and [the Department's] implementation of it [had]

evolved over time as a result of a combination of statutory, regulatory, and operational changes."

*Id*. at 25,137. Congress, for example, "extended the prohibition on Recovery Auditor reviews of

inpatient hospital status . . . absent evidence of systematic gaming, fraud, abuse or delays in the

provision of care by a provider of services," and the Department "modified the original 'rare and

unusual' exceptions policy under the 2-midnight policy to allow for Medicare Part A payment on

a case-by-case basis for inpatient admissions that do not satisfy the 2-midnight benchmark." *Id.*

"[I]n reviewing the public comments . . . received on the 0.2 percent reduction," moreover, the Secretary "recognized" that the "estimate for the 0.2 percent reduction had a much greater degree of uncertainty than usual." *Id.* Because the "estimate depended critically on the assumed utilization changes in the inpatient and outpatient hospital settings, relatively small changes would have a disproportionate effect on the estimated net costs," and thus "the actual results could differ significantly from the estimate." *Id.* Finally, "in reviewing the public comments [it] received" in response to "the December 1, 2015 notice," the Secretary "also considered the fact that [the Department's] actuaries' most recent estimate of the impact of the 2-midnight policy varies between a savings and a cost of the FY 2016 to FY 2015 time period." *Id.* at 25,137–38.

"[T]aking all [these] factors into account," the Secretary proposed that the Department "remove" the 0.2 percent rate reduction "beginning in FY 2017." *Id.* at 25,138. Of greater relevance here, the Secretary also proposed that the Department adopt a one-time rate increase for FY 2017 "to address the effect of the 0.2 percent reduction to the rates in effect for 2014, the 0.2 percent reduction to the rates in effect for FY 2015 . . . , and the 0.2 percent reduction in rates in effect for FY 2016." *Id.* The Secretary proposed "that the most transparent, expedient, and administratively feasible method" to compensate for these reductions was to adopt "a temporary one-time prospective increase for FY 2017 rates of 0.6 percent (= 0.2 percent + 0.2 percent + 0.2 percent)." *Id.* As the Secretary explained, although the Department "generally do[es] not believe it is appropriate in a prospective system," like Medicare, "to retrospectively adjust rates even where . . . a prospective change in policy is warranted," she was proposing "this action in the specific context . . . in which [it was] ordered by a Federal court to further explain the basis of an adjustment [it had] imposed for past years." *Id.*

The Secretary adopted the proposed adjustments in a final rule, which was promulgated in August 2016.  FY 2017 rule, 81 Fed. Reg. 56,762.  "The vast majority of commenters," according to the Secretary, "recognized the unique nature of this situation and supported prospectively removing the 0.2 percent reduction to the rates and making a temporary one-time prospective increase to the FY 2017 rates to address the effect of the 0.2 percent reduction to the rates for FYs 2014 through 2016."  *Id.* at 57,059.   "Some commenters," however, "raised concerns about the adequacy of the proposed adjustment relative to their estimates of the impact of the 2-midnight policy to date."  *Id.*  Most significantly, some commenters maintained that adoption of the 2-midnight policy actually caused a net utilization shift from inpatient to outpatient status and thus resulted in "a net savings" in "Medicare expenditures."  *Id.* at 57,059–60.  These commenters, accordingly, argued that the Secretary "should adopt a rate increase to offset [the] asserted decline in expenditures."  *Id.* at 57,060.

In response, the Secretary wrote:

We believe these commenters are mischaracterizing our proposal.  In making our proposal, we were not attempting to determine a new point estimate of the effect of the 2-midnight policy for the purpose of then proposing (1) a prospective adjustment to rates for the net effect of that new estimate relative to the –0.2 percent adjustment we put in place in FY 2014 and (2) a temporary one-time adjustment to the rates in FY 2017 to address the net effects of that new estimate over the FY 2014–FY 2016 time period.  Rather than determine a new point estimate, we proposed to *remove* the –0.2 percent adjustment we did make and [to] address the effect of that adjustment for FYs 2014 through 2016.

*Id.*  The Secretary stressed that the Department was "not required by statute to make an adjustment to the rates for the effect of the 2-midnight policy," but simply "chose to do so at the time for the reasons stated in the prior rulemaking."  *Id.*  Because the Department was "no longer . . . confident that the effect of the 2-midnight policy on the number of discharges paid under the IPPS may be measured in this context," it "proposed to make no adjustment (and to account for

the past effects of the adjustment [it] had made)." *Id.* In short, having come to question the Department's ability to make a confident assessment of the effect of the 2-midnight rule on inpatient and outpatient utilization, the Secretary decided not to exercise her discretionary adjustment authority. *Id.*

The Secretary was more receptive, however, to two sets of comments. First, in response to concerns that "a very small number of hospitals would not benefit from the adjustments to the FY 2017 rates" because they had closed or converted to a different type of hospital, the Secretary agreed to "provide a process to address the situation of closed or converted hospitals." *Id.* Second, in response to concerns that the 0.6 percent adjustment would "not compensate hospitals that are party to the lawsuit for interest and/or all hospitals for the time value of money," the Secretary committed "not [to] contest that hospitals that are party to the Shands Jacksonville Medical Center, Inc. v. Burwell, No. 14-263 (D.D.C.) and other currently pending cases that challenge the –0.2 percent adjustment should receive interest under section 1878(f)(2) of the" Medicare Act. *Id.*

Finally, the Secretary noted that some commenters argued that the "0.6 percent adjustment would not fully compensate hospitals for the effect of the –0.2 percent adjustment for FY[] 2014 through FY 2016" because of a "recent trend of a decline in inpatient admissions." *Id.* In response, the Secretary "recognize[d] that [the Department's] proposed method of prospective . . . adjustment for FY 2017 generally may have a differential *positive or negative* impact on an individual hospital relative to an attempt to estimate hospital by hospital the impact of the 2-midnight adjustment for FYs 2014, 2015, and 2016." *Id.* She explained, however, that these "differential impacts are an appropriate consequence" in light of the "prospective nature"

of the relevant "methodology" and the Department's "goal to adopt a transparent, expedient, and administratively feasible approach." *Id.*

## II. LEGAL STANDARD

When a court has remanded a rule for agency reconsideration, the application of the APA and governing statutes apply with the same force as in the original rulemaking. *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009). As before, the Court may set aside the Secretary's action under the APA "only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA requires an agency to "examine the relevant data and [to] articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015) (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)) (emphasis omitted). This requirement includes a duty to provide "the opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules" and an "explanation . . . [including] the general bases for the rules chosen." *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982). An agency, however "need not justify the rules it selects in every detail." *Id.*

Should an agency "arrive[] at substantially the same conclusion" on remand as it did in the prior proceeding, the reviewing court "will accord a somewhat greater degree of scrutiny . . . 'recogniz[ing] the danger that an agency, having reached a particular result, may become so committed to that result as to resist engaging in any genuine reconsideration of the issues.'" *Greyhound Corp. v. ICC*, 668 F.2d 1354, 1358 (D.C. Cir. 1981) (quoting *Food Mktg. Inst. v. ICC*, 587 F.2d 1285, 1290 (D.C. Cir. 1978)). In other words, "[t]he agency's action on remand

must be more than a barren exercise of supplying reasons to support a pre-ordained result."

*Food Mktg. Inst.*, 587 F.2d at 1290.

## III. ANALYSIS

Both the *Bakersfield* and *Athens* Plaintiffs contend that the Secretary's actions on remand violated the APA, but for very different reasons. As explained below, the Court concludes that neither approach is availing.

### A.      The *Bakersfield* Plaintiffs' Challenge

According to the *Bakersfield* Plaintiffs, the proper disposition of the case follows from a simple syllogism: First, a rule that is adopted in violation of the APA must be set aside. Second, the Court has already concluded that the FY 2014 rulemaking violated the APA because the Secretary failed to provide a meaningful opportunity for public comment on the 0.2 percent rate reduction. Third, although the Court provided the Secretary with the opportunity to cure this deficiency on remand, that opportunity has now "come and gone," and the Secretary not only failed to cure the deficiency but affirmatively "abdicated any claim to the rate reduction's legitimacy." Dkt. 82 at 8; 17. Thus, because the procedurally-deficient FY 2014 rate reduction remains in effect, the Court must set it aside.

