# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SHANDS JACKSONVILLE MEDICAL CENTER, INC., *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 14-263 (RDM) |
| ALEX AZAR, Secretary, U.S. Department of Health and Human Services, | |
| *Defendant*. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs—over a thousand hospitals—brought these consolidated cases to challenge a regulation promulgated by the Secretary of Health and Human Services that imposed a 0.2 percent, across-the-board reduction in the inpatient prospective payment system rates used to compensate hospitals under the Medicare program. After a prior decision by this Court remanding the matter for further administrative proceedings, *see Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240 (D.D.C. 2015) ("*Shands I*"); the Secretary's decision on remand to abandon the 0.2 percent rate adjustment, *see* Medicare Program, Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Proposed Policy Changes and Fiscal Year 2017 Rates, 81 Fed. Reg. 56,762 (Aug. 22, 2016) ("FY 2017 Rule"); and a further decision by this Court upholding the Secretary's actions on remand, *see Shands Jacksonville Med. Ctr. v. Azar*, ___ F. Supp. 3d ___, 2018 WL 6831167 (Dec. 28, 2018) ("*Shands II*"), all that remains for resolution are three motions seeking the award of interest on the amount in controversy for FYs 2014–2016. Dkt. 69, Dkt. 70, Dkt. 71.

The first of these motions is brought on behalf of those plaintiffs represented by Hooper, Lundy & Bookman, P.C. and Akin Gump Strauss Hauer & Feld, LLP ("Hooper and Akin Plaintiffs");[1] the second on behalf of those plaintiffs represented by Foley & Lardner, LLP ("Foley & Lardner Plaintiffs");[2] and the third on behalf of those plaintiffs represented by King & Spalding LLP ("*Athens* Plaintiffs").[3] All three groups (collectively "Plaintiffs") contend that they are "prevailing parties" within the meaning of 42 U.S.C. § 1395oo(f)(2) and, as a result, are entitled to interest for each of the three fiscal years at issue. The Hooper and Akin Plaintiffs also argue that, should the Court conclude that they are not entitled to interest under 42 U.S.C. § 1395oo(f)(2) for any of the years at issue, the Court should direct the Secretary to award interest pursuant to another provision of the Medicare statute, 42 U.S.C. § 1395g(d).

In response, the Secretary agrees that *some* interest is due and, indeed, represented on remand that the "hospitals that are party to . . . *Shands Jacksonville Medical Center, Inc. v. Burwell*, No. 14-263 (D.D.C.)" or to any other case challenging the 0.2 percent rate reduction that was pending on the date the final FY 2017 Rule issued—August 2, 2016—"should receive

---

[1] Hospitals represented by Akin Gump Strauss Hauer & Feld, LLP include all plaintiffs in the following cases: *Shands Jacksonville Med. Ctr., Inc. v. Sebelius*, Civ. No. 14-263; *Dignity Health v. Sebelius*, Civ. No. 14-536; *Shands Jacksonville Med. Ctr., Inc. v. Burwell*, Civ. No. 15-1150; and *Shands Jacksonville Med. Ctr., Inc. v. Burwell*, Civ. No. 16-2484. Hospitals represented by Hooper, Lundy & Bookman, P.C. include all plaintiffs in the following cases: *St. Helena Hosp. v. Burwell*, Civ. No. 14-1477; *Long Beach Mem'l Med. Ctr. v. Burwell*, Civ. No. 15-1601; *St. Helena Hosp. v. Burwell*, Civ. No. 16-30; and *St. Helena Hosp. v. Burwell*, Civ. No. 17-39. *See* Dkt. 69 at 1 n.1.

[2] The Foley & Lardner Plaintiffs include the *Bakersfield Heart Hospital v. Cochran*, Civ. No. 14-976; *Shannon Medical Center v. Cochran*, Civ. No. 15-1800; *Asante Rouge Valley Medical Center v. Cochran*, Civ. No. 16-0032; and *Palmerton Hospital-Carbon v. Cochran*, Civ. No. 16-1543. *See* Dkt. 72 at 1 n.1.

[3] This is the same group of plaintiffs, from *Athens Reg'l Med. Ctr. v. Burwell*, Civ. No. 14-503, that challenged the Secretary's actions on remand in *Shands II*.

interest under" 42 U.S.C. § 1395oo(f)(2).  FY 2017 Rule, 81 Fed. Reg. at 57,060; *see also* Dkt.

72 at 12–13.  But the Secretary opposes the award of interest to the extent the specific hospital

did not have a challenge to its Medicare payment rate for the specific fiscal year at issue pending

on the day the FY 2017 Rule, granting them relief from the 0.2 percent reduction, was

promulgated.  *See* Dkt. 72 at 12–14.  That cutoff makes a difference because, on that day, August

2, 2016, not all of the plaintiff-hospitals had challenges pending with respect to each of the three

fiscal years at issue; some, for example, had challenges pending before this Court with respect to

their FY 2014 and FY 2015 inpatient prospective payment system rate determinations, but no

equivalent challenges with respect to FY 2016.  The Secretary further contends that 42 U.S.C.

§ 1395g(d) does not accord the relief that the Hooper and Akin Plaintiffs seek and, albeit

belatedly, also argues that the Court lacks jurisdiction to consider their § 1395g(d) claim because

it was not presented to the Secretary or exhausted through available administrative processes.

     As explained below, the Court agrees with the parties that those hospitals that had

challenges with respect to a given fiscal year pending before this Court on or before August 2,

2016 are entitled to an award of interest pursuant to § 1395oo(f)(2) for that fiscal year.  Section

§ 1395oo(f)(2), however, does not support an award of interest to those hospitals that did not

have a challenge to the relevant fiscal year pending on that date.  Finally, the Court is

unpersuaded by the Hooper and Akin Plaintiffs' alternative theory because, unlike

§ 1395oo(f)(2), *see Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 981 (D.C. Cir. 1991) (hereinafter

"*Tucson*"), § 1395g(d) does not authorize the judiciary, in the first instance, to award interest to a

prevailing party; the statute, instead, imposes the payment obligation on the Secretary.  Because

the Hooper and Akin Plaintiffs never requested payment from the Secretary under § 1395g(d),

there is no administrative determination for the Court to review.

The Court will, accordingly, **GRANT** in part and **DENY** in part Plaintiffs' motions for an award of interest.

## I.  BACKGROUND

**A.      Statutory and Regulatory Background**

1.      *Medicare Prospective Payment System*

The federal Medicare program provides health insurance to the aged, blind, and disabled under Title XVIII of the Social Security Act.  42 U.S.C. § 1395 *et seq*.  Medicare consists of five parts, two of which are relevant here:  Part A covers inpatient hospital services, *id*. § 1395d(a)(1), and Part B covers services not covered by Part A, including hospital outpatient services and visits to a doctor, *id*. §§ 1395j–1395w.  *See generally Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011).  The Secretary administers the program through the Centers for Medicare and Medicaid Services ("CMS").  "Prior to October 1983, Medicare reimbursements [to hospitals] were based on the 'reasonable costs' of inpatient services furnished to Medicare patients."  *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994) (quoting 42 U.S.C. § 1395f(b)).  In 1983, however, Congress "completely revised the scheme for reimbursing Medicare hospitals," establishing the Prospective Payment System, which "relies on prospectively fixed rates for each category of treatment rendered."  *Id.*

"The Inpatient Prospective Payment System—or 'IPPS'—compensates hospitals based on the number of patients they discharge and each patient's primary diagnosis at that time." *Shands II*, 2018 WL 6831167, at *3; *see also* 42 U.S.C. § 1395ww(d)(3)(D)(iii).  One important element used in calculating the applicable payment rate is the "standardized amount," which is set each year by CMS, acting on behalf of the Secretary.  *See* 42 U.S.C. § 1395ww(d)(3). "Roughly speaking, the standardized amount represents the average per-patient operating costs across all hospitals, *see* 42 C.F.R. § 412.64, modified to account for various economic and other

factors." *Shands I*, 139 F. Supp. 3d at 244. The statute prescribes the calculation of the standardized amount in detail, mandating that the rate for a given fiscal year "is equal to" an amount calculated by the Secretary based on specific determinations that the Secretary "shall" make. 42 U.S.C. §§ 1395ww(d)(1), (3). "CMS does not calculate the standardized amount from scratch each year." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011). Rather, CMS "calculated the standardized amount for a base year and has since carried that figure forward, updating it annually for inflation." *Id.*; *see also* 42 U.S.C. §§ 1395ww(b)(3)(B)(i), (d)(2), (d)(3)(A)(iv)(II); 42 C.F.R. §§ 412.64(c)–(d).

