# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHANDS JACKSONVILLE MEDICAL
CENTER, INC., et al.,

   *Plaintiffs*,

   v.

NORRIS COCHRAN,[1]

   *Defendant*.

Case No. 14-263 (RDM) (cons.)

## <u>MEMORANDUM OPINION AND ORDER</u>

This is the final chapter in a long-running series of cases originally brought by more than a thousand hospitals.  In the Court's most recent opinion, the Court concluded that some, but not all, of the hospitals were entitled to an award of interest as "prevailing part[ies]" pursuant to 42 U.S.C. § 1395oo(f)(2).  A subset of hospitals that were not entitled to interest under § 1395oo(f)(2) for some of the claims at issue (the "Hooper and Akin Plaintiffs") pressed an alternative theory, asking that the Court direct the Secretary of Health and Human Services ("Secretary") to award them interest under 42 U.S.C. § 1395g(d).  Unlike the "prevailing party" provision, which applies to those who are successful in litigating claims against the Secretary, § 1395g(d) applies at the agency level and requires the Secretary to pay or to recover interest when an administrative "determination is made that the amount of payment . . . to [the] provider . . . was in excess of or less than the amount of payment that [was] due" and the "excess or deficit" is not paid or recovered within 30 days of the determination.  42 U.S.C. § 1395g(d).  The

---

[1] Although this lawsuit previously named Alex M. Azar II, Norris Cochran is now Acting Secretary of Health and Human Services.

Court rejected the Hooper and Akin Plaintiffs' § 1395g(d) challenge on the grounds that the hospitals never presented that claim to the Secretary and, indeed, never raised the issue before any decisionmaker at the administrative level.  There was, in short, no decision, action, or refusal to act for the Court to review.

In a footnote, the Hooper and Akin Plaintiffs asked as a last resort that the Court remand their FY 2016 appeals to the Provider Reimbursement Review Board ("PRRB") for a ruling on the availability of interest under § 1395g(d).  The Court denied that request, also in a footnote, but because the issue was not briefed in any detail, the Court granted the hospitals leave to renew their request for "good cause" after conferring with counsel for the Secretary.  Although the Court intended to provide the Hooper and Akin Plaintiffs with only a limited opportunity to explore a narrow issue, the Court's footnote ultimately precipitated multiple rounds of additional briefing, oral argument, and an evolving cascade of arguments.  Suffice it to say, the hospitals have focused less on whether a remand is appropriate and, instead, have (in substance if not in name) sought reconsideration of the Court's conclusion that their § 1395g(d) challenge failed for lack of presentment.

Treating the hospitals' multiple submissions and arguments as a motion for reconsideration, the Court will deny that motion on the ground that the hospitals could have, but did not, raise the § 1395g(d) issue with the Secretary in a timely manner.  That was the basis of the Court's prior decision, and, with minor refinement to the relevant analysis, the Court remains persuaded that it lacks jurisdiction to consider the Hooper and Akin Plaintiffs' § 1395g(d) claim. The Court will also deny their request that the Court remand the matter to the PRRB for further proceedings because (1) the Court lacks jurisdiction to do so and (2) in any event, the hospitals

have failed to demonstrate good cause for not raising the § 1395g(d) issue with the Secretary in the first instance.

## I.  BACKGROUND

The litigation began when over a thousand hospitals brought an array of lawsuits challenging a regulation promulgated by the Secretary of Health and Human Services ("Secretary") that imposed a 0.2 percent, across-the-board reduction in the Inpatient Prospective Payment System ("IPPS") rates used to compensate hospitals under the Medicare program.  In 2015, the Court concluded that the Secretary failed to provide sufficient notice of the actuarial assumptions and methodology that she employed in calculating the 0.2 percent reduction and that, without this information, the hospitals were denied a meaningful opportunity to comment on the rule.  *See Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 261–65 (D.D.C. 2015) ("*Shands I*").  To remedy this procedural omission, the Court remanded the matter to the Secretary for further administrative proceedings, but applying the factors set forth in *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993), the Court declined to vacate the rule.  *Shands I*, 139 F. Supp. 3d at 267–71.

On remand, the Secretary published a notice describing the assumptions that the actuaries had used and, as contemplated by the Court's decision, invited further public comment.  *See Medicare Program; Inpatient Prospective Payment Systems; 0.2 Percent Reduction*, 80 Fed. Reg. 75,107 (Dec. 1, 2015).  After receiving comments and considering the matter further, however, the Secretary lost confidence in the basis for the 0.2 percent rate reduction and, as a result, issued a proposed rule that would remove the 0.2 percent adjustment for FY 2017 and thereafter and that would address the effects of the 0.2 percent rate reductions for FYs 2014, 2015, and 2016 by adopting a one-time 0.6 percent rate increase for FY 2017.  *See* Medicare Program; Hospital

Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care

Hospital Prospective Payment System and Proposed Policy Changes and Fiscal Year 2017 Rates,

81 Fed. Reg. 24,946, 25,137–38 (Apr. 27, 2016) ("2017 Proposed Rule").  Consistent with this

proposal, in the final rule setting the FY 2017 rates, the Secretary abandoned the 0.2 percent rate

reduction going forward and adopted the proposed one-time 0.6 percent rate increase for FY

2017.  *See* Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care

Hospitals and the Long-Term Care Hospital Prospective Payment System and Policy Changes

and Fiscal Year 2017 Rates, 81 Fed. Reg. 56,762 (Aug. 22, 2016) ("2017 Final Rule").

Some of the comments submitted in response to the 2017 Proposed Rule raised concerns

about the time value of money and argued that some or all of the hospitals should receive interest

to make up for this asserted loss.  *Id.* at 57,060.  These commenters asked that the Secretary

"refine the 1.006 percent adjustment [for FY 2017] to account for" the time value of money or

that the Secretary "otherwise address the issue."  *Id.*  In response, the Secretary announced:

> We will not contest that hospitals that are party to the *Shands Jacksonville
> Medical Center, Inc. v. Burwell*, No. 14-263 (D.D.C.) and other currently
> pending cases that challenge the -0.2 percent adjustment should receive interest
> under section 1878(f)(2) of the Act [42 U.S.C. § 1395oo(f)(2)]. For these
> hospitals, we will slightly increase the 1.006 factor by a uniform factor
> consistent with the interest rates used for this purpose in effect for the relevant
> time periods for paying interest. We disagree with commenters who indicated
> that we should pay all hospitals interest or for the time value of money.

*Id.*  In short, after considering the comments, the Secretary decided not to contest the award of

interest under 42 U.S.C. § 1395oo(f)(2) for those hospitals that were parties to the *Shands* case

itself or to any of the "other *currently pending* cases."  *Id.* (emphasis added).  The Secretary,

however, otherwise declined to compensate hospitals for the time value of money.  *Id.*

Many of the hospitals then returned to this Court to challenge the adequacy of the

Secretary's actions on remand.  One group of hospitals argued that the Secretary should have

4

repealed or amended the rule that initially adopted the 0.2 percent rate reduction, which would have resulted in the recalculation of amounts each hospital was entitled to receive for FYs 2014, 2015, and 2016. *Shands Jacksonville Med. Ctr., Inc. v. Azar*, 366 F. Supp. 3d 32, 51 (D.D.C. 2018) ("*Shands II*"). And a second group of hospitals argued that the Secretary took a step in the right direction in the 2017 Final Rule but did not go far enough. In their view, the Secretary should have adopted an across-the-board rate increase (above and beyond the 0.6 percent make-up payment) to compensate hospitals for losses that they allegedly sustained due to the Secretary's decision to alter the manner in which the Medicare program distinguishes between in-patient and out-patient services. *Id.* at 57–58. This Court rejected those challenges, *see id.* at 66, and the D.C. Circuit affirmed that decision, *see Shands Jacksonville Med. Ctr., Inc. v. Azar*, 959 F.3d 1113 (D.C. Cir. 2020).