Anticipating the Secretary's response, the *Bakersfield* Plaintiffs go on to argue that the one-time, 0.6 percent rate increase that the Secretary adopted in FY 2017 does not forestall this conclusion. As an initial matter, they argue that the FY 2017 rate increase did not moot their challenge because the administrative record does not establish that the 0.6 percent rate increase "will make Plaintiffs whole." *Id.* at 22. Then, turning to the substance of the issue, they stress that the FY 2017 rule did not "repeal, amend, or supersede the FY 2014 rule" and argue that nothing short of a repeal of the FY 2014 rule—and certainly not an adjustment in the rates set for a different fiscal year—is legally sufficient to remedy the APA violation. *Id.* at 25. But, even if

the Court declines to vacate the FY 2014 rate reduction, the *Bakersfield* Plaintiffs continue, they are at least entitled to "make whole" relief, which will require that the Secretary "compare" the loss to each of the plaintiff-hospitals resulting from the 0.2 percent reduction adopted in FYs 2014–2016 with the gain to each hospital realized from the FY 2017 0.6 percent adjustment. *Id.* at 28. Finally, they argue that the FY 2017 final rule is not currently before the Court and that, as a result, the Court lacks jurisdiction to consider whether the "0.6 percent positive adjustment" adopted in that rulemaking "was an appropriate response to the botched FY 2014 rulemaking." Dkt. 82 at 23 n.6; *see also* Dkt. 93 at 14–15; *id.* at 9 ("The Plaintiffs in the instant case are not challenging whether the Secretary's method for addressing the deficient payment reduction is proper.").

Before turning to these contentions, it is worth clarifying what is, and what is not, in dispute. First, and most importantly, the Secretary no longer defends the FY 2014 adjustment. To the contrary, after receiving comments in response to its December 2015 notice, the Department "changed its mind," Dkt. 65 at 7, and elected "to remove the 0.2 percent adjustment" going forward and to "address the effect of that adjustment" for past years by adopting a one-time 0.6 percent increase in the rates, 81 Fed. Reg. at 57,060. Second, although the parties have spilled much ink on the question of mootness, the Secretary concedes that the *Bakersfield* Plaintiffs' challenge is not moot: The Department's "position is not that the issue has been mooted, but rather, . . . simply that the remedial approach [it] has chosen is lawful." Dkt. 89-1 at 22 n.11. The Court, of course, has an independent duty to determine whether it has Article III jurisdiction to consider the challenge, *see LeFande v. District of Columbia*, 841 F.3d 485, 492 (D.C. Cir. 2016), but it agrees that mootness is a red herring.

Although the *Bakersfield* Plaintiffs recognize that the Secretary has "abandoned [the Department's] defense of the rate reduction," Dkt. 82 at 16, they stress that the FY 2014 rate reduction nonetheless remains in effect. That premise is correct—and indeed undisputed. The next step in their argument, however, is more problematic. In their view, not only does the FY 2014 rate reduction remain in effect, but it stands alone, wholly apart from any action the Secretary took in the FY 2017 rulemaking. Had the Secretary "withdrawn, cancelled, amended, or superseded" the FY 2014 rate reduction in the FY 2017 rule, they argue, that chasm might have been bridged. Dkt. 82 at 26. But according to the *Bakersfield* Plaintiffs, the Secretary merely "address[ed]" the 0.2 percent rate reduction in the FY 2017 rulemaking—a word that the *Bakersfield* Plaintiffs contend signals the Secretary's recognition that the Department "could not claim that the 0.6 percent adjustment removed the effects of the 0.2 percent negative adjustment." *Id*. at 26 n.7.

The distinction between "removing" and "addressing" the 0.2 percent adjustment, however, cannot bear the weight that the *Bakersfield* Plaintiffs suggest. To understand why, it is necessary to distinguish between two sets of questions posed by the Secretary's actions on remand:

1.     *The Secretary Addressed the Court's Order on Remand*

The first set of questions turns whether the Secretary has addressed the flaw in the FY 2014 rulemaking that prompted the Court's remand. As the Court explained in *Shands I*, the Secretary's failure to disclose the critical assumptions relied upon by the Department's actuaries deprived Plaintiffs and "other members of the public" of the "opportunity to offer meaningful comments on the . . . propos[ed] . . . 0.2 percent reduction." 139 F. Supp. 3d at 265. There is no dispute that, on remand, the Department disclosed those assumptions and provided the public

with the opportunity to comment on the rate reduction.  80 Fed. Reg. at 75,107–117.  That

additional process addressed the APA deficiency that the Court identified in *Shands I*.  As a

result, the *Bakersfield* Plaintiffs cannot show that the Secretary failed to heed the Court's order;

to the contrary, the Department not only provided a meaningful opportunity for comment on the

actuarial assumptions, it changed its position regarding the adjustment based at least in part on

the comments that it solicited and received.

  Although the *Bakersfield* Plaintiffs at times employ language suggesting that they were

once again denied a meaningful opportunity to comment, what they actually challenge is the

justification that the Secretary offered for the adjustment on remand.  Dkt. 82 at 11–15.  They

assert that the Secretary seems to have unfairly and unjustifiably assumed that hospitals and

practitioners would "game the system" by using the more flexible standards applicable to

medical (as opposed to surgical) cases to extend hospital stays merely to satisfy the 2-midnight

policy.  *Id.* at 12.  They question whether "a hospital, as opposed to the admitting physician or

other practitioner," would have the ability "to prolong the stay of the patient," and question

whether "the admitting practitioner" would have any financial or other motivation to prolong the

stay.  *Id.*  They stress that patients, in fact, typically "want to leave the hospital as soon as

possible" and that doctors "are concerned about hospital-acquired infections."  *Id.*  And they

raise a host of other reasons why the actuaries' assumptions were purportedly unsound.  *Id.* at

12–15.

  After reciting these deficiencies, the *Bakersfield* Plaintiffs come to their point: "the

Secretary still has not articulated a satisfactory explanation for the factors he took into account

for his rate reduction, and he has therefore not provided the public with a meaningful opportunity

to comment" on the FY 2014 rate reduction.  Dkt. 82 at 15.  That contention, however, conflates

the APA obligation to provide the public with a meaningful opportunity to comment on a proposed rule and the APA obligation to offer a reasoned and rational explanation for the action the agency ultimately takes.  When considered separately, Plaintiffs' argument founders.  With respect to the first obligation, as explained above, the administrative record establishes that the Secretary did, in fact, provide the public with a meaningful opportunity to comment on the 0.2 percent rate reduction.  And, with respect to the second obligation, the Secretary was not required to provide a reasoned and rational explanation for a conclusion that the Department declined to defend.  To be sure, had the Secretary decided to stand by the 0.2 percent reduction after considering the comments that the Department received, she would have been required to explain that decision.  But that is not what she did.

2.    *The Secretary Was Not Required to Rescind the FY 2014 Rate Adjustment*

The *Bakersfield* Plaintiffs, of course, do not concede the premise of this analysis—they maintain that Secretary did not abandon the FY 2014 (or FY 2015 and FY 2016) rate reduction but, rather, left the rule in place.  That argument, however, has nothing to do with whether the Secretary provided the public with a meaningful opportunity to comment on the rate reduction or whether she offered a reasoned explanation for the actuarial assumptions the Department applied.  Rather, it implicates a second, distinct set of questions that focus on whether, having lost confidence in the actuarial assumptions underlying the FY 2014 rule, the Secretary was required formally to rescind the FY 2014 rate adjustment or whether she could, instead, "address" any concerns regarding the FY 2014 rate adjustment (and any similar concerns about the FY 2015 and FY 2016 rate adjustments) by adopting a 0.6 percent prospective rate adjustment in FY 2017.  Cleared of the preceding underbrush, this is the central issue presented by the *Bakersfield* Plaintiffs' challenge, and none of the arguments that they press is persuasive.