CMS then applies "various statutory adjustments" to the standardized amount. *Shands II*, 2018 WL 6831167, at *3. For example, to account for the fact that costs of labor vary across the country, CMS "determines the proportion of the standardized amount attributable to wages and wage-related costs and then multiplies that labor-related proportion by a 'wage index' that reflects 'the relation between the local average of hospital wages and the national average of hospital wages.'" *Cape Cod Hosp.*, 630 F.3d at 205. The statute also grants the Secretary authority to establish other appropriate adjustments and exceptions by regulation. 42 U.S.C. § 1395ww(d)(5)(I).

### 2. *Judicial Review of Rate Determinations*

Medicare providers submit annual cost reports to "[M]edicare administrative contractors," previously referred to as "fiscal intermediaries," which determine the total payment due the provider for the period covered by the report and issue "a written notice reflecting the contractor's final determination." 42 C.F.R. § 405.1803(a); *see also* 42 U.S.C. § 1395h(a); 42 C.F.R. § 405.1801. For hospitals "that receive[] payments for inpatient hospital services under the prospective payment system . . . , the contractor must include in the notice [1] its determination of the total amount of the payments due the hospital under that system for the cost

reporting period covered by the notice" and [2] its explanation regarding "any difference in the amount determined to be due, and the amounts received by the hospital during the cost reporting period covered by the notice." 42 C.F.R. §405.1803(a)(2). The notice must also include "appropriate references to law, regulations, CMS Rulings, or program instructions to explain why the contractor's determination of the amount of program reimbursement for the period differs from the amount the provider claimed." *Id*. § 405.1803(b).

A hospital may appeal a contractor's final determination to the Provider Reimbursement Review Board ("PRRB"). *See* 42 U.S.C. § 1395oo(a). If dissatisfied with the PRRB's final decision regarding the contractor's determination, a provider may "obtain judicial review" of that decision by commencing a civil action within 60 days. 42 U.S.C. § 1395oo(f)(1). When a provider challenges the validity of a regulation, which the Medicare administrative contractor merely applied in the process of determining the total payment due to the provider, the relevant process is somewhat different. Because the PRRB is bound by the Department's regulations, *see* 42 C.F.R. § 405.1867, it cannot adjudicate a challenge to the validity of a regulation. To obtain judicial review in those circumstances, the provider may seek a determination by the PRRB that the PRRB "is without authority to decide the question," and the PRRB may then grant expedited judicial review ("EJR"), allowing the provider to commence a civil action "within sixty days of the date on which notification of such determination is received." 42 U.S.C. §1395oo(f)(1). If the PRRB grants EJR, that "determination shall be considered [the] final decision" of the Department. *Id.* A provider that seeks judicial review and "prevail[s]" is entitled an "annual interest" on "the amount in controversy." 42 U.S.C. § 1395oo(f)(2).

**B.  Procedural History**

1.  *0.2 Percent Rate Reduction and 2-Midnight Rule*

The roots of the present dispute stretch back to the Secretary's decision in FY 2014 to modify the rules used to determine when a Medicare beneficiary should be admitted for inpatient care.  "Although the payments that the Medicare program makes vary depending on whether a Medicare beneficiary is treated on an 'inpatient' or an 'outpatient' basis, the Medicare Act does not define either term and does not 'specify when inpatient admission is appropriate.'"  *Shands II*, 2018 WL 6831167, at *3 (internal citation omitted).  Prior to FY 2014, CMS "advised physicians to 'use a 24-hour period as a benchmark,'" along with several other factors, "and to 'order [inpatient] admission for patients who are expected to need hospital care for 24 hours or more.'"  *Shands I*, 139 F. Supp. 3d at 245 (alteration in original) (quoting Medicare Benefit Policy Manual, CMS Pub. 100–02, Ch. 1, § 10 (2003)).  Over time, the Secretary became concerned that this approach—considering the length of stay as only one factor in whether to admit a Medicare beneficiary for inpatient care—"engendered provider uncertainty and 'considerable variation' in billing decisions."  *Shands II*, 2018 WL 6831167 at *3 (quoting Medicare Program, Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Proposed Fiscal Year 2014 Rates, 78 Fed. Reg. 27,486, 27,648 (proposed May 10, 2013) ("FY 2014 Proposed Rule")).

To clarify the standard for inpatient status, the Secretary proposed the "2-midnight policy," under which, "in addition to services designated . . . as inpatient only," other services "would be generally appropriate for inpatient hospital payment under Medicare Part A when the physician expects the patient to require a stay that crosses at least 2 midnights and admits the patient to the hospital upon that expectation."  FY 2014 Proposed Rule, 78 Fed. Reg. at 27,648.  Moreover, because the Department's actuaries estimated that the 2-midnight policy would result

in a net utilization shift of 40,000 "encounters" from outpatient to inpatient status, and because inpatient "encounters" typically cost the Medicare program more than outpatient "encounters," the Secretary proposed to offset the additional cost by using her "exceptions and adjustments" authority, 42 U.S.C. § 1395ww(d)(5)(I)(i), to adopt a 0.2 percent reduction to the "the operating IPPS standardized amount, the hospital-specific rates, and the Puerto Rico-specific standardized amount." FY 2014 Proposed Rule, 78 Fed. Reg. at 27,649–51. The 0.2 percent amount was premised on the estimation of the Department's actuaries that, because of this anticipated utilization shift, adoption of the 2-midnight policy would result in "an estimated cost of $220 million to the Medicare program." *Shands I*, 139 F. Supp. 2d at 243.

Commenters objected to the proposed 0.2 percent rate adjustment "on multiple grounds, including the Secretary's failure to explain or to support the methodology the Department's actuaries employed to conclude that replacing the 24-hour benchmark with the 2-midnight policy would lead to a net decrease in IPPS encounters." *Shands II*, 2018 WL 6831167, at *4. Despite these objections, the Secretary adopted the 0.2 percent rate reduction in the final FY 2014 Rule. Medicare Program, Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Proposed Policy Changes and Fiscal Year 2014 Rates, 78 Fed. Reg. 50,496, 50,953–54 (Aug. 19, 2013) ("FY 2014 Rule"). Multiple groups of hospitals timely challenged the rate reduction before the PRRB, which concluded that it lacked authority to decide the legal question presented and, accordingly, granted the hospitals' "request[s] for expedited judicial review for the issue and the subject year [FY 2014]." JA 1–7, 27–33, 52–58, 61–68, 70–76, 79–85, 90–98, 100–08, 110–18, 120–26; Dkt. 23-1 at 22 n.4.

2.    *Shands I*

Over a thousand hospitals then brought multiple lawsuits in this Court challenging the FY

2014 Rule under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq. See Shands*

*I*, 139 F. Supp. 3d at 250 (listing cases).  Among other things, the plaintiffs in those actions

argued that the Secretary lacked statutory authority to adopt the rate reduction; that the Secretary

adopted the FY 2014 Rule in violation of the procedural requirements of the APA; and that the

0.2 percent rate reduction was arbitrary and capricious.  The Court rejected the challenge to the

Secretary's statutory "exceptions and adjustment" authority and declined to reach their arbitrary

and capricious challenge, but held that the Secretary adopted the FY 2014 Rule in violation of

the APA because she failed to disclose important information about the methodology the

Department's actuaries applied.  *Shands I*, 139 F. Supp. 3d at 263.  As the Court explained, "the

Secretary's failure to disclose the critical assumptions relied upon by the HHS actuaries deprived

Plaintiffs and other members of the public of a meaningful opportunity to comment on the

proposed 0.2 percent reduction."  *Id.*  The Court, accordingly, remanded the matter (without

vacatur) to allow the Secretary to identify the assumptions the Department's actuaries applied

and to provide an opportunity for meaningful public comment.  *Id.* at 266–71.

3.    *Actions on Remand*

On remand, the Secretary published a notice describing the assumptions that the

Department's actuaries used in calculating the "utilization shift" and invited public

comment.  *See* Medicare Program; Inpatient Prospective Payment Systems; 0.2 Percent

Reduction, 80 Fed. Reg. 75,107 (Dec. 1, 2015) ("December 2015 Notice").  "By April 2016,

however, the Department's confidence in the 0.2 percent rate reduction had waned," and the

Secretary issued a proposed rule that would remove the adjustment going forward beginning in

FY 2017 and that would address the effects of the 0.2 percent reductions for FYs 2014, 2015,

and 2016 by adopting a one-time 0.6 percent rate increase for FY 2017. *Shands II*, 2018 WL

683117 at * 7. The Secretary explained that, although the Department "generally do[es] not

believe it is appropriate in a prospective system," like the IPPS, "to retrospectively adjust rates

even where . . . a prospective change in policy is warranted," she was proposing the 0.6 percent

adjustment in light of this Court's remand order in *Shands I*. *Id.* (alteration in original).