 The Court's third opinion took up the question of interest. Three different groups of hospitals sought the award of interest to make them whole for the delay in payments resulting from the 0.2 percent reduction in their IPPS rates for FYs 2014, 2015, and 2016, which they did not recoup until they received the 0.6 percent rate increase in FY 2017. *Shands Jacksonville Med. Ctr., Inc. v. Azar*, No. 14-cv-263, 2019 WL 1228061 (D.D.C. Mar. 15, 2019) ("*Shands III*"). All three groups of hospitals argued that they were "prevailing parties" within the meaning of 42 U.S.C. § 1395oo(f)(2) and, as a result, were entitled to interest for each of the three fiscal years at issue. *Id.* at *1. The Court agreed that those hospitals that had filed suit before the Secretary adopted the 0.6 percent rate increase in the 2017 Final Rule were entitled to prevailing-party interest but that those hospitals that did not bring suit until after the Secretary had already provided them with the relief that they sought were not entitled to prevailing-party interest. *Id.* at *6–14. On appeal, the D.C. Circuit agreed that "the [h]ospitals [were] entitled to interest for

each fiscal year that they challenged the rate reduction in court by August 2, 2016, when the

Secretary promulgated the FY 2017 rate increase" and that those hospitals that had not brought

suit by August 2, 2016 had no claim to interest under § 1395oo(f)(2).  *Shands Jacksonville Med.*

*Ctr., Inc.*, 959 F.3d at 1121.

The third group of hospitals, represented by Hooper, Lundy & Bookman, P.C. and Akin

Gump Strauss Hauer & Feld LLP and which the Court has referred to as the "Hooper and Akin

Plaintiffs,"[2] pressed an alternative argument not raised by the other hospitals.  They argued that,

to the extent they were not entitled to an award of prevailing-party interest under § 1395oo(f)(2),

the Secretary should have paid them interest pursuant to § 1395g(d).  *Shands III*, 2019 WL

1228061, at *1.  In relevant part, that provision provides:

> Whenever a final determination is made that the amount of payment made under
> this part to a provider of services was in excess of or less than the amount of
> payment that is due, and payment of such excess or deficit is not made (or
> effected by offset) within 30 days of the date of the determination, interest shall
> accrue on the balance of such excess or deficit not paid or offset . . . at a rate
> determined in accordance with the regulations of the Secretary of the Treasury
> applicable to charges for late payments.

42 U.S.C. § 1395g(d).  As the Court observed, § 1395g(d) differs from § 1395oo(f)(2) in an

important respect: "§ 1395g(d) imposes a duty on the Secretary to pay interest, while

§ 1395oo(f)(2) authorizes the federal courts to award interest."  *Shands III*, 2019 WL 1228061, at

*15.  That difference was significant because the Hooper and Akin Plaintiffs never asked the

---

[2]  Hospitals represented by Akin Gump Strauss Hauer & Feld LLP include all plaintiffs in the
following cases: *Shands Jacksonville Med. Ctr., Inc. v. Sebelius*, Civ. No. 14-263; *Dignity
Health v. Sebelius*, Civ. No. 14-536; *Shands Jacksonville Med. Ctr., Inc. v. Burwell*, Civ. No. 15-
1150; and *Shands Jacksonville Med. Ctr., Inc. v. Burwell*, Civ. No. 16-2484. Hospitals
represented by Hooper, Lundy & Bookman, P.C. include all plaintiffs in the following cases: *St.
Helena Hosp. v. Burwell*, Civ. No. 14-1477; *Long Beach Mem'l Med. Ctr. v. Burwell*, Civ. No.
15-1601; *St. Helena Hosp. v. Burwell*, Civ. No. 16-30; and *St. Helena Hosp. v. Burwell*, Civ. No.
17-39. *See* Dkt. 69 at 1 n.1.

Secretary to award interest under § 1395g(d) and thus there was no adverse administrative decision or action for the Court to review.

The Hooper and Akin Plaintiffs did not dispute "that, in general, a provider must exhaust administrative remedies before bringing suit," but they maintained that exhaustion was not required in this context because (1) application of the Medicare Act's channeling provisions would preclude review entirely of the Secretary's failure to pay interest and (2) the channeling provisions do not apply to actions brought under the Mandamus Act, 28 U.S.C. § 1361. *Id.* The Court was unpersuaded. As the Court explained, "neither exception relieves a provider of the obligation to make all reasonable efforts to exhaust its administrative remedies before filing suit." *Id.* "The first exception, by definition, applies only if application of the channeling rule would preclude judicial review, and the second exception, which relies on the extraordinary relief available in mandamus, requires the plaintiff to 'exhaust administrative remedies' before brining suit." *Id.* (quoting *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813–14 (D.C. Cir. 2001)). Because the Hooper and Akin Plaintiffs had "failed to carry their burden of showing that they were unable to request interest under § 1395g(d) at *any* point in the administrative process," the Court concluded that it was without jurisdiction to consider their previously unasserted claim to interest under § 1395g(d). *Id.*

The Court's analysis started with the text of § 1395oo(a)(1)(A), which grants the PRRB jurisdiction if the provider is "dissatisfied with a final determination" made by "the Secretary as to the amount of the payment [due] under [the IPPS statute]." 42 U.S.C. § 1395oo(a)(1)(A); *Shands III*, 2019 WL 1228061, at *15. According to the Hooper and Akin Plaintiffs, they could not have relied on that avenue of review because the 2017 Final Rule constituted the final determination that they had been underpaid for FYs 2014, 2105, and 2016, Dkt. 69-1 at 16–17,

and they were "not dissatisfied with the Secretary's determination to increase the rates paid

under the IPPS statute . . . in the FFY 2017 IPPS Final Rule, or the determination in that Rule to

pay interest under [§] 1395oo." Dkt. 114 at 4. Instead, they argued that their dissatisfaction

arose exclusively from "the Secretary's *post-hoc* determination in this litigation not to pay [§]

1395oo interest for years filed in court after the underpayment determination." *Id.* This Court

rejected that rationale for several reasons.

First, as the Court explained, "§ 1395g(d) is not available as a judicial remedy for the

Secretary's refusal to pay interest under § 1395oo(f)(2); rather, it is part of the complex web of

provisions that define the amounts the Secretary is required to pay providers for their services."

*Shands III*, 2019 WL 1228061, at *16. Second, there was "nothing [*post-hoc*] about the

Secretary's agreement to pay interest under § 1395oo(f)(2) only with respect to those fiscal years

for which the provider at issue had an action pending in Court on August 2, 2016." *Id.* To the

contrary, commenters raised the question of interest in response to the 2017 Proposed Rule, and

"[t]he Secretary clearly announced that position in the FY 2017 Rule, asserting: 'We will not

contest that hospitals that are party to the *Shands Jacksonville Med. Ctr., Inc. v. Burwell*, No. 14-

263 (D.D.C.) and other *currently pending cases* that challenge the -0.2 percent adjustment should

receive interest under [§ 1395oo(f)(2) ].'" *Id.* (alteration in original) (quoting 81 Fed. Reg. at

57,060 (emphasis added)). The Hooper and Akin Plaintiffs, however, never—in any way—

disputed that decision at the administrative level. *Id.* Moreover, the Court observed that

"Plaintiffs' own argument undercut[] their position that their dissatisfaction stem[med] from 'the

Secretary's *post-hoc* determination in this litigation.'" *Id.* In particular, they argued "that they

could not have sought interest pursuant to § 1395g(d) 'in the course of [their] PRRB appeals'

challenging the FY 2014, 2015, and 2016 Rules because the 'underpayment determination by the