The *Bakersfield* Plaintiffs first argue that the administrative record does not show that the 0.6 percent rate increase was sufficient to make them whole—that is, it did not completely undo the FY 2014 rate reduction.[5] Dkt. 82 at 21–23. In support of this contention, they point to comments that were submitted in response to the FY 2017 proposed rule indicating that hospital admissions declined over the relevant period, and they note that the Department has not disputed the accuracy of these comments. *Id.* at 22–23 and n.6. Declining hospital admissions are relevant because, roughly stated, the dollar value of each of the adjustments at issue is a product of the IPPS standardized amount (or hospital-specific or Puerto Rico-specific amount), which varies based on the adjustment at issue, times the number of hospital discharges in the relevant fiscal year. Accordingly, a 0.6 percent rate increase in FY 2017 would not make a hospital whole for 0.2 percent rate decreases in FYs 2014–2016, if the hospital discharged fewer patients in FY 2017 than it did, on average, in FYs 2014–2016.

And, even if the FY 2017 0.6 percent rate increase was sufficient to compensate *all* Medicare hospitals for their *aggregate* losses, the Department's approach failed even to consider "the specific circumstances of each and every Plaintiff." *Id*. at 23. From this, the *Bakersfield* Plaintiffs conclude that the FY 2017 0.6 percent adjustment "is neither solace nor sufficient legal redress for any Plaintiff that was shorted by the 0.2 percent payment reduction." *Id.*

Although the factual premise of this argument is convincing, its conclusion is not. As the Secretary explained in the FY 2017 final rule, the Department did not intend for the 0.6 percent increase precisely to mirror the 0.2 percent reductions for FYs 2014–2016 or to make whole each

_____

[5] Although the *Bakersfield* Plaintiffs raise this argument to show that the FY 2017 rulemaking did not render their challenge to the FY 2014 rate adjustment moot, the Court will give them the benefit of the doubt and, having concluded that the case is not moot, will consider the argument on the merits.

individual hospital that had been subject to those reductions. The Secretary, instead, adopted the 0.6 percent FY 2017 rate adjustment as "the most transparent, expedient, and administratively feasible method to" address "the effect of the 0.2 percent reduction to the rates in effect for FY 2014, the 0.2 percent reduction to the rates in effect for FY 2015, . . . and the 0.2 percent reduction to the rates in effect for FY 2016." FY 2017 rule, 81 Fed. Reg. at 57,059. The Secretary added that, although the Department does not generally believe that "it is appropriate in a prospective system to retrospectively adjust rates," it was prepared to "take this action in the specific context of this unique situation." *Id.* With respect to the "small number of hospitals" that "would not benefit from the adjustment to the FY 2017 rates"—such as those that "closed" or "converted to a different type of hospital" by FY 2017—moreover, the Secretary agreed to provide "a process to address" their losses. *Id.* at 57,060.

Notably, although the *Bakersfield* Plaintiffs contend that the Secretary was required to provide each Medicare hospital with "make whole" relief, they fail to cite a single statutory and regulatory provision in support of that contention. Nor is it the Court's role to engage in its own review of what is, by any measure, a "complex statutory and regulatory regime," *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993), in search of a provision that might support their contention. To the extent Plaintiffs purport to find the "make whole" obligation in the APA, moreover, they also fail to explain the basis for their argument. To be sure, an APA violation might, at least at times, require "make whole" relief. But, as explained above, the *Bakersfield* Plaintiffs' contention that the Secretary violated the APA by failing to provide a reasoned explanation for the Department's initial reliance on the actuaries' assumptions attacks a strawman; the Department no longer stands by the 0.2 percent reduction.

For present purposes, the more apt question is whether the Secretary's decision to "address" that about-face by adopting a prospective 0.6 percent rate increase—a question that has not previously been presented to the Court—was adopted in violation of the APA or failed sufficiently to undo the 2014 rate reduction.  With respect to that question, however, the *Bakersfield* Plaintiffs offer little more than *ipse dixit*.  Indeed, in response to the Department's contention that the D.C. Circuit and other courts have held that the APA does not require that the Department act with precision in making remedial adjustments under the Medicare Act, Dkt. 89-1 at 20–21 (quoting *Chaves Cty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 919 (D.C. Cir. 1991) (noting that "any minor errors will tend to balance out in the end")), Plaintiffs merely assert that these "cases have nothing to do with" their argument and that they "are not challenging whether the Secretary's method for addressing the deficient payment reduction is proper," Dkt. 93 at 8–9.

The *Bakersfield* Plaintiffs make this concession for good reason.  In other contexts, the D.C. Circuit has recognized that, at least in the absence of a statutory command to the contrary, reasonableness is the touchstone for determining whether the Secretary's response to a past deficiency is appropriate under the Medicare Act.  *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225 (D.C. Cir. 1994), although not on all fours with this case, provides helpful guidance.  In that case, the Secretary "corrected an erroneous regional wage index for the Sacramento area" for the second half of 1984, "but refused to apply the new index retroactively to" the first half of the year.  *Id.* at 1226.  After concluding that no statutory provision compelled the Secretary to adopt a retroactive remedy, the Court concluded that her decision was also "reasonable" for purposes of the APA.  *Id.* at 1232–36.  As the Court explained, although "retroactive corrections . . . are not necessarily inconsistent with the" prospective payment

system, that proposition does not mean "that a prospective-only policy is unreasonable." *Id.* at 1232; *see also Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1169 (D.C. Cir. 2015) (Secretary may "sensibly" conclude "that 'the interests in finality and administrative efficiency outweighed the value of increased accuracy'" (quoting *Methodist Hosp.*, 38 F.2d at 1235)). Various considerations, moreover, might reasonably support such a policy. The Secretary might reasonably conclude, for example, that a "prospectivity policy" enhances certainty and thus promotes "efficient and realistic cost-saving targets;" that "finality protects Medicare providers as well as the Secretary from unexpected shifts in basic reimbursement rates;" and that such a policy reduces "administrative burden[s]." *Methodist Hosp.*, 38 F.2d at 1232–33.

Here, the Secretary relied on similar, although not identical, considerations, concluding that adoption of the one-time, 0.6 percent rate increase would provide "the most transparent, expedient, and administratively feasible method to" address the effect of the 0.2 percent rate decreases in FYs 2014–2016. FY 2017 rule, 81 Fed. Reg. at 57,059. The remedy the Secretary adopted, moreover, was reasonably calibrated to address the problem it sought to remedy. The Secretary, for example, recognized that certain hospitals might miss the opportunity to recoup their losses because they have closed or converted to a different type of hospital, and agreed to provide a further process to address the unique circumstances of those hospitals. *Id.* at 57,060. To be sure, had the Secretary simply declined to adopt any remedy or adopted an unreasonable one, the *Bakersfield* Plaintiffs would have a point. But the Secretary recognized that, notwithstanding the Department's general view that it is not "appropriate in a prospective system to retroactively adjust rates," *id.*, a prospective remedy was appropriate here to compensate hospitals for the effects of the past 0.2 percent rate increases. That remedy may not make each

hospital whole on a dollar-for-dollar basis, but it provides a reasonable approximation of the FY 2014 adjustment that the Secretary sought to undo.

In Plaintiffs' view, *Methodist Hospital* and the Secretary's "prospective-only policy" are inapposite because they "are not seeking a retroactive rate adjustment based on subsequent evidence that the number of inpatient discharges turned out to be less than what the Secretary predicted;" rather, Plaintiffs' "complaint is that the FY 2014 [r]ule was defective to begin with, both procedurally and substantively." Dkt. 93 at 9. This case, in their view, is accordingly more akin to *Cape Cod Hospital v. Sebelius*, 630 F.3d 203, 214 (D.C. Cir. 2011), where the D.C. Circuit "reject[ed] the Secretary's . . . contention that the hospitals [were] improperly seeking a form of 'retroactive relief' inconsistent with the prospective nature of the payment system used to compensate hospitals for providing inpatient Medicare services." Dkt. 93 at 9. As the D.C. Circuit explained, the Secretary could not reasonably rely on the Department's prospective-only policy to defend the effect of past computational errors on the calculation of "current" Medicare payments. *Cape Cod Hosp.*, 630 F.3d at 214–15.