After providing an opportunity for public comment on this new proposal, the Department

finalized the rule, including the one-time 0.6 percent rate increase. *See* FY 2017 Rule, 81 Fed.

Reg. 56,762. Of particular relevance to the motions now pending before the Court, a number of

commenters objected that the proposed 0.6 percent rate adjustment would "not compensate

hospitals that are party to the lawsuit for interest and/or all hospitals for the time value of

money." *Id.* at 57,060. In the final rule, the Secretary responded as follows:

> We will not contest that hospitals that are party to . . . *Shands Jacksonville Medical Center, Inc. v. Burwell*, No. 14-263 (D.D.C.) and other currently pending cases that challenge the -0.2 percent adjustment should receive interest under [42 U.S.C. § 1395oo(f)(2)]. For these hospitals, we will slightly increase the 1.006 factor by a uniform factor consistent with the interest used for this purpose in effect for the relevant time periods for paying interest. We disagree with commenters who indicated that we should pay all hospitals interest or for the time value of money.

*Id.*

4.      *Shands II*

The matter then returned to this Court, where two groups of plaintiffs raised distinct

challenges to the Secretary's actions on remand.

The first group—the "*Bakersfield* Plaintiffs"—argued that the Court in *Shands*

*I* remanded the matter to the Secretary to provide her with an opportunity to cure the FY 2014

Rule's deficiencies and, because the FY 2017 Rule was "only 'forward-looking' and did not

'repeal, amend, or supersede the FY 2014 Rule,'" it was not "legally sufficient to remedy the

APA violation." *Shands II*, 2018 WL 6831167, at *2 (internal citation omitted); *see also id.* at *9. The *Bakersfield* Plaintiffs also argued in their reply brief that the FY 2017 Rule—in which the Secretary addressed the effects of the rate reduction adopted in FY 2014—was "not currently before the Court and that, as a result, the Court lack[ed] jurisdiction to consider whether the '0.6 percent positive adjustment' adopted in that rulemaking 'was an appropriate response to the botched FY 2014 rulemaking.'" *Id.* at *9 (internal citation omitted). The Court was unpersuaded on both counts. On the merits, the Court concluded that the Secretary did precisely what she was required to do by the Court's remand order: she explained the actuaries' methodology, provided an opportunity for meaningful public comment on that methodology, and considered—in light of those comments and other developments—whether her prior decision was sound. *Id.* at *10. The fact that the Secretary decided to abandon the rate adjustment, and to "address" the application of the 0.2 percent rate decreases in FYs 2014, 2015, and 2016 through a one-time 0.6 percent rate increase for FY 2017, was not contrary to any law identified by the *Bakersfield* Plaintiffs. *Id.* at *11–*13. Finally, the Court concluded that it had jurisdiction to consider the FY 2017 Rule to the extent it addressed any underpayments for FYs 2014, 2015, and 2016, even though no party had yet brought a challenge to the FY 2017 rates through the PRRB process. *Id.* at *15–*16. As the Court explained, it had remanded the matter for further proceedings and, to the extent the Secretary addressed deficiencies in the FY 2014 Rule in the context of the FY 2017 rulemaking, the Secretary's actions were properly before the Court. *Id.* at *16.

The second group of hospitals—the "*Athens* Plaintiffs"— "acknowledge[d] that the Secretary took a step in the right direction [with the FY 2017 Rule] by adopting the 0.6 percent rate increase," but argued that the Department did not go far enough. *Id.* at *2. They argued that

data before the Department showed not only that "the Secretary erred in hypothesizing that the 2-midnight rule would result in a net increase in inpatient encounters," but actually "showed that the 2-midnight rule would decrease inpatient encounters and would, accordingly, decrease Medicare payments to hospitals." *Id.* As a result, they argued that the Secretary should have adopted an across-the-board rate *increase* to compensate hospitals for the reduced payments, and that the Secretary's failure to consider their comments to that effect violated the APA. *Id.* The Court was, again, unpersuaded. As the Court explained: "In light of (1) the absence of any statutory command that the Secretary ensure budget neutrality; (2) the fact that the Secretary did not 'recognize[] that basic principles of budget neutrality require ensuring that hospitals be adequately compensated for the financial impact of the two-midnight policy,' . . . and (3) the '[e]xtremely narrow' scope of review applicable to the Secretary's 'refusal' to grant an exception or adjustment under 42 U.S.C. § 1395ww(d)(5)(I)(i)," the *Athens* Plaintiffs' challenge lacked merit. *Id.* at *21 (alterations in original). The Court further concluded, moreover, that the Secretary could "hardly be faulted for failing to respond in detail to comments regarding an action that [she] never proposed." *Id.*

## II. DISCUSSION

All that remains before the Court are three motions filed by different sets of plaintiffs seeking awards of interest. All three sets of plaintiffs seek an award of interest pursuant to 42 U.S.C. § 1395oo(f)(2) for FYs 2014–16. One set of plaintiffs argues that, to the extent they are not entitled to interest under § 1395oo(f)(2) for any of the three fiscal years at issue, they are entitled to interest (at a higher rate) under 42 U.S.C. § 1395g(d), a provision that directs the Secretary to collect or to pay interest on certain over- or under-payments. Dkt. 69-1 at 6. The Secretary does not dispute that those plaintiffs who had claims pending before this Court with

respect to a given fiscal year on August 2, 2016—the day the FY 2017 Rule was finalized—are entitled to interest under 42 U.S.C. § 1395oo(f)(2) for that fiscal year.[4]  Dkt. 72 at 12–13.  He disagrees, however, that interest is due under § 1395oo(f)(2) for any fiscal year for which the provider did not have a case pending on August 2, 2016, and he disagrees that § 1395g(d) has any bearing on the present dispute or that the Hooper and Akin Plaintiffs' § 1395g(d) argument is properly before the Court.  *Id.* at 13, 15–16.

As explained below, the Court concludes that each plaintiff-hospital is entitled to an award of interest pursuant to § 1395oo(f)(2) for each fiscal year for which it had a challenge pending before this Court on August 2, 2016.  In all other respects, however, Plaintiffs are not entitled to an order compelling the Secretary to pay interest pursuant to § 1395oo(f)(2) or § 1395g(d).

## A.    Claims Pending on August 2, 2016

To start, all agree that Plaintiffs are entitled to an award of interest for each fiscal year for which the provider at issue had a claim pending before this Court on August 2, 2016.  That consensus invites the question whether at least that portion of Plaintiffs' claim to interest presents a case or controversy with sufficient adversity to sustain this Court's Article III jurisdiction.  *See Campbell-Ewald Co. v. Gomez,* 136 S. Ct. 663, 669 (2016) ("[A]n actual controversy [must] be extant at all stages of review, not merely at the time the complaint is filed.") (citation omitted); *see also Powell v. McCormack*, 395 U.S. 486, 496 (1969) ("Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.").  The Court concludes that it does.

---

[4]   Although the Federal Register notice announcing the final rule was published on August 22, 2016, FY 2017 Rule, 81 Fed. Reg. at 56,762, the Secretary represents that the final rule was published on the Federal Register's website on August 2, 2016.  *See* Dkt. 72 at 7 n.2.

Over two-and-a-half years have now passed since August 2, 2016, when the Secretary agreed to pay interest on those claims, and the Secretary has yet to pay any portion of the interest Plaintiffs seek. That omission, moreover, is not for want of effort by Plaintiffs. To the contrary, at least one set of Plaintiffs has filed a motion seeking the interim payment of interest for these claims, Dkt. 102, and the Secretary has opposed that motion, Dkt. 103. Nor is it evident that the Secretary is prepared to make payment as soon as this Court decides the pending motions. Rather, at the last status conference, counsel for the United States represented that the Secretary will not make payment until the "case is finally over and definitive, and until the appeal time has run and we know there's not going to be an appeal." Dkt. 108 at 14 (Hrg. Tr.). Although counsel did not expressly address whether the Secretary is prepared to pay interest if there *is* "going to be an appeal," his assertion, at the very least, casts doubt on that prospect.

Under these circumstances, the Court concludes that Plaintiffs' application for interest for those years that the Secretary has committed—at least in theory—to pay continues to present a live case or controversy. Quoting a 1908 Supreme Court decision, the D.C. Circuit explained in *Tucson* that, if a case or controversy exists at the time suit is filed,

> [i]t is not necessary that the defendant should controvert or dispute the claim. It is sufficient that he does not satisfy it. It might be that he could not truthfully dispute it, and yet, if from inability, or, mayhap, from indisposition, he fails to satisfy it, it cannot be that because the claim is not controverted the Federal court has no jurisdiction of action brought to enforce it. Jurisdiction does not depend upon the fact that the defendant denies existence of the claim made, or its amount or validity. If it were otherwise, then the circuit court would have no jurisdiction if the defendant simply admitted his liability and the amount thereof as claimed, although not paying or satisfying the debt.