Secretary *that serves as the foundation for*' their claim to interest 'was not even made until the [FY 2017 Rule] was issued in August 2016.'" *Id.* (quoting Dkt. 114 at 5 (emphasis added)).  But that framing of the issue seemed "to concede that it was the Secretary's determination in the FY 2017 Rule, and not any '*post-hoc*' determination, that form[ed] the source of Plaintiffs' claim, and the Hooper and Akin Plaintiffs [did] not address whether they [would] be able to seek interest under § 1395g(d) in PRRB proceedings relating to the FY 2017 Rule."[3]  *Id.*

The Hooper and Akin Plaintiffs further argued that "[t]he Medicare statute provides no administrative mechanism for an interest claim to be pursued apart from an underlying claim over which the [PRRB] has jurisdiction."  Dkt. 114 at 5.  The Court, however, was once again unpersuaded that this entitled Plaintiffs to bring suit without satisfying the presentment requirement.  As the Court observed, Plaintiffs failed to explain "why a claim that the Secretary should have included an interest component in her calculation of an underpayment [was] not a claim of 'dissatisf[action] with a final determination . . . as to the amount of total program reimbursement due the provider for the items and services provided.'"  *Shands III*, 2019 WL 1228061, at *16.  To be sure, the Court recognized that the Hooper and Akin Plaintiffs *might* have faced some *conceivable* difficulties had they attempted to raise a claim for interest.  "But, absent any effort to raise the issue with respect to any fiscal year, the hurdles that the Hooper and Akin Plaintiffs invoke" were, in the Court's view, "simply conjectural."  *Id.*

---

[3]  Apart from these difficulties with the Hooper and Akin Plaintiffs' argument, the Court went on to observe that Plaintiffs did not seek Expedited Judicial Review ("EJR") from the PRRB with respect to FY 2016 until after the Secretary promulgated the 2017 Final Rule, suggesting that they could have timely included their claim to interest in that request.  *Shands III*, 2019 WL 1228061, at *16.  Plaintiffs have now explained that they were required to file their appeals to the PRRB before the Secretary promulgated the 2017 Final Rule and that they were not permitted to raise any claims in their request for EJR that were not included in their appeals. Dkt. 152 at 7.  For present purposes, the Court accepts this representation and no longer relies on this alternative basis for its decision.

The Hooper and Akin Plaintiffs included a final footnote in their brief, which has precipitated all that has happened in this case since then.  That footnote asserted:

> If the Court concludes that the Hospitals are not entitled to interest under section 1395oo(f) for FFY 2016 and that the Secretary correctly asserted that the PRRB has "jurisdiction over any claim for interest under § 1395g(d)" (Def.'s Mem. at 3 (ECF No. 113, Feb. 15, 2019)), then the Court should remand the Hospitals' FFY 2016 appeals to the PRRB for a ruling on interest under section 1395g(d) for FFY 2016.

Dkt. 114 at 11 n.7.  The Court was unpersuaded—at least based on this bare assertion—that remand was appropriate.  But because neither party had briefed the propriety of a remand to the PRRB for further consideration, the Court denied Plaintiffs' request "without prejudice to [their] renewing it for good cause after conferring with counsel for the Secretary."  *Shands III*, 2019 WL 1228061, *17 n.8.

After issuing its decision in *Shands III*, the Court entered a minute order explaining that "it is the Court's understanding that there are no remaining issues to be resolved in these consolidated matters."  Minute Order (Mar. 18, 2019).  It added, however, that "[i]f any party would like to raise additional issues with the Court, that party shall file a status report outlining the remaining issues to be resolved."  *Id.*  On March 25, 2019, the Hooper and Akin Plaintiffs filed a status report explaining that they sought "briefing on the issue of a remand of FFY 2016 appeals to the PRRB for a ruling on interest under [§] 1395g(d)."  Dkt. 116 at 2.  The Court held a scheduling conference on April 23, 2019 and set a schedule for briefing on the issue.  Minute Entry (Apr. 23, 2019).  On May 13, 2019, the Secretary filed a memorandum addressing Plaintiffs' claim for interest.  Dkt. 135.  Plaintiffs filed a response on June 7, 2019, Dkt. 139, and Defendant replied on June 21, 2019, Dkt. 142.

The Court heard extended oral argument on November 14, 2019.  At argument, counsel for the Hooper and Akin Plaintiffs repeated arguments the Court had previously rejected, raised a

number of arguments not mentioned in their briefs, and asked that the Court consider a number of administrative and judicial precedents and regulations that they had not previously cited. Among other things, Plaintiffs (1) repeated their contention that they were not "dissatisfied" with the 2017 Final Rule and, thus, were not entitled to seek review of the Secretary's failure to award interest under § 1395g(d), Dkt. 152 at 10; (2) conceded that they did not raise the § 1395g(d) issue in the administrative process but argued that they nonetheless complied with the presentment requirement by sending an email to litigation counsel (after bringing suit) requesting that the Secretary agree to their demand, *id.* at 13–14, 30, 35; (3) argued that a PRRB regulation precluded them from raising a second challenge to the FY 2016 IPPS rate determination, effectively precluding them from challenging the Secretary's failure to award the interest under § 1395g(d), *id.* at 19 (citing PRRB Rule 4.6.1); (4) posited that presentment is not required for a claim for interest under § 1395g(d) because such a claim to interest does not arise "under [§] 1395oo or any other administrative process," *id.* at 21; (5) maintained that they were justifiably confused about whether the 2017 Final Rule awarded prevailing-party interest to all hospitals, rather than just those that had filed suit in this Court by August 2016, and it was for that reason that they did not raise the § 1395g(d) issue with the Secretary when they might have, *id.* at 22; (6) argued that under the PRRB's decision in *Univ. of Pittsburgh Med. Ctr. v. Highmark Medicare Servs.*, PRRB Dec. 2014-D26 (Sept. 23, 2014) ("*Pittsburgh Medical*"), the PRRB lacks jurisdiction to consider § 1395g(d) claims to interest, thus depriving providers of a means for seeking administrative relief along the road to seeking judicial review, Dkt. 152 at 51; (7) conceded that the hospitals could have filed a petition with the Secretary seeking to reopen the rulemaking to award them interest but argued that this mechanism did not support application of the presentment requirement because the Secretary's denial of such a request is not subject to

judicial review, *id.* at 72–73; and (8) invoked the D.C. Circuit's decision in *In re Medicare Reimbursement Litigation*, 414 F.3d 7 (D.C. Cir. 2005), for the proposition that hospitals are entitled to seek mandamus relief without exhausting administrative processes when they seek relief under a "self-effectuating" statutory provision, like § 1395g(d), Dkt. 152 at 48, 85–87.

At the conclusion of oral argument, the Court noted that, after giving Plaintiffs multiple opportunities to make their case, it had "heard about some new case law," regulations, and PRRB decisions for the first time at oral argument. *Id.* at 97. The Court further noted that Plaintiffs were, in effect, asking the Court to reconsider its decision in *Shands III*, and thus they needed to explain why the Court's decision was incorrect and needed to identify any—and *all*—authority that, in their view, counsels a different result. *Id.* at 97–98. To ensure a complete record, the next day the Court ordered the Hooper and Akin Plaintiffs to "file a copy of the[ir] 2016 appeal[s] to the [B]oard," Minute Entry (Nov. 14, 2019), and, shortly after that, ordered that they file copies of "any comments that they submitted to the Secretary during the relevant rulemakings regarding the awarding of interest," Minute Order (Nov. 18, 2019). None of those comments included any reference to § 1395g(d). Dkt. 155 at 2 (conceding that none of the comments "specifically address[ed] § 1395g(d) interest").

On December 13, 2019 Plaintiffs filed their brief and exhibits, Dkt. 155; the Secretary responded to that filing on January 17, 2020, Dkt. 157; and Plaintiffs replied on February 7, 2020, Dkt. 160. Finally, on July 9, 2020, Plaintiffs filed a notice of supplemental authority in support of their claim. Dkt. 162. By any measure, the matter is now ripe for decision.