It is hard to know what to make of that contention because the 0.6 percent rate increase the Secretary adopted was, in fact, designed to redress a past action that the Secretary declined to defend. Although noting that the Department "generally" does not believe that it is "appropriate . . . to retrospectively adjust rates," the Secretary proceeded to adopt a remedy "in the specific context of this unique situation" designed to "address" the FY 2014, FY 2015, and FY 2016 rate reductions. FY 2017 rule, 81 Fed. Reg. at 57,059. In other words, although the Department adopted a remedy that paid hospitals prospectively, that action was taken to compensate the hospitals for revenue that they lost for FYs 2014–2016.

The "prospective" or "retrospective" nomenclature, accordingly, is not what matters. What matters is that the Department adopted what it concluded was a reasonable means of undoing the earlier rate increases, and, as *Methodist Hospital* instructs, the types of considerations that the Secretary employed—transparency, efficiency, and administrative feasibility—are consistent with the Secretary's statutory duties. *See Methodist Hosp.*, 38 F.2d at 1232–33. The fact that the *Bakersfield* Plaintiffs—by their own account—have not "challeng[ed] whether the Secretary's method for addressing the deficient payment reduction is proper," Dkt. 93 at 9, resolves matters. It is unduly formulaic, and at odds with the substantial deference that Courts owe to the Secretary in the administration of such a "complex statutory and regulatory regime," *Good Samaritan Hosp.*, 508 U.S. at 404, to say—as Plaintiffs do—that the Secretary's sole recourse in circumstances like those present here is to set aside the earlier adjustment and to recalculate the payments due for prior years.

3. *The Court Has Jurisdiction to Consider the Remedial Aspects of the FY 2017 Rule*

Finally, the *Bakersfield* Plaintiffs argue for the first time in their reply brief that the Court lacks subject-matter jurisdiction to consider whether the rate increase included in the FY 2017 rule "was reasonable, or arbitrary and capricious." Dkt. 93 at 14–15. The unstated implication of this argument is that the chasm between the FY 2014 rate reduction and the FY 2017 rate increase is jurisdictional and thus beyond the Court's authority to bridge. As explained below, the Court is unpersuaded.

Three statutory provisions speak to the Court's jurisdiction. *See Jordan Hosp. v. Leavitt*, 571 F. Supp. 2d 108, 113 (D.D.C. 2008). First, 42 U.S.C. § 405 divests federal courts of jurisdiction "on any claim arising under" Title II of the Social Security Act "except as herein provided," 42 U.S.C. § 405(h), and then provides for judicial review "after any final decision of

the Commissioner of Social Security made after a hearing to which he was a party," *id.* § 405(g). *See Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir. 2018). Second, 42 U.S.C. § 1395ii provides that the exclusive-jurisdiction provision contained in 42 U.S.C. § 405(h) "shall also apply with respect to" Title XVIII of the Social Security Act—that is, the Medicare Act—"to the same extent [it is] applicable with respect to" Title II. *See Am. Hosp. Ass'n*, 895 F.3d at 825. Third, 42 U.S.C. § 1395oo(f) provides that "[p]roviders shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received." *See also* 42 C.F.R. § 405.1877(a)(1) (42 U.S.C. §§ 405 and 1395ii "provide that a decision or any action by a reviewing entity is subject to judicial review solely to the extent authorized by" 42 U.S.C. § 1395oo(f)(1)).

Notwithstanding increased judicial reluctance to treat every "statutory limitation as jurisdictional," *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013), this Court is bound by existing precedent holding that 42 U.S.C. §§ 405(g) and 1395oo(f) encompass at least certain jurisdictional elements. To start, the Supreme Court and the D.C. Circuit have held that § 405(g) includes both "a 'nonwaivable' requirement 'that a claim for benefits shall have been *presented* to the Secretary,' . . . and a waivable requirement that administrative remedies provided by the Secretary be exhausted." *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1131 (D.C. Cir. 1992) (emphasis added) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 328 (1976)). And, although it is possible to read this precedent to draw the jurisdictional line at the initial "presentment" of a claim as opposed to some "final decision," *compare Bowen v. City of New York*, 476 U.S. 467, 483 (1986) ("The nonwaivable element is the requirement that a claim

for benefits shall have been presented to the Secretary.") *with Heckler v. Ringer*, 466 U.S. 602, 639 n.27 (1984) (Stevens, J., concurring in part and dissenting in part) ("What the plain language of the statute requires is not 'presentment' of a 'clam for reimbursement' but rather 'a decision of the Secretary.'"), the Court need not step into that morass here because controlling D.C. Circuit precedent establishes that "Section 1395oo . . . exacts an administrative *determination* as a jurisdictional postulate." *Ass'n of Am. Med. Colleges v. Califano*, 569 F.2d 101, 109 (D.C. Cir. 1977) (emphasis added).[6] As a result, the Court's jurisdiction is dependent on a "final decision" of some type by the Provider Reimbursement Review Board (the "Board"). The scope of this requirement, however, varies depending on the nature of claim the plaintiff seeks to raise, and, in particular, on whether the relevant decisionmaker—here, the Board—has authority to render a decision on that type of claim. *Id.* at 110 ("The nature of the claim may influence the type of proceeding needed."); *see also Mathews*, 424 U.S. at 330–32 (presentation of claim to a pre-deprivation hearing was sufficient to allow for judicial review of constitutional claim); *Weinberger v. Salfi*, 422 U.S. 749, 764–65 (1975) (presentation of a claim to benefits was sufficient to allow for judicial review of constitutional challenge).

Applying these principles here, the Court concludes that it has jurisdiction to consider whether the FY 2017 rulemaking adequately addressed the deficiencies that the *Bakersfield* Plaintiffs have raised regarding the FY 2014 rate adjustment. As an initial matter, there is no

---

[6] The Court notes that, although the Supreme Court has reached a different conclusion regarding 42 U.S.C. § 1395oo(a), *see Sebelius v. Auburn Reg'l Med. Ctr.*, 58 U.S. 145 (2013), *Association of American Medical Colleges* dealt with the separate requirements contained in 42 U.S.C. § 1395oo(f), 569 F.2d at 109–10, and the Court is bound by that decision, *see United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) (observing that the D.C. Circuit must leave to the Supreme Court "the prerogative of overruling its . . . decisions," and that "district judges, like panels of [the D.C. Circuit], are obligated to follow controlling circuit precedent until either [the Court of Appeals], sitting en banc, or the Supreme Court, overrule it" (internal quotation marks omitted)).

question that the *Bakersfield* Plaintiffs, along with an array of other providers, presented their challenge to the FY 2014 adjustment to the Board and that the Board rendered decisions with respect to each of those appeals. *See, e.g.*, Civ. No. 14-976, Dkt. 1-1 at 7–9. In each case, moreover, the Board granted the relevant providers' request for "expedited judicial review" pursuant to 42 U.S.C. § 1395oo(f)(1). *See id.* at 8. The expedited-judicial-review provision permits the provider to institute a judicial action involving a "question of law or regulations relevant to the matters in controversy" within sixty days of obtaining a determination from the Board "that it is without authority to decide the question." 42 U.S.C. § 1395oo(f)(1). Accordingly, by granting expedited review, the Board necessarily determined that it was "without authority to decide the legal sufficiency of the Final Rule." *See* Civ. No. 14-976, Dkt. 1-1 at 8.