947 F.2d at 979 (quoting *In re Reisenberg*, 208 U.S. 90, 108 (1908)). That principle governs here. The Secretary concedes liability with respect to those claims pending on August 2, 2016, but has refused Plaintiffs' demands for immediate payment and apparently will continue to do so

pending entry of a final non-appealable order. Because at least some of the Plaintiffs have indicated that they are likely to file an appeal of the Court's decision in *Shands II*, *see* Dkt. 110, the Secretary's refusal to make payment could continue for many months to come. Plaintiffs' contention that any such delay is unwarranted is more than sufficient to establish the ongoing adversity that Article III demands.

Having concluded that the Court has jurisdiction to consider Plaintiffs' applications for interest payable with respect to claims pending before this Court on August 2, 2016, the Court concludes that Plaintiffs are entitled to the relief they seek. The Secretary concedes that Plaintiffs are entitled to this relief, and the Court concurs. Each plaintiff-hospital "sought judicial review pursuant to 42 U.S.C. § 1395oo(f)(1); . . . there was an 'amount in controversy'; and" those plaintiff-hospitals "were the 'prevailing part[ies]'" with respect to the fiscal years for which they had properly brought suit on or before August 2, 2016. *Tucson*, 947 F.2d at 979. The Court will, accordingly, grant the pending motions to the extent Plaintiffs seek this category of relief.

**B.      Claims Brought After August 2, 2016**

In contrast, Plaintiffs' claims to interest payable to providers that had not brought suit challenging the 0.2 percent rate reduction for a given fiscal year on or before August 2, 2016— that is, the date the Secretary abandoned the rate reduction and announced that she would provide a 0.6 percent rate increase for FY 2017 to make up for the rate reductions applied in FYs 2014–2016—face substantial, and ultimately unsurmountable, hurdles. Although Plaintiffs' reliance on § 1395oo(f)(2) and § 1395g(d) raise similar difficulties, the questions presented are distinct and require separate consideration.

1.    42 U.S.C. § 1395oo(f)(2)

The United States is, of course, "immune from suit save as it consents to be sued," and the Court's jurisdiction is, accordingly, "define[d]" by "the terms of [that] consent." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (citation omitted).  A waiver of sovereign immunity, moreover, must be "unequivocally expressed," *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990) (citation omitted), and "any doubts about the scope of a waiver" must "be resolved in favor of the narrower governmental liability," *Trout v. Sec'y of Navy*, 317 F.3d 286, 290 (D.C. Cir. 2003) (citation omitted).  Nor is there any doubt that these principles apply to "claims of interest against the United States;" indeed, if anything, they apply with "'an added gloss of strictness' . . . because the historical 'no-interest rule' bars recovery of interest against the government 'unless the award of interest was affirmatively and separately contemplated by Congress.'" *Id.* (citations omitted).

All agree that Congress has waived the sovereign immunity of the United States to permit the award of interest to a prevailing party under 42 U.S.C. § 1393oo(f)(2).  The dispute focuses, instead, on the scope of that waiver.  Section 1395oo(f)(2) provides:

> Where a provider seeks judicial review pursuant to [42 U.S.C. § 1395oo(f)(1)], the amount in controversy shall be subject to annual interest beginning on the first day of the first month beginning after the 180-day period as determined pursuant to [42 U.S.C. § 1395oo(a)(3)] and equal to the rate of interest on obligations issued for purchases by the Federal Hospital Insurance Trust Fund for the month in which the civil action authorized under [42 U.S.C. § 1395oo(f)(1)] is commenced, to be awarded by the reviewing court in favor of the prevailing party.

42 U.S.C. § 1395oo(f)(2).  The D.C. Circuit's decision in *Tucson Medical Center v. Sullivan* provides significant, although not conclusive, guidance regarding the application of § 1395oo(f)(2) in the present context.  Because *Tucson* is the leading precedent—and the only D.C. Circuit precedent—relevant to the question presented, it is worth describing the decision in

some detail.  The Court will then consider how that decision, the Medicare statute, and other relevant authorities apply to Plaintiffs' claims for interest with respect to lawsuits filed after August 2, 2016.

<blockquote>a.  Tucson Medical Center</blockquote>

The relevant background for the *Tucson* case began with the Secretary's decision in 1981 to exclude federal government hospitals from the formula used to calculate the wage index, which in turn "had a significant impact on the amount hospitals were reimbursed."  *Tucson*, 947 F.2d at 975.  Several hospitals challenged the rule, and the district court struck it down because the Secretary had failed to provide an adequate opportunity for public comment.  *Id.* at 975–76. Rather than appeal that decision, the Secretary reissued the rule in 1984 after providing the required opportunity for public comment.  *Id.* at 976.  But, effectively breathing life back into the failed 1981 rule, the Secretary applied the 1984 rule retroactively.  *Id.*  The hospitals again brought suit, and the district court again struck the rule down.  *Georgetown Univ. Hosp. v. Bowen*, No. 85-1845, 1986 WL 53398 (D.D.C. Apr. 11, 1986).  This time, the Secretary appealed.  The D.C. Circuit affirmed, *see Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750 (D.C. Cir. 1987), as did the Supreme Court, *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988).  Meanwhile, the fiscal intermediaries responsible for auditing the hospitals' cost reports applied the 1984 rule retroactively; the hospitals brought administrative appeals; and the PRRB granted the hospitals' request for EJR three days after the Supreme Court issued its decision holding that the Secretary lacked authority to apply the 1984 rule retroactively.  *Tucson*, 947 F.2d at 976.  Shortly after that, the Secretary circulated a memorandum prepared by the General Counsel of the Health Care Financing Administration ("HCFA")—CMS's predecessor agency— advising the PRRB that the Supreme Court's decision controlled all "properly pending . . .

administrative and judicial appeals." *Id.* The hospitals then brought suit seeking to set aside the fiscal intermediaries' decision applying the 1984 rule retroactively to their cost reports. *Id.* Finally, the day after they filed suit, HCFA issued a final ruling in which it conceded that the Supreme Court's decision, and a related decision from the D.C. Circuit, obligated HCFA to reimburse hospitals for the amounts withheld in light of the 1984 rule. *Id.* at 977.

Against this backdrop, the D.C. Circuit rejected the Secretary's contention that the hospitals' claims for interest under § 1395oo(f)(2) were moot. Significantly, at the time they brought suit, HCFA had not yet conceded that the Supreme Court and related D.C. Circuit decision compelled it to reimburse the hospitals, and the memorandum from HCFA's General Counsel did not squarely address their claims because, at the time the memorandum was issued, they did not have claims "pending" before the PRRB or the district court: the PRRB had granted their requests for EJR, but they had yet to bring suit. *Id.* at 978–79. The Court also concluded that the hospitals satisfied each of the three requirements for an award of interest under § 1395oo(f)(2): (1) the appellants sought judicial review pursuant to § 1395(f)(1); (2) there was an "amount in controversy"' and (3) the appellants were the "prevailing part[ies]." *Id.* at 979–81.

*First*, the hospitals properly sought "judicial review" under § 1395oo(f)(1) because they "clearly exhausted their administrative remedies" before the PRRB and then filed a timely action for judicial review. *Id.* at 979. In reaching that conclusion, the D.C. Circuit distinguished two decisions, both of which were, in the court's view, "properly" decided but inapposite. *Id.* at 979 n.10. In the first of those case, *Riley Hospital & Benevolent Ass'n v. Bowen*, 804 F.2d 302 (5th Cir. 1986), the Fifth Circuit held that the district court was without jurisdiction to award interest under § 1395oo(f)(2) for a cost reporting period for which the plaintiff had not obtained a final decision from the PRRB before the district court held that the contractor had applied the

incorrect amortization schedule for two prior cost reporting periods, even though the same error was repeated and eventually corrected for the later cost reporting periods. *Id*. at 304–06. As the *Tucson* decision explained, "[t]he *Riley* court properly denied the recovery of interest because the providers had not exhausted their administrative remedies *for the fiscal years in question*." *Tucson*, 947 F.2d at 979 n.10 (emphasis added).