## II. ANALYSIS

In *Shands III*, the Court allowed the Hooper and Akin Plaintiffs—for "good cause"—to renew their request that the Court remand the § 1395g(d) question to the PRRB. 2019 WL

12

1228061, at *17 n.8.  Rather than address this issue, however, most of Plaintiffs' briefing and argument since then has taken issue with the Court's holding that Plaintiffs failed to raise their claim for interest with the Secretary or the PRRB, that they had an opportunity to do so, and that, as a result, the Court was without jurisdiction to consider their claim for § 1395g(d) interest on the merits.  That focus is puzzling because Plaintiffs have not actually moved for reconsideration of the Court's order.  It is evident to the Court, however, that they in fact seek reconsideration, and the Court will accordingly treat their numerous submissions and arguments as a motion for reconsideration.

Under Federal Rule of Civil Procedure 54(b), district courts may "reconsider an interlocutory order 'as justice requires.'"  *Capitol Sprinkler Inspection, Inc. v. Guest Servs., Inc.*, 630 F.3d 217, 227 (D.C. Cir. 2011) (quoting *Greene v. Union Mut. Life Ins. Co. of Am.*, 764 F.2d 19, 22–23 (1st Cir. 1985)).  Although the D.C. Circuit has yet to establish a controlling standard "governing Rule 54(b) reconsideration," *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.C. Cir. 2004), numerous decisions in this district have relied on the following inquiry:

> Justice may require revision when the Court [1] has patently misunderstood a party, [2] has made a decision outside the adversarial issues presented to the Court by the parties, [3] has made an error not of reasoning but of apprehension, or [4] where a controlling or significant change in the law or facts has occurred since the submission of the issue to the Court. Errors of apprehension may include a Court's failure to consider controlling decisions or data that might reasonably be expected to alter the conclusion reached by the court.

*Castañon v. United States*, 2020 WL 5569943 (D.D.C. Sept. 16, 2020) (three-judge court) (quoting *Singh v. George Wash. Univ.* 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (citations, alterations, and quotation marks omitted)); *see also McLaughlin v. Holder*, 864 F. Supp. 2d 134, 141 (D.D.C. 2012) (quoting *Ficken v. Golden,* 696 F. Supp. 2d 21, 35 (D.D.C. 2010)).

The parties' briefing largely revisits arguments that the Court considered in its earlier opinion rejecting the Hooper and Akins Plaintiffs' request that it order the Secretary to pay them interest pursuant to § 1395g(d).  *Shands III*, 2019 WL 1228061, at *14–17.  As before, Plaintiffs concede that, in the usual course, the Medicare statute's channeling provisions divest the district courts of jurisdiction to consider claims that were not first presented to the Secretary or his representative.  Dkt. 155 at 2–3.  As before, they concede that they never asked the Secretary or anyone else involved in the administrative process to award them interest under § 1395g(d).  *Id.* at 3–4.  And, as before, they argue that two exceptions to the usual presentment requirement save their claim: First, invoking the D.C. Circuit's decision in *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 705 (D.C. Cir. 2011), they contend there was no means for them to raise their § 1395g(d) claim in the administrative process and that, where application of the channeling rule "would not lead to a channeling of review through the agency, but would mean no review at all," it does not apply.  Dkt. 155 at 3.  Second, invoking the D.C. Circuit's decision in *Monmouth Med. Ctr. v. Thompson*, 257 F.3d at 811–15, they argue that the channeling rule does not bar review under the Mandamus Act, 28 U.S.C. § 1361.  Dkt. 155 at 3 n.4.

Because the Mandamus Act, like the Medicare statute, requires plaintiffs to exhaust administrative remedies before bringing suit, *Monmouth Med. Ctr.*, 257 F.3d at 813, both of the Hooper and Akin Plaintiffs' theories turn on (1) whether they had the opportunity to present their claims in the administrative process, and (2) whether they, in fact, sought relief from the Secretary.  In considering Plaintiffs' arguments, it is first necessary to distinguish between two concepts of what it means to present a claim in the administrative process.  Under the first, more general concept, presentment simply means to raise the issue with the administrative agency in some manner before seeking judicial review.  Under the second, which is more specific to the

Medicare statute, presentment means to follow the reticulated statutory and regulatory rules for obtaining PRRB review as a prerequisite to seeking judicial review. The Court starts with the first of these concepts because it readily resolves the Hooper and Akin Plaintiffs' contention that they are entitled to relief under the Mandamus Act even though they never—in any way—raised their claim to § 1395g(d) interest in the administrative process. The Court will then turn to the specific presentment rules contained in the Medicare statute and its implementing regulations and Plaintiffs' contention that the Court has general federal question jurisdiction.

## A.        Mandamus Act

"The 'remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances.'" *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002) (quoting *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980)). Mandamus "is available [only] if (1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *Council of and for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1533 (D.C. Cir. 1983) (en banc). This final condition means that mandamus is available only if the plaintiff "has exhausted all other avenues of relief," *Heckler v. Ringer*, 466 U.S. 602, 616 (1984), including all available "administrative remedies," *Monmouth Med. Ctr.*, 257 F.3d at 813. All "three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).

Here, there is little doubt that the Hooper and Akins Plaintiffs could have asked that the Secretary award interest under § 1395g(d) to all hospitals that did not receive interest under § 1395oo(f)(2). The comments submitted in response to the 2017 Proposed Rule, which first proposed making a one-time 0.6 percent rate adjustment for FY 2017 "to address the effect of the

0.2 percent reduction to the rates" that were in place in FYs 2014, 2015, and 2016, 81 Fed. Reg. at 25,138, objected that the 0.6 percent rate adjustment would fail to compensate hospitals "for the time value of money," 2017 Final Rule, 81 Fed. Reg. at 57,060.  But, as Plaintiffs now concede, they did not ask the Secretary to award interest pursuant to § 1395g(d).  Dkt. 152 at 36–37; Dkt. 155 at 2.  Plaintiffs did not do so then or at any other time in the administrative process. Moreover, and of equal significance, nothing precluded them from raising the issue either when the Secretary invited comments on the 2017 Proposed Rule or, as they now concede, 30 days after he promulgated the 2017 Final Rule, when (under Plaintiffs' theory) interest should have started to accrue under § 1395g(d).  Decisively, when asked at oral argument whether they could have asked that the Secretary award interest at the 30-day mark, counsel for the Hooper and Akin Plaintiffs responded:

> Oh, your Honor, believe me, I take your point.  And could that have been done? Sure, absolutely.  Is that a legal requirement in a situation where you have a self-effectuating statute [like § 1395g(d)] and—no, number one.  And then, number two, to the extent there needs to be some form of presentment, some sort of request, that was made to the [S]ecretary's counsel.

Dkt. 152 at 48.  In other words, although Plaintiffs agree that they could have asked the Secretary to award interest under § 1395g(d), they contend that they were not required to do so because (1) § 1395g(d) is a "self-effectuating statute" and (2) in any event, they eventually asked the Secretary, though litigation counsel, to pay them interest under § 1395g(d).  Neither argument withstands scrutiny.

To start, it is difficult to know what to make of the Hooper and Akin Plaintiffs' assertion that § 1395g(d) is "self-effectuating."  If all they mean is that the statute directs the Secretary to pay interest if payment is not made within 30 days of a "final determination" that a provider of services received an amount "less than the amount of payment that [was] due," 42 U.S.C.