The Court does not understand the *Bakersfield* Plaintiffs to contend that it would lack jurisdiction had the Secretary addressed the deficiencies in the FY 2014 adjustment in a proceeding devoted to FY 2014, nor could they successfully press such an argument. The statutory requirements for jurisdiction were satisfied: an array of providers *presented* claims to the Board regarding the FY 2014 0.2 percent reduction, and the Board *decided* that it lacked authority "to decide the legal sufficiency of the Final Rule." *E.g.*, Civ. No. 14-976, Dkt. 1-1 at 8. The proceedings on remand, moreover, did not operate to divest the Court of jurisdiction to address that issue or to require further proceedings before the Board. To the contrary, the Court's remand order contemplated only that the Secretary would provide the public with a further opportunity to comment on the actuarial assumptions she relied upon in adopting the FY 2014 0.2 percent reduction and that she would, to the extent necessary, conduct further "rulemaking" proceedings relating to that issue. Dkt. 53. The Court did not contemplate that the

parties would return to the Board, which had already decided that it lacked authority to review the validity of the 0.2 percent reduction, and, indeed, doing so would have frustrated the Court's direction that the Secretary "expedite proceedings on remand." *Shands I*, 139 F. Supp. 3d at 270 (indicating that the Secretary's failure to comply with the expedited schedule "may counsel in favor of vacatur of the rule"). All of this is more than sufficient to sustain the Court's jurisdiction to consider the lawfulness of the FY 2014 rule, in light of the proceedings on remand. *See* 42 C.F.R. § 405.1877(g)(3) (noting that Board review should not occur "to the extent . . . inconsistent with the court's remand order or any other order of the court regarding the civil action").

The *Bakersfield* Plaintiffs do not question the Court's jurisdiction to entertain such a challenge. They, instead, takes aim at the Court's jurisdiction to consider the substance of the FY 2017 rule, which was not subject to the Board's earlier expedited judicial review determination. Dkt. 93 at 14–15. To this, the Court might add that the substance of the FY 2017 rule also falls beyond the scope of the lawsuits that are at issue in the pending cross-motions; all that is currently at issue is the lawfulness of the FY 2014 rule. *See, e.g*., Civ. No. 14-976, Dkt. 1 (challenge to FY 2014 rule); *see also* Civ. No. 14-263 (consolidated actions), Dkt. 53 (remanding matter for further consideration of 0.2 percent reduction used "for fiscal year 2014"). Plaintiffs are therefore correct that any challenges that any providers may want to bring with respect to the FY 2017 rule are not currently before the Court.

But that does not answer the relevant question, which is whether the Court may consider whether the 0.6 percent rate increase the Secretary adopted in the FY 2017 rule adequately "addresses" any deficiencies in the FY 2014 rule. Plaintiffs fail to identify any statute, regulation, or case law that precludes the Court from doing so. The jurisdictional provisions that

Plaintiffs invoke speak only to when a provider may seek judicial review of a regulatory action; they say nothing about which regulatory actions the Secretary may invoke in defending an earlier action that is properly before the Court. Nor is the Court convinced that agency proceedings are hermetically sealed in the manner that Plaintiffs suggest. As the Secretary made clear, she decided to address the problem posed by the FY 2014 rate increase in the context of the FY 2017 rulemaking. FY 2017 rule, 81 Fed. Reg. at 57,059. There is no reason the Court cannot, or should not, consider what the Secretary said and did in the context of evaluating the FY 2014 rule, regardless of the proceeding in which she did so. Or, put differently, the Secretary expressly considered and addressed this Court's remand of the FY 2014 rate adjustment in the course of finalizing the FY 2017 IPPS rule, and there is no reason an agency cannot do multiple things—addressing multiple years—in a single proceeding. Here, there is no question that the Secretary addressed the FY 2014 rate adjustment at the same time as setting the FY 2017 rates, and absent constitutional or regulatory restraints, agencies are "free to fashion their own procedure[s] and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties," *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 543 (1978) (citation and internal quotation marks omitted).

The Court, accordingly, concludes that it has jurisdiction to consider whether the actions the Secretary took in the FY 2017 rule adequately addressed any deficiencies in the FY 2014 rule, and that she acted reasonably when addressing deficiencies in the FY 2014 rate adjustment by adopting a one-time, offsetting rate increase in FY 2017. This decision, moreover, leaves providers free to bring whatever other challenges that they deem appropriate with respect to the FY 2017 rule, after exhausting proceedings before the Board.

**B.     The *Athens* Plaintiffs' Challenge**

Unlike the *Bakersfield* Plaintiffs, the *Athens* Plaintiffs do not question the Court's

authority to review the Secretary's decision to adopt a 0.6 percent rate increase in the FY 2017

rule to "address" the 0.2 percent rate decreases she adopted in FYs 2014–2016.[7]  Their objection,

instead, is that the Secretary did not go far enough.  Throughout the administrative process, they

have taken issue with the Secretary's prediction that the 2-midnight rule would cause a net

*increase* in inpatient stays, costing the Medicare program approximately $220 million.  Both in

the original rulemaking and on remand, they submitted comments purporting to show that "the

two-midnight rule would have the opposite effect and [would] produce a much larger net

*decrease* in inpatient admissions."  Dkt. 84-1 at 6 (emphasis in original).  "In other words," they

posited, "rather than cost the government hundreds of millions of dollars, the two-midnight rule

would cost hospitals billions."  *Id*.  The *Athens* Plaintiffs now argue that the Secretary violated

the APA by "refusing to engage with" their comments showing that the Secretary should have

adopted a rate increase to compensate hospitals for their losses.  *Id.* at 9.  Moreover, "[b]ecause

the [Secretary] has continued," in their view, "to refuse to consider comments that show that the

---

[7]  Although the Secretary does not dispute "the Court's jurisdiction to consider [this] challenge[]" to [the Secretary's] decision on remand," Dkt. 89-1 at 13, the Court must assure itself, *sua sponte*, that it has jurisdiction.  *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).  For reasons explained above, the Court concludes that it has jurisdiction.  Although the challenge that the *Athens* Plaintiffs have brought differs from the challenge brought by the *Bakersfield* Plaintiffs, the *Athens* Plaintiffs raised the issue that they now press before the Board, and the Board concluded that it lacked authority to decide the question.  *See, e.g.*, Dkt. 36 at 27, 32–33.  The question, moreover, fell within the scope of the Court's remand order.  *See* Dkt. 53 (remand order); *see also* Dkt. 19 (seeking remand "to determine inpatient rates for fiscal year 2014 taking into account all relevant factors and disclosing in a rulemaking all facts, data, and assumptions relied upon by the Secretary"); Civ. No. 14-503, Dkt. 1 at 18 (requesting that the Secretary be directed "to recalculate the appropriate increase in the standardized amount . . . for FY 2014 in order to offset the aggregate decrease in the IPPS payments resulting from adoption of the two-midnight rule and pay the Providers the additional sums due them as a result of such recalculation").

two-midnight rule shifts utilization and costs hospitals billions," they urge the Court to vacate the FY 2014 rate adjustment and to order that the Secretary adopt a "budget neutral" rule in its place. *Id.*

The scope of judicial review under the APA is "narrow and a court is not to substitute its judgment for that of the agency." *State Farm Mut.l Auto. Ins. Co*., 463 US. at 43. The Court must, nonetheless, ensure that the agency did not neglect "an important aspect of the problem;" that it "examine[d] the relevant data and articulate[d] a satisfactory [and rational] explanation for its action;" that its explanation is not at odds with "the evidence" that was "before the agency;" that its decision is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise;" and that it did not commit "'a clear error of judgment.'" *Id.* (citations omitted). The Court must also consider whether the agency acted in "observance" of the procedures "required by law," 5 U.S.C. § 706(2)(D), including by providing a meaningful opportunity for interested parties to submit comments, *see Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002); *see also* 5 U.S.C. § 553(c), and by responding to those comments that "raise significant problems," *City of Waukesha v. EPA*, 320 F.3d 228, 257–58 (D.C. Cir. 2003) (citation omitted). It is not the Court's role, however, to demand perfection but rather to ask whether the "the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974), and whether the agency rendered a reasoned decision that was "based on consideration of the relevant factors," *City of Waukesha*, 320 F.3d at 258 (citation omitted).