The other case, *National Medical Enterprises, Inc. v. Sullivan*, 1990 WL 169276 (C.D. Cal. July 5, 1990), involved a similar scenario. In that case, the plaintiff "disputed the propriety of reimbursement over costs claimed for return on equity capital (ROE)" for fiscal years 1974–79. *Id.* at *1. The plaintiff exhausted its administrative remedies and filed suit in federal district court, which held that the ROE costs for 1974–79 were properly claimed. *Id.* The Ninth Circuit affirmed, and the Secretary paid the amount due for fiscal years 1974–79, along with interest pursuant to § 1395oo(f)(2). *Id.* The plaintiff also disputed the fiscal intermediaries' denial of its ROE claim for fiscal years 1980–84. *Id.* While that challenge was pending before the PRRB, however, the Ninth Circuit issued its decision affirming the district court in the earlier case, and the Secretary acquiesced in that decision and directed the fiscal intermediaries to compensate the plaintiff for the disputed ROE claims for fiscal years 1980-84. *Id.* *1–*2. The PRRB declined to award the plaintiff interest under § 1395oo(f)(2)—or under § 1395g(d)—however, and the plaintiff then brought suit. *Id.* at *2. The district court rejected that claim on the merits, holding that the plaintiff could not obtain interest under § 1395oo(f)(2) for any fiscal year for which it did not seek judicial review of the PRRB's substantive decision, and plaintiff was "unable to seek review" with respect to fiscal years 1980–84 because the PRRB "never rendered a final decision" for those years. *Id.* at *6. In the words of the *Tucson* decision, "[o]nce again, the issue was failure to exhaust administrative remedies." *Tucson*, 947 F.2d at 979 n.10.

*Second*, the hospitals also satisfied the § 1395oo(f)(2)'s "amount in controversy" requirement. *Id.* at 980. Of particular relevance here, the court held that "the 'amount in controversy' must be determined as of the date the suit is filed." *Id.* (citation omitted). Because the appellants in that case brought suit while there still "existed an amount in controversy such that their claims were not moot"—that is, because HCFA had not yet issued a final ruling conceding that it was obligated to pay the amount at issue in the reimbursement dispute—the court concluded that the statutory "amount in controversy" requirement was satisfied. *Id.*

*Third*, and finally, the hospitals satisfied § 1395oo(f)(2)'s "prevailing party" requirement. *Id.* Although the Secretary argued that a HCFA regulation limited awards of interest to those plaintiffs who obtain a judgment from the district court, *Tucson* held the regulation was "irrelevant" because § 1395oo(f)(2) is "directed to the judiciary," and thus Congress had not delegated any express or implicit interpretative authority to the agency. *Id.* at 980–81. The D.C. Circuit then articulated the relevant test: "Interest will be awarded only after a suit is properly filed, which in turn means that the Secretary's agency [HCFA in that case] has made a determination adverse to the provider. From this perspective, a party in court prevails as soon as it receives the disputed amount." *Id.* at 982. The hospitals satisfied these requirements because, not only did they "properly file[]" suit challenging HCFA's decision, but they had good reason to do so; had they failed to bring a timely challenge to the PRRB's decision, HCFA "might well have claimed that they" were not entitled to the benefit of HCFA's concession that the 1984 rule lacked retroactive force. *Id.*

Unlike in *Tucson*, Plaintiffs have not shown that they satisfy each of the statutory prerequisites for an award of interest under § 1395oo(f)(2) for challenges filed in this Court after August 2, 2016. The difficulties with Plaintiffs' claims to interest for these fiscal years depends

on which of two possible theories they employ: Under the first theory, they concede that they may recover interest only for a fiscal year for which they exhausted the PRRB process and then brought suit challenging the PRRB's decision for that fiscal year. To the extent they have done so, however, Plaintiffs maintain that they are entitled to interest under § 1395oo(f)(2), even if they did not bring suit until after August 2, 2016. Under the second theory, they maintain that all they were required to do was successfully challenge the FY 2014 rate adjustment, which they did. The inevitable result of that successful challenge, in their view, opened the door to an award of interest for FYs 2014, 2015, and 2016 because the FY 2014 rate adjustment remained in effect until affirmatively set aside in FY 2017. In short, by prevailing in their challenge to the FY 2014 Rule, they assert, they achieved a victory that covered all three fiscal years at issue. As explained below, regardless of how Plaintiffs' claims to interest are framed, the Court is unpersuaded.

        b.     *Separate Actions for Each Fiscal Year*

Plaintiffs have, at least for the most part, brought separate lawsuits for each of the fiscal years at issue; not all of those suits, however, were brought before August 2, 2016. Taking the lead case by way of example, *Shands Jacksonville Medical Center v. Sebelius*, No. 14-263, was filed in February 2014 and, among other forms of relief, sought an order "directing the Secretary to pay the plaintiff hospitals the additional amounts due as a result of [the required] correction for all discharges occurring in Federal fiscal year 2014, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2)." Dkt. 1 (Prayer for Relief). The *Shands* plaintiffs filed a second suit on July 20, 2015—again, before August 2, 2016—seeking, among other things, an order "directing the Secretary to pay the plaintiff hospitals the additional amount due as a result of [the required] correction for all discharges occurring in Federal fiscal year 2015, plus interest

calculated in accordance with 42 U.S.C. § 1395oo(f)(2)." *Shands Jacksonville Medical Ctr., Inc. v. Burwell*, Civ. No. 15-1150, Dkt. 1 at 84 (Prayer for Relief). As to both of these actions, there is no dispute that the Plaintiffs are entitled to an award of interest.

The third *Shands* action, however, highlights the core problem posed by the pending motions. The *Shands* plaintiffs brought that case on December 20, 2016, *after* the Secretary had agreed to adopt the one-time, 0.6 percent rate increase to address the 0.2 percent rate reductions for FYs 2014–16. *See Shands Jacksonville Med. Ctr., Inc. v. Burwell*, Civ. No. 16-2484. The complaint avers, moreover, that the PRRB did not grant EJR until December 12, 2016 and, indeed, that the hospitals did not seek EJR until November 2016, well after the Secretary had agreed to the 0.6 percent rate increase. *Shands Jacksonville Med. Ctr., Inc. v. Burwell*, Civ. No. 16-2484, Dkt. 1 at 75 (Compl. ¶¶ 51–52).

To the extent this claim, and others filed after August 2, 2016, seek the relief the Secretary provided in FY 2017, those claims are, of course, moot—or, more precisely, Plaintiffs lacked Article III standing to bring a challenge seeking relief that they had already been accorded. This logic, moreover, extends to Plaintiffs' claims to interest under § 1395oo(f)(2). As the D.C. Circuit recognized in *Tucson*, "interest claims are moot . . . if the underlying reimbursement claims were moot at the time they were filed." 947 F.2d at 978. In *Tucson*, the appellants were able to clear this hurdle because the HCFA had not issued binding directions to the PRRB until after the appellants had brought suit. Here, in contrast, the Secretary issued a final rule on August 2, 2016, establishing a legally enforceable entitlement to the 0.6 percent rate adjustment. As a result, Plaintiffs lacked standing to bring suit after August 2, 2016, seeking the relief they now invoke as the foundation for their claims to interest.

For the same reason, as *Tucson* also confirms, a provider cannot satisfy the statutory "prevailing party" requirement when the Secretary has unambiguously granted the relief sought before the PRRB issues a determination. *Id*. at 979–82. The phrase "prevailing party" is not defined in the Medicare statute. As noted above, however, *Tucson* adopted the following test: "Interest will be awarded only after a suit is properly filed, *which in turn means that the Secretary's agency has made a determination adverse to the provider*. From this perspective, a party in court prevails as soon as it receives the *disputed amount*." *Id.* at 982 (emphasis added). For present purposes, the "disputed amount" is the difference between the amount the *Shands* Plaintiffs, for example, received for FY 2016, and that amount as supplemented by the 0.2 percent share of the 0.6 percent rate increase that they received for FY 2017. But the PRRB did not make an "adverse determination" with respect to that amount. To the contrary, the PRRB was bound to apply the FY 2017 Rule, which required payment of the 0.6 percent rate increase.[5]

Perhaps anticipating this rejoinder, the substantive relief that forms the prayer for relief in the third *Shands* action, filed after August 2, 2016, differs from the earlier actions. The complaint acknowledges that the Secretary adopted a "'one-time,' 0.6% rate increase to the