§ 1395g(d), their argument would create a gaping hole in the requirement that parties exhaust all avenues of relief before seeking mandamus, *Ringer*, 466 U.S. at 616. As the Hooper and Akin Plaintiffs explain it, they use the term "self-effectuating" to mean that the administrative action at issue—here, the payment of interest—is "statutorily required" and is not triggered by a request for payment. Dkt. 152 at 47–48. But many, and perhaps most, statutory demands on agencies are self-executing in this way. The fact that an obligation is mandated by statute (even without a specific request) does not relieve litigants of the obligation at least to try to obtain administrative relief before seeking the extraordinary relief of mandamus. To the contrary, the existence of a clear statutory mandate is necessary to satisfy an entirely separate requirement for seeking mandamus; the plaintiff must show that "the defendant ha[d] a clear duty to act." *Council of and for the Blind of Del. Cnty. Valley*, 709 F.2d at 1533. Plaintiffs' contention that they may forgo an opportunity to seek administrative relief before petitioning for mandamus—that is, their contention that, "[s]ure," they "absolutely" could have asked the Secretary, but that there was no "legal requirement" that they do so—fundamentally misunderstands the nature of mandamus. Mandamus is a remedy of last resort that is available only if the plaintiff is left with no other option. Plaintiffs' concession that they had the option of asking the Secretary for relief but did not pursue that option is, accordingly, dispositive.

Notwithstanding this difficulty, the Hooper and Akin Plaintiffs rely on two D.C. Circuit precedents in an effort to bolster their argument that, if the relevant government official has failed to comply with a "self-effectuating" statutory obligation, mandamus is available without first seeking administrative relief. Neither decision supports that ambitious contention. The first of the cases, *Monmouth Medical Center*, 257 F.3d 807, held that the district court had jurisdiction under § 1361 to compel the plaintiffs' Medicare contractors to reopen their FYs 1993

and 1994 disproportionate share hospital ("DSH") adjustments to ensure compliance with a ruling from the Health Care Financing Administration ("HCFA") (now, the Centers for Medicare & Medicaid Services ("CMS")) that adopted "a new interpretation [of the statute] more favorable to hospitals," *id*. at 808–10.  The D.C. Circuit so held, however, only after painstakingly reviewing every avenue of possible administrative relief and concluding that the plaintiffs had done "all they [could] to vindicate their right to reopening" and that "all other avenues of relief are either foreclosed or futile."  *Id*. at 815.  Among other things, the court (1) explained why review was not available under § 1395oo(f); (2) observed that "under the Secretary's regulations, only the [Medicare contractors] have the jurisdiction to reopen;" and (3) stressed that the HCFA rule at issue—"Ruling 97-2"—purported to bar re-openings and "was issued without notice or opportunity for comment," *id.* at 801–13.  In short, *Monmouth* did not turn on whether the right to reopen was "self-effectuating" but, rather, on the complete unavailability of any administrative avenue of relief.

The second case, *In re Medicare Reimbursement Litigation*, 414 F.3d 7, involved the same substantive claim as *Monmouth*.  The only arguably material difference between the two cases was that the plaintiffs in *Monmouth* had asked that their Medicare contractors reopen the relevant DHS adjustment determinations pursuant to 42 C.F.R. § 405.1885(a), while the plaintiffs in *In re Medicare Reimbursement Litigation* had not.  414 F.3d at 9–10.  But, as the D.C. Circuit explained, that was a distinction without a difference because Ruling 97-2 purported to bar "intermediaries from reopening closed [Notices of Program Reimbursements] to recalculate DSH entitlement in accordance with the new interpretation of the statute."  414 F.3d at 11.  Significantly, "intermediaries were not at liberty to ignore this bar even if they believed the ruling amounted to a notice of inconsistency," *id.*, which ordinarily would have triggered a

duty to reopen under 42 C.F.R. § 405.1885(b).  Thus, in the view of the D.C. Circuit, the fact that the *Monmouth* plaintiffs sought reopening under § 405.1185(a), while the *In re Medicare Reimbursement Litigation* plaintiffs did not, was of no import.

One sentence in *In re Medicare Reimbursement Litigation*, if read in isolation, might seem to support the Hooper and Akin Plaintiffs' contention that exhaustion is not required under 28 U.S.C. § 1361 when a statutory obligation is "self-effectuating."  As noted above, the Secretary argued in that case that mandamus was unavailable because the plaintiffs had not moved to reopen under § 405.1885(a), which granted intermediaries (now Medicare contractors) the discretion to reopen certain determinations, although it did not mandate that they do so. Another part of the regulation, 42 C.F.R. § 405.1885(b), mandated that the intermediary reopen a determination if HCFA notified it that the determination was "inconsistent with the applicable law, regulations, or general instructions issued by" HCFA.  *Monmouth Med. Ctr.*, 257 F.3d at 809 (quoting 42 C.F.R. § 405.1885(b)).  Unlike discretionary reopening, mandatory reopening was triggered exclusively by HCFA's filing of a notice of inconsistency.

In the Secretary's view, only those hospitals that sought discretionary reopening had "a legally cognizable interest in the reopenings" mandated by § 405.1885(b).  In response, the *In re Medicare Reimbursement Litigation* court wrote:

> But given that section 405.1885(b) does not require hospitals to file anything at all to obtain relief, we see no basis for holding that only those hospitals that appealed or sought section 405.1885(a) reopenings have a personal right to the reopening required by section 405.1885(b).

414 F.3d at 11.  From this sentence, Plaintiffs suggest that § 1361's exhaustion requirement does not apply to statutory obligations that are "self-effectuating"—that is, those that "do[] not require hospitals to file anything at all to obtain relief."  But that reads far too much into this sentence. Rather, read in context, all that the D.C. Circuit held was that the *In re Medicare Reimbursement*

*Litigation* plaintiffs were not less entitled to judicial review than the *Monmouth* plaintiffs merely because they failed to seek relief under the discretionary reopening provision.  The D.C. Circuit concluded that the fact that a separate provision required Medicare contractors to reopen when notified of an inconsistency *by HCFA* had no bearing on the avenues for relief that might have been pursued *by the hospitals*.  *Id.* at 11–12.  The critical point in *In re Medicare Reimbursement Litigation* was that "the hospitals could not have obtained relief by seeking reopening in 1997," *id.*, and that point has no salience here, where the Hooper and Akin Plaintiffs correctly acknowledge that they could have asked the Secretary to award them interest pursuant to § 1395g(d).

Plaintiffs' alternative theory—that they did, in fact, present their claim to the Secretary by raising the issue with government counsel in this litigation—fares no better.  As an initial matter, the Court doubts that a communication with *litigation* counsel from the Department of Justice constitutes *administrative* exhaustion.  The Department of Justice is not the Secretary's agent for purposes of presentment or exhaustion of administrative claims; rather, it serves as the Secretary's agent for the purposes of the litigation, and the litigation alone.[4]  *See* 28 U.S.C. § 516.  Beyond that, Plaintiffs' theory is also in considerable tension with the core purpose of the

---

[4]  Plaintiffs contend that the rules of professional conduct arguably precluded them from communicating directly with the Secretary about their claim to interest after the case was brought.  If true, that proposition would likely send chills through the administrative law bar.  But, fortunately, it is not correct.  Under Rule 4.2(a) of the D.C. Rules of Professional Conduct, a lawyer may communicate with a represented party with "the prior consent of the lawyer representing such other person or [as] authorized by law or a court order to do so," and under Rule 4.2(d), the ban on communicating with a represented party "does not prohibit communication by a lawyer with government officials who have the authority to redress the grievance of the lawyer's client, whether or not those grievances or the lawyer's communications relate to matters that are the subject of the representation, provided that" the lawyer discloses "to the government official to whom the communication is made" that she is representing an opposing party in the litigation.

exhaustion requirement—that is, to provide agencies with the opportunity to address the plaintiff's concerns before involving a coordinate branch of government in the dispute.