According to the *Athens* Plaintiffs, the Secretary's response to their request that she adopt a rate increase to compensate hospitals for lost revenue resulting from the 2-midnight rule fails each of these requirements. They stress that, from the very beginning, both common sense and

the relevant data have left little doubt that the Department's "shift" from the 24-hour benchmark "to [the] longer, two-midnight standard" made it more "difficult for hospitals to admit patients on an inpatient basis and thus shift[ed] those cases to the lower outpatient rates," resulting in significant financial losses to the hospitals. Dkt. 84-1 at 10. And they argue that the Secretary adopted a "budget-neutrality principle" in the original FY 2014 rule, which the Secretary has neither disavowed nor effectuated. Dkt. 95 at 8–9. Armed with these two premises, they then contend (1) that the Secretary has failed to consider an important aspect of the problem—that is, the evidence showing "that the two-midnight rule would result in a substantial net decrease in inpatient admissions far greater than the net increase CMS predicted;" (2) that she failed to consider reasonable alternatives—that is, the upward adjustment to the FY 2014 IPPS rates that they urged in the comment process; and (3) that she failed to respond to significant comments— that is, the comments that they submitted challenging the actuaries' assumptions and purporting to show that the 2-midnight rule "would actually cost hospitals billions of dollars." Dkt. 84-1 at 7–31.

The Department responds that the sovereign immunity of the United States bars this challenge because the Secretary's "adjustment" authority to grant the rate increase that Plaintiffs seek is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and thus review of the Secretary's decision whether to exercise that authority lies beyond the reach of the APA. Dkt. 89-1 at 16–19. Moreover, should the Court reach the merits of the *Athens* Plaintiffs' challenge, the Secretary contends that she acted well within the bounds of the APA in declining to exercise that adjustment authority. *Id*. at 25–30. As explained below, the Court is unpersuaded by the first of these arguments but agrees with the second.

1.    *Whether the Adjustment Authority Is Committed to Agency Discretion by Law*

Under "[t]he APA's comprehensive provisions for judicial review of 'agency action,'" an aggrieved party may seek judicial review of a final agency action, including a failure to act. *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). "But before any review at all may be had, a party must first clear the hurdle of § 701(a)." *Id.* That section provides that the waiver of sovereign immunity and cause of action included in the APA are not available "to the extent that . . . (1) statutes preclude judicial review, or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). For present purposes, only the second of these exceptions is at issue. That exception is "a very narrow" one, which Congress intended to apply only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). In most cases, moreover, "courts must apply a presumption in favor of judicial review." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 102 (D.D.C. 2018). Indeed, the presumption applies in all cases, except those "involving enforcement decisions, allocation of lump sum appropriations, or other 'categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.''" *Id.* (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).

According to the Secretary, this is one of those "rare instances" in which the relevant agency action or inaction—here, the Secretary's decision declining to adopt an adjustment increasing the FY 2014 IPPS payment rates—is committed to agency discretion and thus is not subject to judicial review. At first blush, that argument carries some force. Under the Medicare Act, the Secretary is required to follow a series of complex statutory instructions to derive "the standardized amount that is used to calculate inpatient prospective payments for most hospitals."

*Shands I*, 139 F. Supp. 3d at 250–251.  "Section 1395ww(d)(5) authorizes her to make additional payments, exceptions, and adjustments, most of which relate to atypical circumstances or particular types of hospitals."  *Id.* at 251.  In contrast, the subparagraph at issue here—§1395ww(d)(5)(I)(i)—provides the Secretary with a "broad-spectrum grant of authority."  *Adirondack*, 740 F.3d at 694.  Unlike the more cabined authorities that precede it, §1395ww(d)(5)(I)(i) simply provides that:

> The Secretary shall provide by regulation for such other exceptions and adjustments to such payment amounts under this subsection *as the Secretary deems appropriate*.

42 U.S.C. § 1395ww(d)(5)(I)(i) (emphasis added).  This delegation of authority, according to the Secretary, has only one limit—the exception or adjustment must be one that the Secretary "deems appropriate"—and that direction "is precisely the sort of vague statutory formulation that courts have routinely held to be unreviewable."  Dkt. 89-1 at 17.

The *Athens* Plaintiffs disagree for several reasons.  They first argue that, if the Secretary's view of § 1395ww(d)(5)(I)(i) were correct, "this Court's earlier decision remanding for further proceedings would have been unlawful."  Dkt. 95 at 17.  That argument, however, incorrectly equates review of the Secretary's decision to exercise her discretion to make an adjustment pursuant to § 1395ww(d)(5)(I)(i)—that is, her decision to act—with her decision *not* to make an adjustment—that is, her decision to refrain from acting.  An analogy to a slightly different exercise of administrative discretion highlights why § 701(a) does not necessarily require the symmetry that Plaintiffs' suggest:  Courts have long recognized that an agency's decision not to bring an enforcement action is presumptively unreviewable.  *See, e.g.*, *United States v. Batchelder*, 442 U.S. 114, 123–24 (1979).  But once an agency brings an enforcement action, that action is generally subject to review.  That is, as the Supreme Court explained in *Heckler v.*

*Chaney*, once an agency acts to enforce the law, "that action itself provides a focus for judicial review." 470 U.S. at 832. For similar reasons, the Court cannot reject the Secretary's § 701(a) argument here based on the stand-alone contention that the Court's prior review of the Secretary's previous decision to exercise her adjustment authority necessarily means that her decision not to make an adjustment is also subject to review.

That, however, does not end the matter. The D.C. Circuit addressed a question similar to the one posed here in *Marshall County Health Care Authority v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993). There, as here, a group of providers urged the Secretary to grant an exception that would have increased their reimbursement rates; the Secretary declined to do so; and, when the providers challenged the Secretary's inaction, she argued that her decision was insulated from judicial review by 5 U.S.C. § 701(a). *Id.* at 1223–24. Although agreeing that the exception authority at issue conferred broad discretion on the Secretary, the Court of Appeals disagreed that the "determination [was] completely unreviewable." *Id.* at 1224. That is, the Court of Appeals rejected the Secretary's § 701(a) defense.

The Secretary purports to distinguish *Marshall County Health Care Authority* on two grounds. Dkt. 89-1 at 18–19. She first argues that the D.C. Circuit's decision "addressed a separate provision" of the Medicare Act, which "accorded 'exceptions and adjustments' authority to the Secretary as he 'deems appropriate to take into account the special needs of regional and national referral centers.'" *Id.* at 18. That contention is difficult to fathom. In support of the contention, the government cites 42 U.S.C. § 1395ww(d)(5)(C)(i). *Id.* The provision at issue in *Marshall County*, however, was 42 U.S.C. § 1395ww(d)(5)(C)(iii). 968 F.2d at 1223. The government was perhaps confused because § 1395ww(d)(5)(C)(iii) no longer appears in the U.S. Code. The reason it is no longer there, however, is because in 1989 Congress

transferred that subsection to 42 U.S.C. § 1395ww(d)(5)(I)(i)—that is, the very provision that is at issue in this case. *See* Pub. L. No. 101-239, § 6003(e)(1)(ii), 103 Stat. 2142. Although Congress repealed a parenthetical relating to cancer hospitals in 1989, *Shands I*, 139 F. Supp. 3d. at 256, the language that the D.C. Circuit considered in *Marshall County* and the language at issue in this case is identical. That language provides that the "Secretary shall provide by regulation for such other exceptions and adjustments to such payment amounts under this subsection as the Secretary deems appropriate." 42 U.S.C. § 1395ww(d)(5)(I)(i).

This, then, leads to the Secretary's second theory for distinguishing *Marshall County*. In *Marshall County*, the Secretary's decision whether to grant an exception was guided by a separate, substantive provision of the Medicare Act, which directed that she define "urban areas" by reference to Metropolitan Statistical Areas, as defined by the Office of Management and Budget, or "such similar area as the Secretary has recognized." 988 F.2d at 1223. The D.C. Circuit, accordingly, held that "[w]ith respect to the particular provisions relevant to [that] case, . . . Congress [had] provided a rather specific norm—the OMB model—to guide the Secretary's judgment concerning the definition of urban areas" and whether to employ her exceptions authority to modify the governing definition. *Id.* at 1224.