---

[5] The parties spill much ink over whether the "catalyst" theory applies in this context. Plaintiffs argue that the D.C. Circuit in *Tucson* adopted the "catalyst" approach, under which "the party must have substantially received the relief sought, and . . . the lawsuit must have been a catalytic, necessary, or substantial factor in attaining the relief." *Tucson*, 947 F.2d at 982 (citation omitted). The Department argues that, following the Supreme Court's decision in *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dept. of Health & Human Resources*, 532 U.S. 598 (2001), the "catalyst" theory is no longer applicable. Dkt. 72 at 9. *Buckhannon* rejected the catalyst approach in a different context—the case concerned a fee-shifting statute, not § 1395oo—and held that to be a prevailing party, plaintiffs must obtain a "judicially sanctioned change in the legal relationship of the parties," including, for example, an "enforceable judgments on the merits" or a "court-ordered consent decrees." *Buckhannon*, 532 U.S. 598 at 604–05. The parties' arguments, however, are besides the point. The discussion of the catalyst theory in *Tucson* was merely dicta: the *Tucson* court noted, after applying the prevailing parties test described above, that "even analyzing the term 'prevailing party' in § 1395oo(f)(2) as it has been understood in other statutory contexts," the appellants would have still prevailed. *Id.*

prospective payment system rates paid for discharges in Federal fiscal year 2017" and that this adjustment was "meant to 'address' the 0.2% adjustment[s]" applicable in FYs 2014–16, *Shands Jacksonville Med. Ctr., Inc. v. Burwell*, Civ. No. 16-2484, Dkt. 1 at 73 (Compl. ¶¶ 43–44), but alleges that FY 2017 Rule failed to correct the flaws in the FYs 2014–16 Rules and that the FY 2017 Rule failed "adequately [to] explain and [to] respond to significant comments," *id.* at 78 (Compl. ¶ 60). *See also St. Helena Hosp. v. Burwell*, Civ. No. 17-39, Dkt. 1 at 68, 74–75 (Compl. ¶¶ 10, 32) ("Although the Secretary abandoned the reduction starting in FFY 2017, the Secretary's actions do not fully counteract the effect of the reduction on FFY 2016;" "The Secretary's remedy . . . does not make hospitals whole for what they lost in reimbursement in FFY 2016"). Here, too, Plaintiffs run into an insurmountable issue: to the extent they are seeking relief that goes *above and beyond* the relief granted in FY 2017, they are not "prevailing parties" entitled to interest under § 1395oo(f)(2). Plaintiffs did not "substantially receive the relief sought," *Tucson*, 947 F.2d at 982–84, because the only theories that were properly subject to "judicial review pursuant to 42 U.S.C. § 1395oo(f)(1)" at that time, *id.* at 979 & n.10, were the challenges that the Court considered—and rejected—in *Shands II*, 2018 WL 6831167 at *16; *id.* at *21.

In short, Plaintiffs have not established entitlement to interest under § 1395oo(f)(2) for any fiscal year for which the providers at issue did not file suit on or before August 2, 2016.

        c.     *Challenges to the FY 2014 Rule*

Recognizing the difficulties posed by this initial theory, Plaintiffs attempt a different approach: they argue that filing any suit before August 2, 2016 that challenged the validity of the FY 2014 Rule was sufficient to sustain an award of interest for FYs 2014–16, regardless of whether separate suits were timely brought for each of those latter years. The premise of this

theory, which the Court does not question, is that the FY 2014 Rule did not merely establish a 0.2 percent rate increase for that fiscal year. Rather, the rule reduced the standardized amount and hospital-specific rates going forward, and that adjustment automatically carried over into future years until the Secretary used her exceptions and adjustments authority to remove the adjustment in FY 2017. That view of the FY 2014 Rule, moreover, accords with the Secretary's own descriptions. She explained in the FY 2017 Rule, for example, that the FY 2014 Rule "permanently reduce[d] the rates for FY 2014 and future years until . . . removed." 81 Fed. Reg. at 57,059. The D.C. Circuit has also recognized that the Secretary "does not calculate the standardized amount from scratch each year," *Cape Cod Hosp.*, 630 F.3d at 205, but, instead, the amount for a given year is carried forward, updated annually for inflation and any other necessary statutory adjustments, *see* 42 U.S.C. § 1395ww(b)(3)(B)(i), (d)(2), (d)(3)(A)(iv)(II); 42 C.F.R. § 412.64(c)–(d). This understanding of the nature of the FY 2014 Rule also comports with Plaintiffs' complaints, which—in addition to seeking payments for specific fiscal years— requested that the Court declare the FY 2014 Rule invalid. *See, e.g.*, Dkt. 1 at 16 (Prayer for Relief) (requesting that the Court "declar[e] invalid and vacat[e] the provisions of the final rule that reduced the standardized amount"); *Shands Jacksonville Medical Ctr., Inc. v. Burwell*, Civ. No. 15-1150, Dkt. 1 at 84 (Prayer for Relief) (same); *Shands Jacksonville Med. Ctr., Inc. v. Burwell*, Civ. No. 16-2484, Dkt. 1 at 79 (Prayer for Relief) (same). Finally, the Court has recognized that the Secretary has not treated the rulemakings for each fiscal year as "hermetically sealed" regulatory events, and, indeed, used the FY 2017 rulemaking as the occasion to "address" the 0.2 percent adjustments for FYs 2014–16. *Shands II*, 2018 WL 6831167 at *15.

Although the premise of Plaintiffs' argument is well taken, the Court is unpersuaded that it leads to the conclusion that Plaintiffs urge. Because the payment of interest requires a waiver of sovereign immunity, the Court must strictly construe the statute and must abide by the procedures that Congress specified. *See Irwin*, 498 U.S. at 94. For present purposes, the dispositive statutory text is found in the first clause of § 1395oo(f)(2), which limits the availability of interest to those providers that "seek[] judicial review pursuant to" 42 U.S.C. § 1395oo(f)(1). 42 U.S.C. § 1395oo(f)(2). Section 1395oo(f)(1), in turn, provides in relevant part that a provider has "the right to obtain judicial review *of any action of the fiscal intermediary* which involves a question of law or regulations relevant to the matters in controversy whenever the [PRRB] determines . . . that it is without authority to decide the question." *Id.* at § 1395oo(f)(1) (emphasis added). In other words, when the PRRB lacks authority to decide a question of law, such as whether a regulation promulgated by the Secretary is lawful, a provider may obtain judicial review of the "action" taken by the "fiscal intermediary" in reliance on that regulation by obtaining a grant of EJR from the PRRB and then filing suit.

The statutory text is plain: what is subject to review is the "action of the fiscal intermediary." *Id.* Section 1395oo(a), moreover, confirms that the relevant "action" for purposes of § 1395oo(f)(1) is the fiscal intermediary's "final determination"—or failure to render a timely "final determination"—of the payment due the provider after filing "a required cost report." *Id.* at § 1395oo(a); (a)(1). Finally, the statute provides that the provider must file a request for a hearing with the PRRB "after notice of the intermediary's final determination" or "after notice of the Secretary's final determination" with respect to the amount of the payment

due the provider.  *Id*. at § 1395oo(a)(3).[6]  In short, the statute contemplates administrative

exhaustion followed by judicial review of concrete reimbursement determinations made, in the

first instance, by the providers' Medicare administrative contractors.  Absent such a challenge to

a specific cost report (or specific cost reports), § 1395oo(f)(2) does not authorize a federal court

to award the prevailing party interest on the "amount in controversy."

The PRRB's letters granting Plaintiffs EJR in this matter conform to this understanding.

In each case, the PRRB concluded that it had "jurisdiction over the matter *for the subject year*,"

and in each instance it limited its grant of expedited judicial review to "the issue [raised in the

providers' petition] and [to] *the subject year*."  *See, e.g*., St. Helena Hosp. v. Burwell, Civ. No.

14-1477, Dkt. 1-4 at 6 (granting EJR regarding FY 2014 Rule); *Long Beach Mem'l Med. Ctr. v.

Burwell*, Civ. No. 15-1601, Dkt. 1-2 at 7 (same); *St. Helena Hosp. v. Burwell*, Civ. No. 16-30,

Dkt. 1-2 at 17 (granting EJR regarding FY 2015 Rule); *St. Helena Hosp. v. Burwell*, Civ. No. 17-

39, Dkt. 1-3 at 8 (granting EJR regarding FY 2016 Rule).  That temporal limitation is not only

consistent with the text of the statute, but it also carries legal significance of its own accord.  The

administrative remedies that the providers exhausted before filing suit were limited to the

"subject year," and this Court is required to "den[y] the recovery of interest" where the providers

failed to "exhaust[] their administrative remedies *for the fiscal year[] in question*" before

bringing suit.  *Tucson*, 947 F.2d at 979 n.10 (emphasis added); *see also Nat'l Med. Enters., Inc.

v. Sullivan*, 960 F.2d at 869 (to obtain an award of "interest under

---

[6]   Although the statute also permits group appeals, each provider "in such group" must be
otherwise "entitled to . . . a hearing" with the PRRB pursuant to § 1395oo(a).  42 U.S.C. §
1395oo(b).

§ 1395oo(f)(12), [a provider] must (1) have received a final determination from the PRRB on a Medicare *reimbursement claim* . . . ; (2) have sought judicial review of *that decision*; and (3) have been the prevailing party in such judicial action") (emphasis added).