But, even if the Court were to put both of these difficulties aside, it would still be unpersuaded, because exhaustion is a jurisdictional prerequisite to seeking mandamus, and subject-matter jurisdiction "depends upon the state of things at the time" the action is brought. *Mollan v. Torrance*, 22 U.S. 537, 539 (1824). The "time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure." *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570–71 (2004); *see also Goble v. Marsh*, 684 F.2d 12, 16 n.5 (D.C. Cir. 1982) (referencing "the general rule that jurisdiction is a threshold question, to be established at the time of filing"). Here, however, there is no evidence that the Hooper and Akin Plaintiffs raised their request for § 1395g(d) interest with counsel (or anyone else) before the action was commenced. In short, a putative plaintiff cannot satisfy the mandamus exhaustion requirement by simply asking litigation counsel whether her client is willing to concede the case, in whole or in part, after bringing suit.

Plaintiffs' mandamus claim fails for an entirely separate reason as well. As the D.C. Circuit has held, a party "invoking the court's mandamus jurisdiction must have a 'clear and indisputable' right to relief," and "the government's duty . . . must 'be clear and compelling.'" *In re Cheney*, 406 F.3d 723, 729 (2005). A court must, to be sure, construe even an ambiguous statute in applying this test, but, if after doing so, "there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action." *Id.* Here, the statute requires the Secretary to pay or to collect interest if payment is not made or received within 30 days of "a final determination" that "the amount of payment made under" the statute "was in excess of or less than the amount of payment that is due." 42 U.S.C. § 1395g(d). Although this

statutory language is relatively clear, the nature of the Secretary's determination at issue here is not. The payments that the hospitals received in FYs 2014, 2015, and 2016 were the amounts *due* and, although Plaintiffs disputed the lawfulness of the rules setting those rates, the Secretary did not unambiguously determine that the agency's previous rates rested on unreasonable assumptions or otherwise violated the law. Instead, having concluded that the 0.2 percent rate reduction "had a much greater degree of uncertainty than usual" and "taking . . . [other] factors into account," the Secretary decided to remove the adjustment for FY 2017 and later years and to adopt a *prospective* 0.6 percent adjustment for FY 2017 "to address the effect of the 0.2 percent reduction to the rates" in earlier years. 2017 Final Rule, 81 Fed. Reg. at 57,059. The Secretary did so even while stressing that she "still believe[d] the assumptions underlying the 0.2 percent reduction to the rates put in place beginning in FY 2014 were reasonable at the time" of the decision in 2013. *Id.* In light of this explanation, the adoption of a prospective 0.6 percent rate adjustment is more akin to a discretionary policy change than a determination that the agency had illegally deprived hospitals their due in the past. Although the Court need not decide the question for present purposes, it is at least arguable that the Secretary might reasonably have concluded that the 2017 Final Rule did not constitute a determination that the amounts paid to the hospitals in FYs 2014, 2015, and 2016 were "less than the amount" that was *due* in *past years*, but, instead, that the 2017 Final Rule recognized only a *prospective* rate for FY 2017. Under these circumstances, the Hooper and Akin Plaintiffs cannot show that they had a "'clear and indisputable' right to relief." *In re Cheney*, 406 F.3d at 729.

For all of these reasons, the Court adheres to its prior holding that it lacks mandamus jurisdiction to consider the Hooper and Akin Plaintiffs' claims to interest under § 1395g(d).

**B.      General Federal Question Jurisdiction Under § 1331**

The Court also remains convinced that it lacks general federal question jurisdiction, 28

U.S.C. § 1331, over those claims.  Because the Medicare statute speaks to this form of

jurisdiction directly, determining whether jurisdiction exists requires that the Court further detail

the statutory and regulatory rules that typically govern review of Medicare reimbursement (or

non-reimbursement) decisions.

As the D.C. Circuit recently explained, "[t]hree statutes create the scheme for obtaining

judicial review of Medicare claims."  *Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir.

2018).  "First,  42 U.S.C. § 405(h) divests the district courts of federal-question jurisdiction 'on

any claim arising under' Title II of the Social Security Act, and it bars any 'decision of the

Commissioner of Social Security' from being judicially reviewed, 'except as herein provided' in

other Title II provisions."  *Id.* (quoting 42 U.S.C. § 405(h)).  Then, § 405(g) permits an

individual to seek judicial review after receiving a "final decision of the Commissioner of Social

Security made after a hearing to which he [is] a party."  42 U.S.C. § 405(g).  And, finally, 42

U.S.C. § 1395ii provides that § 405(g), and other provisions of the Social Security Act, "shall

also apply with respect to [the Medicare Statute] to the same extent as they are applicable with

respect to [the Social Security Act], except that, in applying such provisions with respect to this

subchapter, any reference therein to the Commissioner of Social Security or the Social Security

Administration shall be considered a reference to the Secretary or the Department of Health and

Human Services, respectively."  42 U.S.C. § 1395ii.  "Although § 1395ii does not specifically

enumerate § 405(g) as one of the incorporated Title II provisions," Supreme Court and D.C.

Circuit "decisions treat it as such, presumably on the theory that expressly incorporating the

judicial-review bar in § 405(h) also effectively incorporates the exception 'herein provided' in

§ 405(g)." *Am. Hosp. Ass'n*, 895 F.3d at 825.  Accordingly, unless the *Council for Urological Interests* exception applies, 668 F.3d at 705, a party must satisfy the procedures specified in the Medicare statute before invoking the jurisdiction of a federal district court.

The Medicare statute, in turn, sets forth "detailed instructions on the means for seeking review of payment determinations." *Monmouth Med. Ctr.*, 257 F.3d at 809.  Under § 1395oo(a), a provider that has filed a timely cost report "may obtain a hearing with respect to such cost report by" the PRRB *and*, subject to an exception not applicable here, "any hospital which receives payments in amounts computed under subsection (b) or (d) of section 1395ww of this title and which has submitted such reports within such time as the Secretary may require . . . may obtain a hearing with respect to such payment by the" PRRB under defined circumstances.  42 U.S.C. § 1395oo(a).  Two such circumstances are relevant here.  First, review is available if the provider "is dissatisfied with a final determination of the organization serving as its fiscal intermediary . . . as to the amount of total program reimbursement due the provider for the items and services furnished to individuals for which payment may be made under this subchapter for" the relevant period.  *Id.* § 1395oo(a)(1)(A)(i).  Second, the provider may obtain review if it "is dissatisfied with a final determination of the Secretary as to the amount of the payment under subsection (b) or (d) of section 1395ww of this title."  *Id.* § 1395oo(a)(1)(A)(ii).  In addition to these requirements, the amount in controversy must be at least $10,000, *id.* § 1395oo(a)(2), and the provider must file a hearing request "within 180 days after notice of the intermediary's final determination" or within "180 days after notice of the Secretary's final determination," *id.* § 1395oo(a)(3).  If providers clear these hurdles and gain access to PRRB review, they then "have the right to obtain judicial review of any final decision of the [PRRB], or of any reversal, affirmance, or modification [of that decision] by the Secretary," but must bring suit "within 60

24

days of the date on which notice of any final decision by the [PRRB] or of any reversal, affirmance, or modification by the Secretary is received." *Id*. § 1395oo(f).  Finally, a provider may also obtain judicial review when the PRRB determines "that it is without authority to decide" an appeal that "involves a question of law or regulation." *Id.*

The Hooper and Akin Plaintiffs maintain that they were unable to seek PRRB review of the denial of their right to interest under § 1395g(d) and thus cannot seek review under the Medicare statute, thereby opening the *Council for Urological Interests* exception.  The Court is unpersuaded that this is one of those rare cases in which strict application of § 1395ii would preclude judicial review altogether.  Rather, as the Secretary observes, Plaintiffs had multiple avenues for raising their § 1395g(d) argument before the Court.