The Court is not convinced, however, that *Marshall County* can be so easily distinguished. In addition to pointing to the "OMB model" as a "specific norm" to "guide the Secretary's judgment," the D.C. Circuit held that the Secretary's § 701(a) argument "puts too much emphasis on the word 'deem;'" that the statute's use of "the mandatory 'shall' . . . might be thought to add at least some obligation to consider exceptions;" that the government's reliance on *Webster v. Doe*, 486 U.S. 592 (1988), was misplaced because the statute at issue in that case "dealt with national security—an area in which the judiciary almost

invariably defers to the executive branch;" and that "[i]t is certainly not true, by contrast, that the Medicare statute reflects that [same] degree of fulsome congressional deference to the executive." *Id.* at 1224–25 & n.2. Finally, the Court of Appeals recognized that, although the action/inaction distinction might counsel in favor of "quite narrow" review of a failure to grant a "waiver[] or exception[,]" "[e]xtremely narrow review is not . . . conceptually equivalent to . . . no review at all," even if, "in practical effect," the ultimate result is the same. *Id.* at 1225.

Nor can the Court accept the Secretary's premise that *Marshall County* is distinguishable on the grounds that Congress provided the Secretary with an underlying norm to apply and that a similar norm is absent in this case. That may well be true, but it goes to the merits of the *Athens* Plaintiffs' challenge, not to the threshold inquiry required by § 701(a). According to the *Athens* Plaintiffs, the FY 2014 rule "recognized that basic principles of budget neutrality require ensuring that hospitals be adequately compensated for the financial impact of the two-midnight policy," and the Secretary has not "disavow[ed] [these] budget-neutrality principles." Dkt. 95 at 8–9. The *Athens* Plaintiffs may face an uphill battle in pressing that claim, but nothing in § 701(a) precludes them from trying.

2.      *Whether the Secretary's Actions on Remand Complied With the APA*

Although *Marshall County* clears the way for the *Athens* Plaintiffs to obtain judicial review, the decision also teaches that judicial review of the Secretary's refusal to invoke her § 1395ww(d)(5)(I)(i) adjustments and exceptions authority is "[e]xtremely narrow." 988 F.2d at 1225. Consideration of the *Athens* Plaintiffs' challenge must start with the uncontested premise that nothing in the Medicare Act requires that the Secretary ensure that the rule at issue remains budget neutral. Tr. Oral Arg. (Rough Draft) at 18–19. In certain areas, the Medicare Act does

require budget neutrality. *See, e.g.*, 42 U.S.C. §§ 1395ww(d)(8)(D) (geographic reclassifications); 1395ww(d)(4)(C)(iii); 1395l(t)(2)(E). This, however, is not one of them.

Nor is this a case in which the Secretary adopted an increase in the FY 2014 rates and later decided to rescind that rule, thus requiring "a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 42; *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). Rather, the Secretary adopted a 0.2 percent rate decrease for FY 2014; subsequently abandoned her defense of that rate decrease; and, in both the original rulemaking and the proceedings on remand, declined the *Athens* Plaintiffs' invitation to adopt a rate increase to offset the cost to participating hospitals resulting from the 2-midnight rule. In short, the Secretary was not required by statute to adopt a rate increase, and she never initiated a rulemaking to consider whether a rate increase was appropriate.

The *Athens* Plaintiffs attempt to cast the case differently. In their view, at the time the Secretary adopted the 2-midnight policy, she "recognized that basic principles of budget neutrality require ensuring that hospitals be adequately compensated for the financial impact of the two-midnight policy," and she has never "disavow[ed]" that commitment to budget neutrality. Dkt. 95 at 8–9. And, given that commitment, she was required by the APA to provide a reasoned explanation why she declined to credit the *Athens* Plaintiffs' comments showing that the 2-midnight policy would cost hospitals billions of dollars. *Id.* at 6. This description, however, substantially overstates what the Secretary actually did in the FY 2014 rule.

The best description of what the Secretary did is captured in her own words. In the notice of proposed rulemaking preceding the FY 2014 adjustment, the Secretary wrote:

> In light of the widespread impact of the proposed policy discussed in [the proposed rule] on the IPPS and the systemic nature of the issue as demonstrated above, we believe it is appropriate to propose to use our exceptions and adjustments authority . . . to offset the estimated $200 million in additional IPPS expenditures associated with the proposed policy. This special exception and adjustment authority authorizes us to provide "for such other exceptions and adjustments to [IPPS] payment amounts . . . as the Secretary deems appropriate." We are proposing to reduce the standardized amount, the hospital-specific rates, and the Puerto Rico-specific standardize amount by 0.2 percent.

FY 2014 proposed rule, 78 Fed. Reg. at 27,650; *see also id.* at 27,651. Then, in the final rule, the Secretary responded to comments opposing the 0.2 percent reduction. Among other things, the Secretary noted that "[i]n 2012 . . . the [Department's Comprehensive Error Rate Testing] Contractor found that inpatient hospital admissions for 1-day stays or less has a Part A improper payment rate of 36.1 percent;" that Recovery auditors had "recovered more than $1.6 billion in improper payments because of inappropriate beneficiary status;" and that "the magnitude of these national figures demonstrates that issues surrounding the appropriate determination of a beneficiary's payment status are not isolated to a few hospitals." FY 2014 rule, 78 Fed. Reg. at 50,953. Although agreeing "with commenters that [the] exceptions and adjustment authority should not be routinely used in the IPPS system," the Secretary concluded "that the systemic and widespread nature of this issue justifie[d] an overall adjustment to the IPPS rates." *Id.* And, finally, in the portion of the FY 2014 rule that the *Athens* Plaintiffs cite, she wrote:

> For similar reasons, while we generally agree with commenters that it is not necessary to routinely estimate utilization shifts to ensure appropriate IPPS payments, this is a unique situation. Policy considerations such as this do not usually result in utilization shifts of sufficient magnitude and breadth to significantly impact the IPPS. In this situation, we believe it would be inappropriate to ignore such a utilization shift in the development of the IPPS payment rates.

*Id.* at 50,953–54.

Understood in this context, it is fair to conclude that the Secretary was concerned about the cost that the 2-midnight policy would impose on the Medicare program. The Secretary believed—regardless of whether she was correct—that Medicare program had routinely made "improper" payments to hospitals for inpatient admissions, and she believed—regardless of whether she was correct—that the 2-midnight policy would increase Medicare payments for inpatient care. Notably, she did not say "that basic principles of budget neutrality require ensuring that *hospitals be adequately compensated* for the financial impact of the two-midnight policy." Dkt. 95 at 8–9 (emphasis added). She did not adopt a general principle in favor of budget neutrality. She did not even conclude that, whenever a utilization shift is of "sufficient magnitude and breadth," the Department would ensure budget neutrality. FY 2014 rule, 78 Fed. Reg. at 50,953–54.

Rather, the Secretary merely determined that—"[i]n this situation"—an adjustment was warranted. *Id*. Indeed, it is not at all clear that it would have been proper for the Secretary to have adopted a sweeping principle requiring budget neutrality in circumstances that were not identified in the notice of proposed rulemaking (or the final rule) without first providing notice and an opportunity for public comment on whether she should do so. *See Sugar Cane Growers Coop. of Fla.*, 289 F.3d at 95; *see also* 5 U.S.C. § 553(c). Plaintiffs' suggestion that the Secretary's reference to "this situation" should be read to encompass any significant utilization shift resulting from the 2-midnight rule is simply too thin a reed to support such a significant step. If anything, moreover, the Secretary's decision on remand from this Court's order in *Shands I* confirms this understanding of the FY 2014 rule. In responding to comments urging the Department to adopt a rate increase, the Secretary emphasized that the only relevant question posed by the notice of proposed rulemaking on remand was whether the Department should

abandon the 0.2 percent rate decrease.  To the extent commenters sought a rate increase, the

Secretary observed that they had "mischaracteriz[ed] [the] proposal."  FY 2017 rule, 81 Fed.