To be sure, *Tucson* recognized that "the primary goal" of § 1395oo(f)(2) "is to compensate the party who eventually receives the money for the delay occasioned by the other party's error." 947 F.2d at 982. But, as the *Tucson* court explained in the very next sentence, "[i]nterest will be awarded only after a suit is properly filed, which in turn means that the Secretary's agency has made a determination adverse to the provider." *Id.* For the reasons explained above, that is what is missing here. Plaintiffs, moreover, have not argued that their Medicare administrative contractors, the PRRB, or the Secretary unnecessarily or unfairly delayed adjudication of their FY 2015 or 2016 challenges, thereby interfering with their ability to obtain a payment of interest. To the contrary, the Secretary observed that there was no "reason that hospitals that filed civil actions challenging the FY 2014 and 2015 downward reductions could not have initiated PRRB petitions, sought and received EJR, and then initiated judicial review prior to August 2, 2016," as some plaintiffs did with respect to FYs 2015 and 2016. Dkt. 72 at 11–12. Plaintiffs did not respond to this argument in their reply briefs, and, when asked about it at a status conference, counsel for one group of plaintiffs responded: "I agree that the hospitals . . . could theoretically have done that, but it's about resources and hospitals expending resources as the litigation continues. . . . So it's a cost benefit." Dkt. 108 at 45 (Hrg. Tr.).

Finally, there is no reason that the usual rules requiring a clear and unambiguous waiver of sovereign immunity ought not apply here. As the Supreme Court has observed, "the statutory scheme . . . is not designed to be "'unusually protective" of claimants.' . . . Nor is it one 'in which laymen, unassisted by trained lawyers, initiate the process.'" *Sebelius v. Auburn Reg'l*

*Med. Ctr.*, 568 U.S. 145, 160 (2013) (internal citations omitted). Rather, "[t]he Medicare payment system in question applies to 'sophisticated' institutional providers" that are well-informed regarding the requirement for presenting and preserving their claims. *Id.* The fact that most hospitals in these consolidated actions sought judicial review for at least one year after FY 2014 shows that they were cognizant of the statutory requirements and were not lulled into believing that they would preserve their claims to interest for each of the fiscal years at issue by bringing a single challenge the FY 2014 rule.

*   *   *

The Court, accordingly, concludes that those hospitals that brought suit challenging the 0.2 percent rate reduction on or before August 2, 2016 for a specific fiscal year are entitled to the payment of interest pursuant to § 1395oo(f)(2) for that fiscal year. Plaintiffs are not, however, otherwise entitled to relief under § 1395oo(f)(2).

    2.    <u>42 U.S.C. § 1395g(d)</u>

One group of Plaintiffs—the Hooper and Akin Plaintiffs—argue that, to the extent they are not entitled to an award of interest for a particular fiscal year under § 1395oo(f)(2), they are entitled to interest (at a higher rate) pursuant to § 1395g(d).[7] That provision appears in the section of the Medicare statute addressing the payments that the Secretary is required to make to

---

[7] None of the Plaintiffs has argued that the Secretary's decision to pay interest only to those providers who had timely claims pending on August 2, 2016, was arbitrary and capricious under the APA, 5 U.S.C. § 706, or that failure to pay interest to those providers rendered the FY 2017 Rule an unreasonable "means of undoing the earlier rate increases," *Shands II*, 2018 WL 6831167 at *13. *See also* Dkt. 93 at 9 ("The Plaintiffs in the instant case are not challenging whether the Secretary's method for addressing the deficient payment reduction [that is, the 0.6 percent increase compensating for the 0.2 percent rate reduction for FY 2014] is proper; they are seeking vacatur of the deficient payment reduction [that is, the 0.2 percent rate reduction for FY 2014 itself].") They, instead, premise their claims to interest exclusively on § 1395oo(f)(2), *see, e.g.*, *id*. at 15, and § 1395g(d), *see, e.g.*, Dkt. 69 at 2.

providers.  *See* 42 U.S.C. § 1395g.  Under § 1395g(a), the Secretary is required "periodically [to]

determine the amount which should be paid" to a provider "with respect to the services furnished

by it" and to pay that amount "not less often than monthly" to the provider, along with

"necessary adjustments on account of previously made overpayments or underpayments."  *Id.*

§ 1395g(a).  Section 1395g(d), then, provides:

> Whenever a final determination is made that the amount of payment made under
> this part to a provider of services was in excess of or less than the amount of
> payment that is due, and payment of such excess or deficit is not made (or
> effected by offset) within 30 days of the date of the determination, interest shall
> accrue on the balance of such excess or deficit not paid or offset . . . at a rate
> determined in accordance with the regulations of the Secretary of the Treasury
> applicable to charges for late payments.

*Id.* § 1395g(d).  *See also* 42 C.F.R.§ 405.378(b) ("CMS will charge interest on overpayments,

and [will] pay interest on underpayments, to providers and suppliers of services.").  According to

the Hooper and Akin Plaintiffs, the Secretary's "perambulatory statements in the FFY 2017 IPPS

Final Rule serve as a 'written determination' that the Hospitals' claims for FFYs 2014, 2015, and

2016 were . . . underpaid," and because "[t]he Secretary has a non-discretionary duty to" to pay

providers interest on any underpayment, they "are entitled to an order in the nature [of]

mandamus requiring the Secretary to perform her mandatory duty to pay [them] interest on

[those] underpayments."  Dkt. 69-1 at 16–17.

Section 1395g(d) differs from § 1395oo(f)(2) in one significant respect: § 1395g(d)

imposes a duty on *the Secretary* to pay interest, while § 1395oo(f)(2) authorizes the *federal*

*courts* to award interest.  This difference governs the proper role of the Court here.  Although the

Court is authorized to award interest under § 1395oo(f)(2) in the first instance, it is the Secretary,

and not the Court, that is charged with making payments to providers for underpayments under

§ 1395g(a), along with interest under § 1395g(d).  In appropriate circumstances, the Court may *review* the Secretary's actions or inactions, but the concept of judicial review is premised on the notion that the agency has acted unlawfully or has declined to act in a manner required by law. Judicial review does not contemplate seeking relief from a court in the first instance.

The Court raised this problem with the parties at a status conference and permitted the Hooper and Akin Plaintiffs and the Secretary to submit supplement briefs on the question.  Dkt. 108 at 21–23 (Hrg. Tr.).  Responding to that invitation, the Secretary now argues that the PRRB "had jurisdiction over any claim for interest under § 1395g(d)," and because Plaintiffs did not exhaust that administrative remedy before filing suit, the Medicare statute's channeling provisions, 42 U.S.C. § 1395ii (incorporating 42 U.S.C. § 405(h)) and 42 U.S.C. § 1395oo(a), bar judicial review.  Dkt. 113 at 2–3.  In support of this contention, the Secretary points to two district court cases holding that the PRRB had jurisdiction to consider claims for interest under § 1395g(d).  *Id.* at 3 (citing *OSF Healthcare Sys. v. Sullivan*, 820 F. Supp. 390, 393–96 (C.D. Ill. 1993), and *Archbishop Bergen Mercy Hosp. v. Heckler*, 614 F. Supp. 1271, 1277 (D. Neb. 1985)).

The Hooper and Akin Plaintiffs do not disagree that, in general, a provider must exhaust administrative remedies before bringing suit.  Dkt. 114 at 2.  But, in their view, this case falls within one of the two exceptions to the channeling requirement.  The first of these exceptions, recognized in *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 680 (1986); *Shalala v. Illinois Council on Long Term Care*, *Inc.*, 529 U.S. 1, 17 (2000); and *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 705–11 (D.C. Cir. 2011), provides that channeling is not required "where its application 'would not lead to a channeling of review through the agency, but would mean no review at all.'"  *Council for Urological Interests*, 668

F.3d at 705 (citation omitted).  And, the second, recognized in *Monmouth Medical Center v. Thompson*, 257 F.3d 807, 813–15 (D.C. Cir. 2001), provides that the channeling requirement does not bar review under the Mandamus Act, 28 U.S.C. § 1361.  As explained below, Plaintiffs have failed to demonstrate that either exception applies here.

Most significantly, neither exception relieves a provider of the obligation to make all reasonable efforts to exhaust its administrative remedies before filing suit.  The first exception, by definition, applies only if application of the channeling rule would preclude judicial review, and the second exception, which relies on the extraordinary relief available in mandamus, requires the plaintiff to "exhaust administrative remedies" before bringing suit, *see Monmouth Med. Center*, 257 F.3d at 813.  On the present record, however, the Hooper and Akin Plaintiffs have failed to carry their burden of showing that they were unable to request interest under § 1395g(d) at *any* point in the administrative process.