First, they "could have appealed to the [PRRB] from the payment determination for any of their cost reports for fiscal years corresponding in whole or in part to Federal Fiscal Year 2017 on the grounds that the [2017 Final Rule] entitled them to interest under § 1395g(d), basing [PRRB] jurisdiction on [§] 1395oo(a)(1)(A)(i)."  Dkt. 157 at 4.  Even if Plaintiffs were confused about whether the 2017 Final Rule authorized the award of interest under § 1395g(d)—and, as discussed below, that proposition is difficult to reconcile with the language of the final rule— they certainly knew about the exclusion of interest once 30 days had passed after the 2017 Final Rule issued and they received a payment "determination" for a corresponding FY 2017 IPPS cost report that did not include interest.  At that time, the "provider" would have "filed a required cost report" and would have been "dissatisfied with a final determination of the organization serving as its fiscal intermediary . . . as to the amount of total program reimbursement due the provider for the items and services furnished . . . for which payment may be made under [the Medicare statute] for the period covered by such report."  42 U.S.C. § 1395oo(a)(1)(A)(i).

Alternatively, Plaintiffs could have directly challenged the 2017 Final Rule, following a path similar to the path they followed in challenging the 2014, 2015, and 2016 Final Rules and that other providers have followed in challenging the 2017 Final Rule.  Under that approach, Plaintiffs could have sought PRRB review on the ground that they were "dissatisfied with a final determination of the Secretary as to the amount of the payment under [42 U.S.C. § 1395ww(b) or (d)]."  *Id.* § 1395oo(a)(1)(A)(ii).  According to Plaintiffs, this avenue of review was unavailable to them because, at the time the 2017 Final Rule issued in August 2016, they were not "dissatisfied with a final determination of the Secretary."  *Id.*; Dkt. 152 at 10.  Rather, in their view, the Secretary had issued just the decision they wanted; she agreed to discontinue the 0.2 percent rate adjustment and to compensate providers for FYs 2014, 2015, and 2016 with a one-time 0.6 percent rate adjustment for FY 2017.  But that ignores the fact that commenters sought payment for the time value of money (albeit not under § 1395g(d)); that the Secretary agreed to the payment of interest under § 1395oo(f)(2) to "hospitals that [were] party to . . . *Shands Jacksonville Medical Center, Inc. v. Burwell*, No. 14-263 (D.D.C.)" and to the related cases that were pending on the date the final rule issued; and that the Secretary otherwise declined to "pay all hospitals interest or for the time value of money."  2017 Final Rule, 81 Fed. Reg. at 57,060.  Because the Hooper and Akin Plaintiffs had not brought a judicial challenge to the Secretary's application of the 0.2 percent adjustment to their FY 2016 IPPS rates by the time the 2017 Final Rule issued, they were "dissatisfied" with at least that aspect of the Secretary's "determination."  And, even if they were uncertain about the Secretary's decision not to otherwise make payments for "the time value of money," nothing kept them from seeking clarification and, as appropriate, filing a PRRB appeal.

In Plaintiffs' view, review is unavailable under either prong of § 1395oo(a)(1)(ii) because a PRRB rule—Rule 4.6.1—limits providers to a single appeal from a final determination, and the Hooper and Akin Plaintiffs had filed an appeal of the 2016 Final Rule before the interest issue arose.  Rule 4.6.1 provides that "[a]ppeals of the same issue from distinct determinations must be pursued in a single appeal," and adds:  "For example, a provider may not appeal an issue from a Medicare contractor's failure to issue a timely Notice of Program Reimbursement ('NPR') and then appeal the same issue from the NPR in separate appeals."  CMS, *Provider Reimbursement Review Board Rules* 8 (2018), *available at* https://www.cms. gov/ Regulations-and-Guidance/Review-Boards/PRRBReview/Downloads/PRRB-Rules-August-29-2018.pdf.  But that contention, once again, ignores other avenues of relief that were available to Plaintiffs.  They could have sought PRRB review of their post-August 2016 NPRs, could have sought review of the 2017 Final Rule, and could have sought reconsideration of that rule and then sought review of the Secretary's decision, if any, on reconsideration.

Plaintiffs also maintain that review was unavailable under § 1395oo(a)(1) because they were not "dissatisfied" with the 2016 Final Rule or the payments that they received pursuant to that rule, Dkt. 152 at 10; rather, they are "dissatisfied" with the Secretary's decision in this proceeding to oppose the award of interest under § 1395oo(f)(2) to those providers who had not brought suit by August 2016, *id.* at 11–12.  The Court need not linger long over this argument because it previously addressed and rejected the argument in *Shands III*.  2019 WL 1228061, at *16.  For present purposes, suffice it to say—as the Court said in *Shands III*—"§ 1395g(d) is not available as a judicial remedy for the Secretary's refusal to pay interest under § 1395oo(f)(2)," and, even if it were, the 2017 Final Rule put Plaintiffs on clear notice of the Secretary's decision.

*Id.* As explained above, nothing prevented Plaintiffs from challenging the 2017 Final Rule, including the Secretary's determination regarding the payment of interest.

Next, Plaintiffs argue that review was unavailable under § 1395oo(a)(1)(A)(ii) because that provision applies only if the provider is dissatisfied with a final determination of the Secretary "'as to the amount of the payment under subsection (b) or (d) of section 1395ww of this title.'"  Dkt. 160 at 3–5 (quoting 42 U.S.C. § 1395oo(a)(1)(ii)).  In their view, this language excludes appeals of denials of the payment of interest pursuant to § 1395g(d), because that provision does not appear in "subsection (b) of (d) of section 1395ww."  In support of this contention, Plaintiffs invoke the PRRB's decision in *Pittsburgh Medical Center*, PRRB Dec. 2014-D26; Dkt. 155-2.  In that decision, the PRRB concluded that it lacked jurisdiction to consider a challenge to the Medicare contractor's failure to pay interest to the provider pursuant to § 1395g(d).  As the PRRB explained, § 1395oo(a)(1)(A)(i) permits providers to obtain PRRB review "'with respect to [a] cost report'" and authorizes the PRRB to "'affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report and to make any other revisions on matters covered by such cost report.'"  Dkt. 155-2 at 9 (quoting 42 U.S.C. § 1395oo(a) and (d)) (emphasis removed).  A majority of the PRRB then concluded that the "payment of interest pursuant to 42 U.S.C. § 1395g(d) does not impact the 'amount paid' for hospital services because the assessment of interest . . . is not part of the Medicare cost report which determines the 'amount paid' for hospital services."  *Id.* at 10.  For this reason, the PRRB held that it lacked "jurisdiction over the assessment of interest whether for an overpayment or an underpayment."  *Id.*  Thus far, Plaintiffs' argument is on firm ground.

That ground starts to weaken, however, when one considers the competing argument set forth in the dissenting PRRB opinion.  *Id.* at 16–19 (Anderson, dissenting).  According to the

dissent, the majority's jurisdictional analysis was overly "narrow and cramped" and, most importantly, failed to account for "the strong presumption that Congress intends for judicial review of administrative action." *Id.* at 16.  Because the provider's claim to interest was "'integrally related' to the amount . . . reported on the cost report," and because any interest due would become "part of the '*total* program reimbursement due the provider for the items and services furnished to individuals for which payment may be made under this subchapter,'" the dissent reasoned that denial of § 1395g(d) interest was subject to PRRB review.  *Id.* (citations omitted).  As the dissent put it: "if the prerequisites of § 1395g(d) are met," interest, "[i]n effect, . . . becomes indistinguishable from the reporting of [applicable costs] on the cost report." *Id.*

The ground supporting Plaintiffs' argument gives way when one turns to the decision of the CMS Administrator on appeal from the PRRB.  *See generally* Dkt. 155-3.  After setting forth the jurisdictional argument adopted by the PRRB majority, noting that the dissenting member would have found jurisdiction, and setting forth the provider's jurisdictional contentions, *id.* at 4–5 & n.8, the Administrator concluded that the provider "properly" invoked the PRRB's jurisdiction and thus "reversed" the PRRB's "jurisdictional decision," *id* at 11.  In short, the decision Plaintiffs trumpeted was reversed on appeal.