Reg. at 57,060.  As the Secretary further explained, she was not proposing to adopt a new

"adjustment to the rates for the net effect of" the 2-midnight policy, but merely sought comments

on whether to remove the -0.2 percent adjustment the Secretary adopted in FY 2014.  *Id.*

In light of (1) the absence of any statutory command that the Secretary ensure budget

neutrality; (2) the fact that the Secretary did not "recognize[] that basic principles of budget

neutrality require ensuring that hospitals be adequately compensated for the financial impact of

the two-midnight policy," Dkt. 95 at 8–9; and (3) the "[e]xtremely narrow" scope of review

applicable to the Secretary's "refusal" to grant an exception or adjustment under 42 U.S.C. §

1395ww(d)(5)(I)(i), *Marshall County Health Care Authority*, 988 F.2d at 1225, the Court

concludes that the *Athens* Plaintiffs' challenge must fail.  At its core, their challenge asserts that

compelling evidence showed that the 2-midnight rule was likely to result in a significant

utilization shift from inpatient to outpatient status and that the Secretary never meaningfully

engaged with that evidence.  But the Secretary did explain the basis for her decision:  What was

at issue in the FY 2014 and FY 2017 rulemakings was whether the Department should adopt—

and adhere to—the 0.2 percent rate decrease.  The Secretary never proposed a rate increase and

never invited public comments on that question.  Moreover, with respect to the issue on which

the Secretary did seek input—whether to adhere to the 0.2 percent rate decrease—she concluded

that, "[f]or many of the reasons comments presented . . . in prior rulemaking," she was "no

longer . . .  confident that the effect of the 2-midnight policy on the number of discharges paid under the IPPS may be measured in this context."  FY 2017 rule, 81 Fed. Reg. at 57,060.

An agency can hardly be faulted for failing to respond in detail to comments regarding an action that the agency never proposed.  But, even putting that difficulty aside, the record demonstrates that the Secretary engaged in reasoned decisionmaking when she concluded that she could not predict the effect of the 2-midnight policy with sufficient confidence to support a rate adjustment.  As the Secretary explained in the final FY 2017 rule, "[t]he 2-midnight policy itself and [the Department's] implementation and enforcement of it have . . . evolved over time as a result of a combination of statutory, regulatory, and operational changes."  81 Fed. Reg. at 57,058.  The Department, for example, hosted or supported various programs designed to educate "stakeholders" about the rule.  *Id.*  In addition, Congress enacted the Protecting Access to Medicare Act of 2014, which, among other things, prohibited Recovery Auditors from reviewing patient status for claims with dates of admission up to March 31, 2015, "absent evidence of systematic gaming, fraud, abuse, or delays in the provision of care by a provider of services," and Congress subsequently extended that prohibition through September 30, 2015.  *Id.* The Secretary, moreover, modified the 2-midnight policy itself to allow "Part A payment on a case-by-case basis for inpatient admissions that do not satisfy the 2-midnight benchmark."  *Id.* at 57,059.  The Secretary also concluded that the Department's ability to estimate "utilization changes" resulting from the policy was less certain than it had previously believed, principally because "relatively small changes" in utilization "would have a disproportionate effect on the estimated net costs."  *Id.*  Finally, the Secretary explained that, "in reviewing the public comments . . . received on the December 1, 2015 notice and comment period," the Department

"also considered the fact that [its] actuaries' most recent estimate of the impact of the 2-midnight policy varie[d] between a savings and a cost over the FY 2014 to FY 2015 time period."[8]  *Id.*

In response, the *Athens* Plaintiffs argue that "even when it is 'difficul[t] [to] determin[e] whether a model produces estimates so inaccurate as to be invalid . . . that does not mean the [agency] [i]s free to choose methods . . . without any apparent rigor in its analysis.'"  Dkt. 84-1 at 24 (quoting *AEP Texas N. Co. v. Surface Transp. Bd.*, 609 F.3d 432, 443 (D.C. Cir. 2010)).  As a result, in their view, the Department was required to engage with the commenters' data and to explain, if possible, why they were wrong to posit that the policy would result in a substantial utilization shift toward outpatient status.  *Id.*  But that contention ignores the substantial deference due to an agency's "judgments about data insufficiency, at least in the absence of further information or explanation . . . regarding why deference in inappropriate."  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 559 (D.C. Cir. 2015).  It ignores the fact that the Medicare Act does not require budget neutrality in this context, and the Secretary never proposed adopting an adjustment to make hospitals—as opposed to the public fisc—whole in the face of utilization shifts.  And it ignores the fact that review of the Secretary's *decision not to exercise*

---

[8]  At oral argument, the *Athens* Plaintiffs argued that the Secretary's consideration of new actuarial analysis was improper.  Oral Arg. Tr. (Rough at 13) (01:13).  Agencies are permitted, however, to reopen the record on remand for additional factfinding or to supplement the record with additional studies so long as they also provide the opportunity for comment.  *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94 (D.C. Cir. 2010); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008).  Because the Secretary provided an opportunity for comment on this data, *see* FY 2017 Proposed Rule, 81 Fed. Reg. at 25,138, her consideration of the 2014 and 2015 actuarial data did not violate the APA.

her § 1395ww(d)(5)(I)(i) authority is "[e]xtremely narrow" and, in "practical effect," may often "be the same as . . . no review at all." *Marshall County Health Care Authority*, 988 F.2d at 1225.

Finally, although barely touched upon in their briefs, the *Athens* Plaintiffs tried a fallback approach at oral argument. Rather than arguing that the Secretary had committed herself to a standalone principle of budget neutrality, they argued that the validity of the 2-midnight policy itself turns on the question of whether the Secretary considered the financial consequences of the policy to participating hospitals and whether she offered a reasoned explanation for concluding that the policy should stand, even if it imposes substantial losses on those hospitals. Oral Arg. Tr. (Rough at 8–11). The problem with this argument, however, is that the *Athens* Plaintiffs have not challenged the validity of the 2-midnight policy. Count One of their complaint alleges that "the 0.2 percent downward adjustment to IPPS payment rates" adopted in the FY 2014 rule "violates the" APA. Civ. No. 14-503, Dkt. 1 at 13 (Compl. ¶ 28). Count Two alleges that "[t]he Secretary's decision not to increase or enact an upward adjustment in the IPPS payment rates violates the" APA. *Id*. at 5 (Compl. ¶ 31). Count Three alleges that the Secretary violated the APA by failing to provide a meaningful opportunity for public comment when she adjusted the IPPS payment rates. *Id*. at 16–17 (Compl. ¶¶ 33–35). Count Four alleges that 42 U.S.C. § 1395ww(d)(5)(I)(i) did not provide the Secretary with the statutory authority to adopt the 0.2 percent rate decrease. *Id*. at 17–18 (Compl. ¶¶ 37–38). And, finally, Plaintiffs' prayer for relief asks that the Court set aside the Secretary's calculation of the relevant payment rates and compel "the Secretary to recalculate" those rates "in order to offset the aggregate decrease in the IPPS payments resulting from adoption of the two-midnight rule." *Id*. at 18 (Compl. Relief Requested). Because the *Athens* Plaintiffs have not challenged the 2-midnight rule itself, they

cannot now argue that the rule is deficient because the Secretary failed to consider whether to adopt a rate increase.

The Court, accordingly, is unpersuaded that the Secretary violated the APA by failing to consider evidence purporting to show that the 2-midnight policy would result in a substantial decrease in inpatient admissions, failing to consider reasonable alternatives to the rate reduction she did adopt, or by failing to respond to comments purporting to show that the 2-midnight policy would result in a substantial decrease in inpatient admissions.

## CONCLUSION

For the reasons given above, the Court will deny the *Bakersfield* and *Athens* Plaintiffs' motions for summary judgment, Dkt. 82; Dkt. 84, and will grant the Secretary's cross-motion for summary judgment, Dkt. 89.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: December 28, 2018