Each of the Hooper and Akin Plaintiffs' arguments rests on the contention that they could not have "pursued" the issue "through an appeal to the" PRRB.  Dkt. 114 at 3.  That is so, they argue, because the PRRB's jurisdiction is limited to appeals "based on dissatisfaction with a final reimbursement determination by a Medicare contractor communicated through a Notice of Program Reimbursement . . . or dissatisfaction with a determination of the Secretary of payment under the IPPS statute."  Dkt. 114 at 3.  This characterization of the statute is correct—it merely describes the language of § 1395oo(a)(1)(A)—but it is far from clear why it prevented Plaintiffs from arguing before the PRRB that they were entitled to interest under § 1395g(d).  To invoke the PRRB's jurisdiction under § 1395oo(a)(1)(A), a provider must be "dissatisfied with a final determination" made by its Medicare administrative contractor about the "total program reimbursement due the provider" or by "the Secretary as to the amount of payment under [the

IPPS statute]." The Hooper and Akin Plaintiffs, however, fail to explain why "total program reimbursement due" would not include a valid claim to interest based on an underpayment. Indeed, the Secretary represents that the PRRB has "jurisdiction over any claim for interest under § 1395g(d)," Dkt. 113 at 3, and nothing in the text of § 1395oo(a)—or in any other statutory provision or regulation Plaintiffs cite—compels a different conclusion. This is not to say, of course, that the PRRB would have granted Plaintiffs' request for interest under § 1395g(d), or even that it would have concluded that it has "authority to decide the question," 42 U.S.C. § 1395oo(f)(1). But that is not an unusual occurrence—indeed, it is what happened with respect to Plaintiffs' challenge to the 0.2 percent reduction—and it does not relieve a provider of the obligation to try.

The Hooper and Akin Plaintiffs attempt to sidestep this conclusion by asserting that they "are _not_ dissatisfied with the Secretary's determination to increase the rates paid under the IPPS statute . . . in the FFY 2017 IPPS Final Rule, or the determination in that Rule to pay interest under 1395oo." Dkt. 114 at 4. "Rather," their dissatisfaction focuses *exclusively* on "the Secretary's *post-hoc* determination in this litigation not to pay [§] 1395oo interest for years filed in court after the underpayment determination." *Id.* That contention, however, fails for three reasons. First, § 1395g(d) is not available as a judicial remedy for the Secretary's refusal to pay interest under § 1395oo(f)(2); rather, it is part of the complex web of provisions that define the amounts the Secretary is required to pay providers for their services. Second, there is nothing "post-hoc" about the Secretary's agreement to pay interest under § 1395oo(f)(2) only with respect to those fiscal years for which the provider at issue had an action pending in Court on August 2, 2016. The Secretary clearly announced that position in the FY 2017 Rule, asserting: "We will not contest that hospitals that are party to the *Shands Jacksonville Medical Center, Inc.*

*v. Burwell*, No. 14-263 (D.D.C.) and other *currently pending cases* that challenge the -0.2 percent adjustment should receive interest under [§ 1395oo(f)(2)]." 81 Fed. Reg. at 57,060 (emphasis added). The Secretary's position was clear from the FY 2017 rulemaking, and, if Plaintiffs ever disputed that decision at the administrative level, they have failed to identify where they did so. Third, Plaintiffs' own argument undercuts their position that their dissatisfaction stems from "the Secretary's *post-hoc* determination in this litigation," Dkt. 114 at 4. They argue that they could not have sought interest pursuant to § 1395g(d) "in the course of [their] PRRB appeals" challenging the FY 2014, 2015, and 2016 Rules because the "underpayment determination by the Secretary *that serves as the foundation for*" their claim to interest "was not even made until the [FY 2017 Rule] was issued in August 2016." Dkt. 114 at 5 (emphasis added). This seems to concede that it was the Secretary's determination in the FY 2017 Rule, and not any "*post-hoc*" determination, that forms the source of Plaintiffs' claim, and the Hooper and Akin Plaintiffs do not address whether they will be able to seek interest under § 1395g(d) in PRRB proceedings relating to the FY 2017 Rule.

Standing alone, moreover, it is difficult to know what to make of Plaintiffs' contention that they could not have sought interest pursuant to § 1395g(d) through their PRRB appeals because the FY 2017 Rule was issued "after the time-frame for challenges to the FFYs 2014, 2105 and 2016 IPPS Final Rules." *Id*. (emphasis omitted). As far as the Court can discern, the Hooper and Akin Plaintiffs are entitled to interest pursuant to § 1395oo(f)(2) with respect to all but two of the lawsuits that they have brought. Yet, the complaints in both of those actions recite that Plaintiffs sought EJR before the PRRB with respect to their FY 2016 claims *after* the Secretary issued the Final FY 2017 Rule—which contained the "perambulatory" language upon which Plaintiffs rely for their § 1395g(d) claim. *See Shands Jacksonville Med. Ctr., Inc. v.*

34

*Burwell*, Civ. No. 16-2484, Dkt. 1 at 74–75 (Compl. ¶¶ 49–52); *St. Helena Hosp. v. Burwell*, Civ. No. 17-39, Dkt. 1 at 77 (Compl. ¶¶ 40–42).  Plaintiffs were, in fact, able to obtain a grant of EJR from the PRRB in *December 2016* with respect to their claim that the FY 2017 Rule did not "pay [them] what they lost in reimbursement for FFY 2016 due to the [rate] reduction."  *See, e.g.*, *St. Helena Hosp. v. Burwell*, Civ. No. 17-39, Dkt. 1-3 at 6.  If there is some reason that the logic that allowed them to do so does not extend to their contention that the FY 2017 Rule also failed to pay them for "what they lost in [the time value of money] for FFY 2016," they have failed to identify that reason.

Finally, Plaintiffs assert that "[t]he Medicare statute provides no administrative mechanism for an interest claim to be pursued apart from an underlying claim over which the [PRRB] has jurisdiction."  Dkt. 114 at 5.  But it is not apparent why a claim that the Secretary should have included an interest component in her calculation of an underpayment is not a claim of "dissatisf[action] with a final determination . . . as to the amount of total program reimbursement due the provider for the items and services provided."  42 U.S.C. § 1395oo(a)(1)(A).  If the Hooper and Akin Plaintiffs are correct that the FY 2017 Rule constituted a "final determination . . . that the amount of payment made under" the Medicare program "was . . . less than the amount of payment that [was] due"—and the Court expresses no opinion on that question—there is no reason to conclude that a failure to let "interest . . . accrue on the balance of such . . . deficit," *id*. at § 1395g(d), would fall outside "the amount of total program reimbursement" to which they are due, *id*. § 1395oo(a)(1)(A), for FY 2017 or any other fiscal year.  The Court can imagine theoretical difficulties Plaintiffs might have faced had they attempted to do so (or if they attempt to do so in the future).  But, absent any effort to raise the

issue with respect to any fiscal year, the hurdles that the Hooper and Akin Plaintiffs invoke are simply conjectural.

*   *   *

Taking a step back from all of this, the principle flaw with Plaintiffs' request that the Court order that the Secretary pay them interest pursuant to § 1395g(d) is that, as far as the Court can discern, they never raised the issue in *any* form before *any* decisionmaker at the administrative level. The courts have long-applied a "strong presumption favoring judicial review," and the channeling provision contained in the Medicare statute does not apply "where its application 'would . . . mean no review at all.'" *Council for Urological Interests v. Sebelius*, 668 F.3d at 705, 707. But, ultimately, there must be something—some decision, some action, or some refusal to act—for the Court to *review*. Here, there is no indication that the Hooper and Akin Plaintiffs, or anyone else, ever requested that the Secretary, any Medicare administrative contractor, or the PRRB provide interest under § 1395g(d). Absent some effort to raise the issue at the administrative level, there is simply nothing for this Court to review. *See Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 379 (2004) ("mandamus may not issue so long as alternative avenues of relief remain available").

The Court, accordingly, denies the Hooper and Akin Plaintiffs' request that the Court "compel an officer or employee" of the Department of Health and Human Services "to perform a duty owed to the plaintiff[s]," 28 U.S.C. § 1361.[8]

---

[8] The Hooper and Akin Plaintiffs request, as a last resort, that the Court remand their FY 2016 appeals to the PRRB "for a ruling on [the availability of] interest under § 1395g(d) for FFY 2016." Dkt. 114 at 11 n.7. Because the Secretary has not had the opportunity to address this argument, and because it appears that Plaintiffs could have raised the § 1395g(d) issue when they previously sought EJR before the PRRB, the Court will deny that request, but will do so without prejudice to Plaintiffs renewing it for good cause after conferring with counsel for the Secretary.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motions for an order awarding interest, Dkt. 69, Dkt. 70, and Dkt. 71, are hereby **GRANTED** in part and **DENIED** in part.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: March 15, 2019