Having once relied on *Pittsburgh Medical* to support its position, Plaintiffs now argue that the decision is unenlightening for two reasons.  First, they argue that the Administrator's decision should be given little or no weight because it is conclusory; the Administrator, in Plaintiffs' view, simply announced her conclusion that the PRRB had jurisdiction over the provider's claim to interest under § 1395g(d).  Dkt. 160 at 5–6.  But that contention ignores the Administrator's summary of the respective arguments and ignores the dissenting member's analysis, which was as detailed, if not more detailed, than the brief analysis contained in the

majority PRRB opinion.  It is safe to infer that the Administrator relied on the rationale set forth

by the provider and the dissenting member.  But, even more to the point, this is not an APA

challenge to the Administrator's decision, where a plaintiff might seek to set the decision aside

as arbitrary and capricious.  To the contrary, the decision was rendered in 2014, well before the

Hooper and Akin Plaintiffs had any reason to seek PRRB review of the Secretary's failure to pay

them interest under § 1395g(d), and the decision opened the door for the review that one would

have thought that they would have hoped to pursue.

Finally, although the Court recognizes that the interpretative issue is a close one, the

dissenting member's reading of the statute is persuasive, in light of the "strong presumption that

Congress intends judicial review of administrative action." *Council for Urological Interests*, 668

F.3d at 707.  If the Court must presume that Congress intended to preserve judicial review in one

form or another, either through administrative review or direct access to the courts, the approach

advocated by the dissenting member and adopted by the CMS Administrator has much to

commend it.  Among other things, it is—if anything—far easier to construe § 1395oo(a)(1) to

include the nonpayment of interest as intertwined with the "amount of the payment under

subsection (b) or (d) of section 1395ww," 42 U.S.C. § 1395oo(a)(1)(A)(ii), than it is to read

§ 405(h) and § 1395ii to do anything short of  precluding any "action against the [Secretary]

brought under section 1331 . . . of title 28 to recover on any claim arising under" the Medicare

statute, 42 U.S.C. § 405(h); *id.* § 1395ii.  That reading of the statute is also far more sensible and

consistent with the congressional policy favoring exhaustion of administrative remedies.  *See*,

*e.g.*, *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 19–20 (2000) ("Congress may

well have concluded that a universal obligation to present a legal claim first to [Health and

Human Services], though postponing review in some cases, would produce speedier, as well as better, review overall.").

Alternatively, Plaintiffs argue that *Pittsburgh Medical* is distinguishable because that case involved a determination by the provider's Medicare contractor, while this case involves a determination by the Secretary. As explained above, the premise of that argument is disputed, and Plaintiffs offer only the ipse dixit response that § 1395(a)(1)(A)(i)—the subparagraph dealing with appeals from Medicare contractors—does not apply "because the Hospitals' § 1395g(d) interest claim does not stem from dissatisfaction with a final payment determination by a Medicare contractor in a Medicare cost report." Dkt. 160 at 4. The Administrator's decision in *Pittsburgh Medical* deals with the "cost report" aspect of this assertion, and it is, at best, unclear why Plaintiffs' claims do not stem from dissatisfaction about a determination made by their Medicare contractors.

Putting that difficulty with Plaintiffs' argument aside, they are correct that the provision authorizing appeals from determinations made by Medicare contractors, § 1395oo(a)(1)(A)(i), differs slightly from the provision authorizing appeals from determinations made by the Secretary, § 1395oo(a)(1)(A)(ii): §1395oo(a)(1)(A)(i) addresses dissatisfaction with a determination relating to "total program reimbursement due the provider for the items and services furnished" under Medicare, while § 1395oo(a)(1)(A)(ii) addresses dissatisfaction with a determination relating to "the amount of payment under" 42 U.S.C. § 1935ww(b) or (d)—the provisions that set forth the IPPS payment scheme. Under either provision, however, essentially the same matter considered in *Pittsburgh Medical* arises. If narrowly construed, the statutory text applies either to a determination made "with respect to a cost report," 42 U.S.C. §§ 1395oo(a)(1)(A)(i), 1395oo(d), or to a payment made under the IPPS, *id.*

§ 1395oo(a)(1)(A)(ii), and neither provision incorporates a determination made under § 1395g(d).  The CMS Administrator's decision in *Pittsburgh Medical* already rejected the narrow reading of § 1395oo(a)(1)(A)(i), and Plaintiffs offer no reason why the Administrator's broader reading should not reach § 1395oo(a)(1)(A)(ii) as well.  But, even if Plaintiffs were right, and even if a Medicare contractor's failure to authorize the payment of § 1395g(d) interest were subject to appeal, while the Secretary's failure to authorize the payment of § 1395g(d) interest were not, that would simply mean that Plaintiffs' path to judicial review was through § 1395oo(a)(1)(A)(i) and not § 1395oo(a)(1)(A)(ii).  Either way, however, they would have a path to judicial review under the Medicare statute, and they would therefore be unable to take advantage of the narrow exception to the channeling rule recognized in *Council for Urological Interests*, 668 F.3d at 707–08.

The Court, accordingly, reaffirms its prior conclusion that it lacks general federal question jurisdiction to consider Plaintiffs' claim to interest under § 1395g(d).

## C.      Propriety of Remand to the PRRB

Plaintiffs argue that, "[i]f the Court ultimately believes or is concerned that the [PRRB] would have had jurisdiction or could have jurisdiction," it should "remand to let the PRRB make that determination."  Dkt. 152 at 25.  The Secretary responds that, "[w]ithout jurisdiction over these claims, this Court has no power to remand them to the Board."  Dkt. 157 at 15.  And, alternatively, the Secretary argues that "any claim that the . . . Plaintiffs might have had for interest under section 1395g(d) should have been presented to the PRRB when Plaintiffs' claims were before the [PRRB]; Plaintiffs' failure to timely assert such claims constitutes waiver."  Dkt. 135 at 3; Dkt. 157 at 2; Dkt. 152 at 63 (arguing that Plaintiffs "failed to timely present the issue to the [PRRB] in the first instance" and, accordingly, have "waived their right to do so now").  In

response, Plaintiffs fall back to their argument that "the PRRB does not have the statutory power to consider the Hospitals' 1395g(d) interest claim," and they argue that they cannot have waived a claim by failing to bring it to a body that had no authority to consider it.  Dkt. 155 at 7.  The Secretary's first argument is both convincing and dispositive.

In asking that the Court remand the matter, Plaintiffs are seeking a form of affirmative relief; in essence, they want the Court's assistance in reopening administrative proceedings that they failed to pursue prior to bringing suit.  To the extent the Secretary is open to considering Plaintiffs' claims at this late date, they are, of course, free to ask.  But they do not need the Court's assistance to do so.  In contrast, to the extent they seek any form of relief from the Court, the Court can act only with jurisdiction, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998); *Forras v. Rauf*, 812 F.3d 1102, 1105 (D.C. Cir. 2016), and for the reasons explained above, the Court lacks jurisdiction.  "Because the Court lacks subject matter jurisdiction over" the Hooper and Akin Plaintiffs' § 1395g(d) claims, "it has no power to remand this case to" the PRRB.  *Avery v. FDIC*, 113 F. Supp. 3d 116, 120 (D.D.C. 2015).  Finally, even if the Court had discretion to remand the matter, Plaintiffs offer no reason why they could not have invoked § 1395g(d) while administrative proceedings were still pending or why the Court should exercise that discretion at this late date.

The Court will, accordingly, deny Plaintiffs' request that the Court issue an order remanding the matter to the PRRB for further proceedings.

**CONCLUSION**

For the reasons set forth, Plaintiffs' motion for reconsideration and motion for remand to the PRRB are hereby **DENIED**.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: February 8, 2021

34